UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| ACS INDUSTRIES INC., | : | |
| Plaintiff | : | |
| | : | |
| v. | : | C.A. No. 22-_____ |
| | : | |
| GREAT NORTHERN INSURANCE COMPANY, | : | |
| Defendant | : | |

## COMPLAINT

Plaintiff ACS Industries Inc. ("ACS" or "Plaintiff") files this Complaint against Great Northern Insurance Company ("Great Northern" or "Defendant" or "Insurer"), seeking declaratory judgment that Great Northern is obligated to provide coverage to ACS for losses due to Coronavirus and COVID-19 and damages for Great Northern's breach of its insurance policy contract with ACS by failing to do so, and in support alleges as follows:

### I.       INTRODUCTION

1.       ACS is a Rhode Island corporation with international operations and a world leader in manufacturing engineered knitted wire mesh solutions.  Great Northern is a member of the Chubb group of insurance companies – one of the largest and most powerful insurers in the world. This Complaint stems from Great Northern's denial of coverage for ACS's losses at three of its manufacturing plants located in Mexico arising from the SARS-CoV-2 virus ("Coronavirus") and the disease it causes, Coronavirus Disease 2019 ("COVID-19"), and the direct physical loss or damage to property and business interruption they caused under the all-risk insurance commercial property policy Great Northern sold to ACS (the "Policy").  The Policy insures ACS's foreign operations, including those in Mexico.

2.     On February 28, 2020, the first case of COVID-19 was identified in Mexico.  By the end of March 2020, non-essential businesses, schools, and places of worship in the United States closed their doors in an effort to stop the proliferation of the deadly virus, which spreads through aerosols or droplets from infected persons, remaining in the air and on surfaces for hours to days, and consistently reintroduced by infected persons.  By early April 2020, government shutdown and restriction orders resulting from Coronavirus and COVID-19 spread to Mexico.

3.     Coronavirus invaded, transformed, and damaged the air and surfaces of indoor spaces of ACS's Mexico plants and other properties, rendering them uninhabitable and unfit for their intended purposes.  The presence of the virus on ACS's premises, including the Mexico Plants, accompanied by the Mexican and other government orders shuttering businesses in response to the deadly virus, caused physical loss or damage to ACS's properties, triggering property and business interruption coverage under the Policy.

4.     The Policy sold by Great Northern is a high-end, "all-risk" commercial property insurance policy, with exorbitant premiums, covering ACS's foreign properties, including its Mexico Plants, and the income stream from ACS's activities on the insured properties.  The Policy operates as a foreign master policy for ACS's foreign properties and provides coverage for its foreign property and business interruption losses when its foreign local policies do not.  The Policy covers business interruption losses from the impairment of ACS's business activities, whether partial or total, caused by physical loss or damage to ACS's properties as wrought by Coronavirus and COVID-19.

5.     Due to the physical loss or damage to ACS's properties caused by the presence of the virus in within one mile of those properties in Mexico and civil authority/government orders resulting therefrom, two of Mexico Plants were completely closed from April 6, 2020 to May 18, 2020 and a third plant, from April 6, 2020 was restricted by Mexican government orders to solely manufacturing certain of its cleaning products.  Moreover, all of the Mexico Plants, when open,

2

operated at reduced capacity with strict limitations on use and suffered interruption of their business operations from the physical presence of Coronavirus and COVID-19 on premises.  As a result, ACS suffered massive losses.

6.     When ACS turned to Great Northern for coverage after its foreign local insurer denied coverage, ACS reasonably expected its high-end insurance policy to compensate ACS for its losses from Coronavirus and COVID-19.  Great Northern, however, turned its back on ACS and denied its claims.

7.     At the same time it was denying claims, Great Northern, upon information and belief, was raising premiums following the emergence of Coronavirus and COVID-19.  The result of the Insurer's behavior (i.e., denying claims and raising premiums) is a profit bonanza of historic proportions, that belies the insurance industry's repeated and false warnings to courts and the media that paying Coronavirus and COVID-19-related claims would bankrupt them and shatter the insurance market.  In reality, Great Northern and other insurers have been recording record profits

8.     By way of example only, Chubb Limited (the parent company of Great Northern) reported net income of $1.19 billion in Q3 2020 – up 9.4%, or $100 million, from the year before.[1]

9.     Given Great Northern's breach of its contractual promises of coverage while reaping a windfall from Coronavirus and COVID-19, ACS now turns to this Court for relief, seeking a declaratory judgment as to the scope and breadth of its rights under its high-end policy and damages for breach of contract.  In the wake of the devastation to their insured premises caused by Coronavirus and COVID-19, ACS should be allowed to rely on its insurance policy, and Great Northern should be made to account**.**

---

[1] Claire Wilkinson, *Chubb reports gains in Q3 profit, net premium written*, BUS. INS. (Oct. 8, 2020), https://www.businessinsurance.com/article/20201028/NEWS06/912337411?template=printart (last visited Mar. 3, 2022).

## II.    PARTIES

10.    ACS is incorporated in the State of Rhode Island with its principal place of business at One New England Way, Lincoln, RI 02865.  ACS is a citizen of Rhode Island.

11.    ACS is informed and believes, and based thereon alleges, that Defendant Great Northern is an Indiana corporation with its principal place of business in the State of New Jersey.

## III.    JURISDICTION AND VENUE

12.    This Court has subject matter over this dispute under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

13.    This Court has general personal jurisdiction over Great Northern pursuant to Fed. R. Civ. P. § 4(k)(1)(A) and R.I. Gen. Laws § 9-5-33 because Great Northern carries on a continuous and systematic part of its general business within the State of Rhode Island, including but not limited to marketing, selling, and issuing insurance policies to Rhode Island businesses and insuring property in Rhode Island.

14.    This Court also has specific personal jurisdiction over Great Northern pursuant to Fed. R. Civ. P. §4(k)(A) and R.I. Gen. Laws § 9-5-33 because Great Northern contracted to insure property and/or risk located within the State of Rhode Island at the time of contracting, and out of which this action arose.

15.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Great Northern conducts business in Rhode Island and ACS resides in Rhode Island.

## IV.    FACTUAL BACKGROUND

### A.    ACS and the Production Plants

16.    ACS, the world leader in engineered knitted wire mesh solutions, manufactures critical components used in systems assemblies, commercial cleaning products, insulation products, among others.  ACS's products range from the filter inside of an airbag whose porosity and flow patterns dictate airbag inflation rates, to a high-temperature cushion used to insulate heat shields from noise vibration harshness ("NVH").

17.    ACS was founded as American Copper Sponge in Rhode Island in 1939, where it

manufactured knitted copper sponges. Today, ACS's operations extend internationally throughout the United States, China, India, Romania, and Mexico. As of January 1, 2020, ACS employed approximately 3,175 individuals, including 2,475 individuals at the Mexico Plants and 75 individuals in the United States, primarily Rhode Island.

18.     As the world's largest vertically integrated Knitted Wire Mesh manufacturer, ACS designs, builds and maintains the majority of its manufacturing equipment in-house. ACS's production capacity has allowed it to provide its products to automotive, aerospace, commercial, industrial, and marine industries. ACS is a key global supplier of pyrotechnic airbag inflator components and exhaust components sold to both Original Equipment Manufacturers ("OEMs") and Tier 1 suppliers. ACS is also a supplier to both the foodservice and janitorial industries in the USA and elsewhere.

19.     ACS's main three manufacturing plants are located in Nuevo Leon, a state in the Northeast region of Mexico (collectively, the "Mexico Plants"):

> a.     Premises # 1, a manufacturing plant located in Monterrey, Nuevo Leon (the "Monterrey Plant"), is a steel wire mill responsible for steel wire drawing, taking 5.5mm wire "rod" and drawing it down into thinner diameters for use in the production of knitted or woven wire mesh which is then used in other finished goods production or sold as-is. The Monterrey Plant is within one mile of many businesses, including but not limited to Clinica 17 IMSS Mitras (a general hospital), Universidad Pedagogica Nacional (a university), Car One Chevrolet Ruíz Cortines (One American Chevrolet car), Platinum Viajes Suc. Monterrey (Apolo Platinum Terminal Monterrey), Tacos A Vapor El Borrado (a taco restaurant), Soportes Marro (an auto parts store), Vikingos Club de Futbol (a rugby club), and many restaurants, bars, and other businesses.

> b.     Premises # 2, a manufacturing plant located in Guadalupe, Nuevo Leon (the "Guadalupe Plant"), is responsible for the production of metal filters for use in automotive airbag inflator systems, as well as metal seals, filters, and gaskets used

5

in vehicle exhaust and vibration dampening/NVH applications. The Guadalupe Plant is within one mile of many businesses, including but not limited to Doctors Hospital East, Merco Linda Vista (a supermarket), Instituto San Diego (a preschool), Moreno Diésel Sa De CV (an auto parts store), Sky Blue Boutiques (a clothing store), and many restaurants, bars, and other businesses.

c.      Premises # 3, a manufacturing plant located in Apodaca, Nuevo Leon (the "Apodaca Plant"), is responsible for production and distribution of cleaning products for the Foodservice and Janitorial-Sanitarian industries, including but not limited to: polyester hand scouring pads; polyester floor cleaning pads; metal scouring sponges; mops, brooms and brushes; grill bricks, etc. The Apodaca Plant is within one mile of many businesses, including but not limited to Centro Deportivo Nuevo Mezquital (a sports complex), Acuity Brands Lighting Planta Mezquital (a manufacturer), General De Baleros, S.A. De C.V. (a truck accessories store), and many restaurants, bars, and other businesses.

20.     As the world leader in engineered knitted wire mesh solutions, ACS's business at the Mexico Plants – including the manufacture and sale of the products and materials listed above - depends on the ongoing operations of hundreds of businesses both internationally and throughout the United States. These "**dependent business premises**"[2] include businesses in the automotive "safety" business manufacturing airbag inflator modules, seat belt assemblies and other safety-related products, major automotive manufactures, original equipment manufacturers ("OEMs") worldwide, foodservice distributors, and foodservice businesses, among others. Specifically, ACS's **dependent business premises** include four of ACS's top five customers all in the automotive safety business, manufacturers of airbag inflator modules, seatbelt assemblies and other safety-related products and are global "Tier 1" suppliers to automotive manufacturers with

---

[2] Defined in the Policy as those business that (i) deliver materials or services to ACS or to others for ACS's account ("contributing premises"); (ii) accept ACS's products or services ("recipient premises"); (iii) manufacture products for delivery to ACS's customers under contract of sale ("manufacturing premises"); and (iv) attract customers to ACS's business ("leader premises").

operations internationally and throughout North America.  These **dependent business premises** are Autoliv (Utah and Mexico); ZF Friedrichshafen AG ("ZF") (U.S. operations in Arizona as well as operations for ZF Reynosa in Mexico); Joyson Safety Systems ("Joyson") (U.S. operations in Florida and Monclova, Mexico); and DAICEL Corporation ("Daicel") (U.S. operations in Arizona).

21.     ACS's **dependent business premises** also includes other production and manufacturing companies both internationally and throughout the U.S., including but not limited to: Tenneco (operations in Indiana), Benteler (operations throughout Europe), Mercedes Benz AG (operations in Germany and South Carolina), Mercedes-Benz U.S. International, Inc. Global Service and Parts (operations in Alabama), Daimler Compra y Manufactura México S. de C.V. (operations in Mexico), Ebersächer Exhaust Technology Sweden AB (operations in Sweden), Magna Steyr Fahzeugtechnik AG & CO KG (operations in Austria), North American Stamping Group ("NASG") (operations in Tennessee, Indiana, Ohio, Canada, and Mexico), P&C automotive (operations internationally including Italy), Faurecia (operations in South Africa), Subaru of Indiana Automotive, Inc. ("SIA") (operations in Indiana), and Daimler Truck AG (operations in Germany).

22.     As a part of its prudent business practices and in recognition of its responsibilities to its employees, customers and its communities, ACS maintains insurance coverage.

23.     ACS specifically maintains all-risk commercial property coverage, covering not only more commonly occurring risks like fire, but also entirely unanticipated and novel risks that may arise.  The pertinent Great Northern policy was effective from May 18, 2019 to May 18, 2020 (the "Policy", Ex. 1).

24.     As described below, the Policy provides coverage for all "*loss* or damage to" ACS's property unless specifically excluded (emphasis added).

**B.     Coronavirus and COVID-19**

25.     COVID-19 is a severe infectious disease caused by Coronavirus.  Coronavirus

causes serious systemic illness and death.[3]   Coronavirus is primarily spread through airborne transmission, and cannot be effectively removed from the air or even entirely from many surfaces by means of routine surface cleaning.

26.     The existence and presence of Coronavirus and COVID-19 are not completely reflected in reported cases or individuals' positive test results, as only a portion of the population has been tested.   For example, in June 2020, the Centers for Disease Control and Prevention ("CDC") estimated that the number of people in the U.S. who had been infected with COVID-19 was ten times higher than the number of reported cases.[4]   Additionally, at least 40% of people infected with COVID-19 are asymptomatic.[5]   COVID-19 also includes a pre-symptomatic incubation period of up to 14 days, during which time infected people can transmit COVID-19 to other people, given that they release infectious droplets and aerosols into the air and onto surfaces without having experienced symptoms and without realizing that they are contagious or infected.[6]

27.     Studies have demonstrated that pre-symptomatic individuals have an even greater ability to transmit COVID-19 than other infected people because they carry high levels of "viral load" during a period when they have no symptoms and therefore are unaware that they are

---

[3] Tianna Hicklin, *Immune cells for common cold may recognize SARS-COV-2*, NAT'L INST. HEALTH (Aug. 18, 2020), https://www.nih.gov/news-events/nih-research-matters/immune-cells-common-cold-may-recognize-sars-cov-2 (last visited Mar. 3, 2022), Ex. 2; Nathan Jaffay, *COVID proteins that trigger strokes and heart attacks identified by Israeli team*, TIMES ISR. (Nov. 3, 2021), https://www.timesofisrael.com/covid-pieces-that-trigger-strokes-and-heart-attacks-identified-by-israeli-team/?utm_source=dlvr.it&utm_medium=twitter (last visited Mar. 3, 2022), Ex. 3.

[4] Lena H. Sun & Joel Achenbach, *CDC chief says coronavirus cases may be 10 times higher than reported,* WASH. POST (June 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/ (last visited Mar. 3, 2022), Ex. 4.

[5] Ellen Cranley, *40% of people infected with Covid-19 are asymptomatic, a new CDC estimate says,* BUS. INSIDER (July 12, 2020), https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7 (last visited Mar. 3, 2022), Ex. 5.

[6] *See Coronavirus disease 2019 (COVID-19) Situation Report – 73*, WHO (Apr. 2, 2020), https://apps.who.int/iris/bitstream/handle/10665/331686/nCoVsitrep02Apr2020-eng.pdf?sequence=1&isAllowed=y (last visited Mar. 3, 2022), Ex. 6; Minghui Yang et al., *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, 203 AM. J. RESPIRATORY & CRITICAL CARE MED. 3 (Feb. 1, 2021), https://www.atsjournals.org/doi/10.1164/rccm.202006-2136LE (last visited Mar. 3, 2022), Ex. 7.

infectious.[7]  The National Academy of Sciences has concluded that "the majority of transmission is attributable to people who are not exhibiting symptoms, either because they are still in the pre-symptomatic stage or the infection is asymptomatic."[8]

28.     As early as February 26, 2020, the CDC advised that COVID-19 was spreading freely without the ability to trace the source of new infections, also known as community transmission or community spread.

29.     COVID-19 is highly contagious, uniquely resilient, and potentially deadly.  The degree to which an infectious disease is contagious is measured by $R_0$, a term that defines the average number of other people who are likely to become infected by one person with that disease. The $R_0$ is a measure of the transmissibility of a pathogen and is determined by estimating the susceptibility of individuals in the population to disease, the transmissibility of the pathogen and importantly, the likelihood and duration of contact between individuals in a population, a parameter that is directly determined by the physical properties of the environment in which contact occurs.[9]  Studies have concluded that one person with COVID-19 could infect as many as 5.7 others ($R_0 \approx 5.7$), which is much higher than seasonal influenza for example, where on average, one person will infect only 1.3 others ($R_0 \approx 1.3$).[10]

30.     Coronavirus can remain infectious for "much longer time periods than generally

[7] *See, e.g.*, Xi He et al., *Temporal dynamics in viral shedding and transmissibility of COVID-19*, 26 NATURE MED. 672-75, 674 (Apr. 15, 2020), https://www.nature.com/articles/s41591-020-0869-5 (last visited Mar. 3, 2022), Ex. 8; Lirong Zou et al., *SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients,* NEW ENG. J. MED. 382, 1177-79 (Mar. 19, 2020), https://www.nejm.org/doi/full/10.1056/NEJMc2001737 (last visited Mar. 3, 2022), Ex. 9.

[8] Seyed M. Moghadas et al., *The implications of silent transmission for the control of COVID-19 outbreaks*, 117 PNAS 30, 17513-15 (July 28, 2020), https://www.pnas.org/content/117/30/17513 (last visited Mar. 3, 2022), Ex. 10.

[9] Anthony R. Ives & Claudio Bozzuto, *Estimating and explaining the spread of COVID-19 at the county level in the USA*, 4 COMMC'NS BIOLOGY 60 (Jan. 5, 2021), https://www.nature.com/articles/s42003-020-01609-6 (last visited Mar. 3, 2022), Ex. 11.

[10] M. Cevik et al., *COVID-19 pandemic-a focused review for clinicians*, 26 CLINICAL MICROBIOLOGY & INFECTION 7, 842-47 (July 1, 2020), https://www.clinicalmicrobiologyandinfection.com/article/S1198-743X(20)30231-7/fulltext (last visited Mar. 3, 2022), Ex. 12.

considered possible."[11]

31.     The World Health Organization ("WHO") stated that "[t]he disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks…People can catch COVID-19 if they breathe in these droplets from a person infected with the virus…These droplets can land on objects and surfaces around the person such as tables, doorknobs and handrails.  People can become infected by touching these objects or surfaces, then touching their eyes, nose or mouth."[12]

32.     People infected with Coronavirus spread the virus not only from small droplets but also from aerosols expelled from their nose and mouth when they cough, sneeze, or speak.  People become infected with Coronavirus and resultant COVID-19 disease if they breathe in these droplets or aerosols expelled by an infected person.  Droplets and aerosols can be expelled in close proximity (one-to-two meters) or can be carried on air currents tens of meters.[13]

**C.     Coronavirus and COVID-19 Cause Physical Loss or Damage to Property**

33.     The omnipresence of Coronavirus and COVID-19 is enabled by multiple modes of viral transmission, including respiratory droplet, airborne/aerosolized, and fomite transmission (i.e., transmission from surfaces and objects).[14]  These transmission methods demonstrate that Coronavirus and COVID-19 cause physical loss or damage to property.

**1.     <u>Respiratory Droplet/Airborne Transmission</u>**

34.     The presence of Coronavirus in the air physically alters and transforms the content of the room air as shown in the following illustrations which depict normal room air at the

---

[11] Shane Riddell et al., *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 Virology J. 145 (Oct. 7, 2020), https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7 (last visited Mar. 3, 2022), Ex. 13.

[12] *Q&A on coronaviruses (COVID-19)*, WHO (updated Apr. 17, 2020), https://web.archive.org/web/20200506094904/https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited Mar. 3, 2022), Ex. 14.

[13] Lidia Morawska & Donald K. Milton, *It Is Time to Address Airborne Transmission of Coronavirus Disease 2019 (COVID-19)*, 71 Clinical Infectious Diseases 9, 2311-13 (Dec. 3, 2020), https://pubmed.ncbi.nlm.nih.gov/32628269/ (last visited Mar. 3, 2022), Ex. 15.

[14] *See, e.g.*, *Scientific Brief: Transmission of SARS-CoV-2: implications for infection prevention precautions*, WHO (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Mar. 3, 2022), Ex. 16.

molecular level in comparison to room air infested with aerosolized Coronavirus at increasing concentration.  Normal room air and room air infested with aerosolized Coronavirus is also compared to room air containing ammonia to depict the similarities in the physical alteration caused by aerosolized Coronavirus and ammonia, and ammonia is a substance that courts have held causes physical loss or damage to property by impairing the functional use of the property. As depicted, aerosolized Coronavirus causes the same physical loss or damage to property caused by ammonia, smoke, soot, radon gas, asbestos, and other hazardous substances.

**Composition of Room Air – Normal vs. Ammonia vs. SARS-CoV-2 Over Time**









35.     Respiratory transmission of COVID-19 occurs through exposure to an infected person's respiratory particles, such as from saliva or mucus.[15]  Respiratory transmission of Coronavirus is commonly divided into droplet (larger particles that have a transmission range of about six feet) and airborne (smaller particles that can remain suspended in the air for prolonged periods of time) modes of transmission.   Though convenient, this binary division is an oversimplification that underscores transmission risk.[16]  Humans produce a wide range of particle sizes when coughing, sneezing, talking, singing, or otherwise dispersing droplets, with virions predominating in the smallest particles.[17]  Respiratory particles produced by the average person can travel almost 20 feet by sneezing.[18]  An M.I.T. researcher has found that virus-laden "clouds"

---

[15] *Id.*

[16] Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED.  9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited Mar. 3, 2022), Ex. 17.

[17] *Id.*

[18] *Id.*

containing clusters of droplets can travel 23 to 27 feet.[19]  A compressive review of viral, host, and environmental factors that affect Coronavirus transmission reported on the "abundant evidence" that proximity is a significant factor in measuring Coronavirus transmission risks.[20]

36.    Airborne transmission involves the spread of the infectious agent caused by the dissemination of droplet nuclei (aerosols) from, for example, exhaled breath that remain infectious when suspended in the air over long distances and time.[21]  These tiny particles can remain suspended "for indefinite periods unless removed by air currents or dilution ventilation."[22]  As a result, the risk of disease transmission increases substantially in enclosed environments, compared to outdoor settings.[23]

---

[19] Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions, Potential Implications for Reducing Transmission of COVID-19*, 323 JAMA 18, 1837-38 (Mar. 26, 2020), https://jamanetwork.com/journals/jama/fullarticle/2763852 (last visited Mar. 3, 2022), Ex. 18.

[20] Eric A. Meyerowitz et al., *Transmission of SARS-CoV-2: A Review of Viral, Host, and Environmental Factors*, ANNALS INTERNAL MED. (Jan. 2021), https://www.acpjournals.org/doi/10.7326/M20-5008 (last visited Mar. 3, 2022), Ex. 19.

[21] Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions, Potential Implications for Reducing Transmission of COVID-19*, 323 JAMA 18, 1837-38 (Mar. 26, 2020), https://jamanetwork.com/journals/jama/fullarticle/2763852 (last visited Mar. 3, 2022), Ex. 18; *see also* Jose-Luis Jimenez, *COVID-19 Is Transmitted Through Aerosols. We Have Enough Evidence, Now It Is Time to Act*, TIME (Aug. 25, 2020), https://time.com/5883081/covid-19-transmitted-aerosols/ (last visited Mar. 3, 2022), Ex. 20; Ramon Padilla & Javier Zarracina, *WHO agrees with more than 200 medical experts that COVID-19 may spread via the air*, USA TODAY (updated Sept. 21, 2020), www.usatoday.com/in-depth/news/2020/04/03/coronavirusprotection-how-masks-might-stop-spread-throughcoughs/5086553002/ (last visited Mar. 3, 2022), Ex. 21; Wenzhao Chen et al., *Short-range airborne route dominates exposure of respiratory infection during close contact*, 176 BLDG. & ENV'T (June 2020), https://www.sciencedirect.com/science/article/pii/S0360132320302183 (last visited Mar. 3, 2022), Ex. 22.

[22] Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited Mar. 3, 2022), Ex. 17.

[23] Muge Cevik et al., *Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) Transmission Dynamics Should Inform Policy*, 73 CLINICAL INFECTIOUS DISEASES, Issue Supp. 2 (Aug. 1, 2021), https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa1442/5910315 (last visited Mar. 3, 2022), Ex. 23.

37.     The airborne transmission of Coronavirus within buildings is depicted in the following illustrations:



24

---

24 Luis Almodóvar, *Breathing, speaking and shouting* (illustration), *in* Mariano Zafra & Javier Salas, *A room, a bar and a classroom: how the coronavirus is spread through the air*, EL PAÍS (Oct. 29, 2020), https://english.elpais.com/society/2020-10-28/a-room-a-bar-and-a-class-how-the-coronavirus-is-spread-through-the-air.html?fbclid=IwAR1jmVExKaRBcT9-lUHc9RV-xBO-XIShPlFtZsdyn1ltCeoNEXwtV_YP4q0 (last visited Mar. 3, 2022), Ex. 24.





[25] *How cough and sneeze droplets travel* (illustration), *in* Ramon Padilla & Javier Zarracina, *WHO agrees with more than 200 medical experts that COVID-19 may spread via the air*, USA TODAY (updated Sept. 21, 2020), https://www.usatoday.com/in-depth/news/2020/04/03/coronavirus-protection-how-masks-might-stop-spread-through-coughs/5086553002/ (last visited Mar. 3, 2022), Ex. 21.

[26] *Coronavirus aerosols and droplets* (illustration), *in* Mariano Zafra & Javier Salas, *A room, a bar and a classroom: how the coronavirus is spread through the air*, EL PAÍS (Oct. 29, 2020), https://english.elpais.com/society/2020-10-28/a-room-a-bar-and-a-class-how-the-coronavirus-is-spread-through-the-air.html?fbclid=IwAR1jmVExKaRBcT9-lUHc9RV-xBO-XIShPlFtZsdyn1ltCeoNEXwtV_YP4q0 (last visited Mar. 3, 2022), Ex. 24.



27



28

---

27 *Major modes of transmission of respiratory viruses during short-range and long-range transmission* (illustration), *in* Nancy H.L. Leung, *Transmissibility and transmission of respiratory viruses*, 19 NATURE REVS. MICROBIOLOGY 528-45 (Mar. 22, 2021), https://www.nature.com/articles/s41579-021-00535-6 (last visited Mar. 3, 2022), Ex. 25.

28 *The Cycle of Property Damage by Persons with COVID-19 in Air and On Surfaces* (illustration), *in* Treasure Island, LLC's Motion to Amend Complaint, Exhibit K at 11, Treasure Island, LLC v. Affiliated FM Ins. Co., No. 2:20-cv-00965-JCM-EJY (Mar. 8, 2021) (No. 85-2), Ex. 26.

17



WHO reported exposure mechanisms for COVID-19 SARS-CoV-2 droplets (dark blue color). Light blue color: airborne mechanism that is known from SARS-CoV-1 and other flu, currently there is no reported evidence specifically for SARS-CoV-2 (Credit: Francesco Franchimon – image from the REVHA COVID-19 Guidance Document(2))

29



30

---

[29] Francesco Franchimon, *image from REVHA COVID-19 Guidance Document(2)* (illustration), *in* Peter Rumsey et al., *COVID-19 and Office Building HVAC Responses*, PEI BLOG (updated July 8, 2020), https://www.pointenergyinnovations.com/covid-19-and-office-building-hvac-responses/ (last visited Mar. 3, 2022), Ex. 27.

[30] *Microscopic View of 3D Spherical Viruses – stock photo* (illustration), *in The COVID-19 virus can spread through the air – here's what it'll take to detect the airborne particles*, CONVERSATION (Aug. 14, 2020), https://theconversation.com/the-covid-19-virus-can-spread-through-the-air-heres-what-itll-take-to-detect-the-airborne-particles-140149 (last visited Mar. 3, 2022), Ex. 28.



38.     Available videos demonstrate Coronavirus "aerosol clouds" lingering indoors in a supermarket, transmitting COVID-19, and rendering the business premises unsafe, uninhabitable, unfit for its intended use or causing it to lose, in whole or in part, its functional use.[32]

39.     The WHO and the scientific community have studied the spread of Coronavirus through aerosols in indoor settings via air circulation systems.  For example, on April 5, 2021, the CDC concluded that:

- "[t]he principal mode by which people are infected with [Coronavirus] … is through exposure to respiratory droplets carrying infectious virus"; and

- "when a person with suspected or confirmed COVID-19 has been

---

[31] Mikko Auvinen & Antti Hellsten (animation), Marie Szaniszlo, *Simulation shows how the coronavirus can spread in supermarkets*, BOSTON HERALD (updated Apr. 11, 2020), https://www.bostonherald.com/2020/04/09/simulation-shows-how-the-coronavirus-can-spread-in-supermarkets/ (last visited Mar. 3, 2022), Ex. 29.

[32] *See e.g.*, David Mercer, *Coronavirus lingers in air longer than previously thought, scientists warn*, SKYNEWS (Apr. 10, 2020), https://news.sky.com/story/coronavirus-3d-model-reveals-how-covid-19-can-spread-in-supermarket-11971373 (last visited Mar. 3, 2022), Ex. 30.

indoors, virus can remain suspended in the air for minutes to hours."[33]

40.     Investigation of over 7,000 COVID-19 cases found that all outbreaks involving three or more people occurred indoors.[34]  Airborne Coronavirus viral RNA has also been detected inside hospitals at distances over 50 meters from COVID-19 patients' rooms.[35]

41.     Moreover, the CDC published a research letter concluding that a restaurant's air conditioning system triggered the transmission of Coronavirus, spreading it to people who sat at separate tables downstream of the restaurant's airflow.[36]  Moreover, one study detected Coronavirus inside HVAC systems transmitted over 180 feet from its source.[37]

42.     A systematic review of airborne transmission of Coronavirus corroborated the CDC's concerns and recommended procedures to improve ventilation of indoor air environments to decrease bioaerosol concentration and reduce Coronavirus' spread.[38]

43.     Additionally, on May 7, 2021, the CDC issued a scientific warning of the risks of indoor airborne transmission of Coronavirus from aerosols at distances greater than six feet from the source, stating that "transmission of SARS-CoV-2 [i.e., Coronavirus] from inhalation of virus in the air farther than six feet from an infectious source can occur" and that:

> With increasing distance from the source, the role of inhalation likewise increases. Although infections through inhalation at distances greater than six feet from an

---

[33] *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, CDC (updated Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (last visited Mar. 3, 2022), Ex. 31.

[34] Hua Qian et al., *Indoor transmission of SARS-CoV-2*, 31 INDOOR AIR 3, 639-45 (May 2021), https://pubmed.ncbi.nlm.nih.gov/33131151/ (last visited Mar. 3, 2022), Ex. 32.

[35] Yuan Liu et al., *Aerodynamic analysis of SARS-CoV-2 in two Wuhan hospitals*, 582 NATURE 7813, 557-60 (June 2020), https://pubmed.ncbi.nlm.nih.gov/32340022/ (last visited Mar. 3, 2022), Ex. 33.

[36] Jianyun Lu et al., *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020*, 26 EMERGING INFECTIOUS DISEASES 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article (last visited Mar. 3, 2022), Ex. 34; *see also* Keun-Sang Kwon et al., *Evidence of Long-Distance Droplet Transmission of SARS-CoV-2 by Direct Air Flow in a Restaurant in Korea*, 35 J. KOREAN MED. SCI. 46, e415 (Nov. 30, 2020), https://jkms.org/DOIx.php?id=10.3346/jkms.2020.35.e415 (last visited Mar 3, 2022), Ex. 35.

[37] Karolina Nissen et al., *Long-distance airborne dispersal of SARS-CoV-2 in COVID-19 wards*, SCI. REPS. 10, 19589 (Nov. 11, 2020), https://www.nature.com/articles/s41598-020-76442-2 (last visited Mar. 3, 2022), Ex. 36.

[38] Zahra Noorimotlagh et al., *A systematic review of possible airborne transmission of the COVID-19 virus (SARS-CoV-2) in the indoor air environment*, 193 ENV'T RSCH. 110612, 1-6 (Feb. 2021), https://www.sciencedirect.com/science/article/pii/S0013935120315097?dgcid=rss_sd_all (last visited Mar. 3, 2022), Ex. 37.

infectious source are less likely than at closer distances, the phenomenon has been repeatedly documented under certain preventable circumstances. These transmission events have involved the presence of an infectious person exhaling virus indoors for an extended time (more than 15 minutes and in some cases hours) leading to virus concentrations in the air space sufficient to transmit infections to people more than 6 feet away, and in some cases to people who have passed through that space soon after the infectious person left. Per published reports, factors that increase the risk of SARS-CoV-2 infection under these circumstances include:

- **Enclosed spaces with inadequate ventilation or air handling** within which the concentration of exhaled respiratory fluids, especially very fine droplets and aerosol particles, can build-up in the air space.
- **Increased exhalation** of respiratory fluids if the infectious person is engaged in physical exertion or raises their voice (e.g., exercising, shouting, singing).
- **Prolonged exposure** to these conditions, typically more than 15 minutes.[39]

44.     The CDC has recommended "ventilation interventions" to help reduce exposure to airborne Coronavirus in indoor spaces, including increasing airflow and air filtration (such as with high-efficiency particulate air ("HEPA") fan/filtration systems).[40]   These and other remedial measures must be implemented, at high cost and extra expense, to mitigate loss and reduce the amount of Coronavirus present in the space and to make property marginally safer for its intended use.  These extreme measures demonstrate that Coronavirus and COVID-19 cause direct physical loss or damage to interior spaces.  Even then, those interventions cannot be guaranteed to eliminate the aerosolized Coronavirus in an indoor space.  Nor do they eliminate it immediately.

45.     The inability to guarantee complete or immediate elimination of aerosolized Coronavirus in indoor spaces can be observed acutely by comparing the infection rates of "essential workers" with that of the general public.  Essential workers are defined by the CDC to

---

[39] *Scientific Brief:  SARS-CoV-2 Transmission*, CDC (updated May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fscience%2Fscience-briefs%2Fscientific-brief-sars-cov-2.html (last visited Mar. 3, 2022), Ex. 38.

[40] *Ventilation in Buildings*, CDC (updated June 2, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html#:~:text=HEPA%20filters%20are%20even%20more,with%20SARS%2DCoV%2D2 (last visited Mar. 3, 2022), Ex. 39.

be those who conduct "operations and services in industries that are essential to ensure the continuity of critical functions in the United States."[41]

46.     After the first wave of mass business closures in March and April of 2020, employees of so-called "essential businesses" that were eventually allowed to re-open or operate at reduced capacities (i.e., essential workers) were faced with elevated rates of infection when compared to the general public, demonstrating the presence of Coronavirus in their workplaces, rendering the same unfit and unsafe for normal use (e.g., for people to present therein).[42]  For example:

- One study found that 20% of essential grocery store workers tested positive for COVID-19, a much higher rate of infections than others in their surrounding communities[43] and that those grocery store workers with interactions with the public tested positive for COVID-19 at a rate five times greater than the general population.[44]

- Essential workers (e.g., liquor store employees) accounted for 87% of excess deaths in California[45] and over 60% in New York City.[46]

- Nursing home residents and employees accounted for at least 35% of all COVID-19 deaths in the United States.[47]

47.     Similar findings have been reported across various sectors of essential workers,

[41] *See Interim List of Categories of Essential Workers Mapped to Standardized Industry Codes and Titles*, CDC (updated Mar. 29, 2021), https://www.cdc.gov/vaccines/covid-19/categories-essential-workers.html (last visited Mar. 3, 2022).

[42] Joanna Gaitens, et al, *COVID-19 and Essential Workers: A Narrative Review of Health Outcomes and Moral Injury*, 18 INT'L J. ENV'T RSCH. PUB. HEALTH 4, 1446 (Feb. 4, 2021), https://www.mdpi.com/1660-4601/18/4/1446 (last visited Mar. 3, 2022), Ex. 40.

[43] *Id.*

[44] Fan-Yun Lan et al., *Association between SARS-CoV-2 infection, exposure risk and mental health among a cohort of essential retail workers in the USA*, 78 OCCUPATIONAL ENV'T MED. 237-43 (Oct. 30, 2020), https://oem.bmj.com/content/oemed/78/4/237.full.pdf (last visited Mar. 3, 2022), Ex. 41.

[45] Yea-Hung Chen et al., *Excess mortality associated with the COVID-19 pandemic among Californians 18-65 years of age, by occupational sector and occupation: March through November 2020*, 16 PLOS ONE 6, e0252454 (June 4, 2021), https://pubmed.ncbi.nlm.nih.gov/34086762/ (last visited Mar. 3, 2022), Ex. 42.

[46] *The plight of essential workers during the COVID-19 pandemic*, 395 LANCET 1587 (May 23, 2020), https://www.thelancet.com/action/showPdf?pii=S0140-6736%2820%2931200-9 (last visited Mar. 3, 2022), Ex. 43.

[47] Artis Curiskis et al., *Federal COVID Data 101: Working with CMS Nursing Home Data*, ATLANTIC (Mar. 4, 2021), https://covidtracking.com/analysis-updates/federal-covid-data-101-working-with-cms-nursing-home-data (last visited Mar. 3, 2022), Ex. 44.

including elevated rates of infection for emergency services personnel (e.g., firefighters, police), prison correctional officers, and transportation and factory workers, among others.[48] These findings disprove arguments that Coronavirus does not affect the safety, usability, or the functional use of property because the government allowed businesses it determined were "essential" to remain open.

### 2.    <u>Fomite (i.e., Surface and Object) Transmission</u>

48.    COVID-19 may also be transmitted to people from physical objects, materials, or surfaces.  "Fomites" are physical objects or materials that carry, and are capable of transmitting infectious agents, altering these objects to become vectors of disease.[49]  Fomite transmission has been demonstrated as highly efficient for viruses, both from object-to-hand and from hand-to-mouth.[50]

49.    In addition, while fomite transmission may not be the primary route of transmission for COVID-19, fomite transmission is significant and in October 2020 was estimated to be responsible for up to 25% of all deaths due to COVID-19 since lockdowns were imposed.[51]

50.    The WHO has described fomite transmission as follows:

Respiratory secretions or droplets expelled by infected individuals can contaminate surfaces and objects, creating fomites (contaminated surfaces). **Viable SARS-CoV-2 virus and/or RNA detected by RT-PCR can be found on those surfaces for periods ranging from hours to days**, depending on the ambient environment (including temperature and humidity) and the type of surface, in particular at high concentration in health care facilities where COVID-19 patients were being treated. Therefore, transmission may also occur indirectly through touching surfaces in the immediate environment or objects contaminated with virus from an infected person

---

[48] *Id.*

[49] *Fomite*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/fomite (last visited Mar. 3, 2022).

[50] P. Rusin et al., *Comparative surface-to-hand and fingertip-to-mouth transfer efficiency of gram-positive bacteria, gram-negative bacteria, and phage*, 93 J. APPLIED MICROBIOLOGY, 4, 585-92 (Sept. 18, 2002), https://pubmed.ncbi.nlm.nih.gov/12234341/ (last visited Mar. 3, 2022), Ex. 45.

[51] A. Meiksin, *Dynamics of COVID-19 transmission including indirect transmission mechanisms: a mathematical analysis*, 148 EPIDEMIOLOGY & INFECTION e257, 1-7 (Oct. 23, 2020), https://www.cambridge.org/core/journals/epidemiology-and-infection/article/dynamics-of-covid19-transmission-including-indirect-transmission-mechanisms-a-mathematical-analysis/A134C5182FD44BEC9E2BA6581EF805D3 (last visited Mar. 3, 2022), Ex. 46.

. . .[52] (emphasis added).

51.     In addition to studies cited by the WHO,[53] numerous other studies and scientific articles have discussed fomite transmission as a mode of virus transmission, including, but not limited to:

- A study of a COVID-19 outbreak published by the CDC identifying elevator buttons and restroom taps as possible causes of the "rapid spread of SARS-CoV-2" in a shopping mall in China.[54]

- A National Institutes of Health study published in the New England Journal of Medicine finding that Coronavirus survives up to four hours on copper, up to 24 hours on cardboard, and up to three days on plastic and stainless steel, and suggesting that people may acquire the virus through the air and after touching contaminated objects.[55]

- An American Society for Microbiology article discussing fomite infection as involving both porous and non-porous surfaces, and occurring through a fomite's contact with bodily secretions, hands, aerosolized virus from talking, sneezing, coughing, etc., or other airborne viral particles that settle after a disturbance of a fomite (e.g., shaking a contaminated textile such as cleaning cloths).[56] According to the researchers, "[o]nce a fomite is contaminated, the transfer of infectious virus may readily occur between inanimate and animate objects, or vice versa, and between two separate fomites (if brought together)."[57] Generally, frequently touched surfaces can become highly transmissive fomites.[58]

- A CDC research letter reporting that Coronavirus can remain viable on polystyrene plastic, aluminum, and glass for 96 hours in indoor living spaces.[59]

---

[52] *See, e.g.*, *Scientific Brief: Transmission of SARS-CoV-2: implications for infection prevention precautions*, WHO (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Mar. 3, 2022), Ex. 16.

[53] *Id.*

[54] Jing Cai et al., *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 EMERGING INFECTIONS DISEASES 6 (June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited Mar. 3. 2022), Ex. 47.

[55] *New coronavirus stable for hours on surfaces*, NAT'L INST. HEALTH (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited Mar. 3, 2022), Ex. 48.

[56] Stephanie A. Boone & Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral Disease*, 73 APPLIED & ENV'T MICROBIOLOGY 6, 1687-96 (Mar. 15, 2007), https://aem.asm.org/content/73/6/1687 (last visited Mar. 3, 2022), Ex. 49.

[57] *Id.*

[58] *Id.*

[59] Boris Pastorino et al., *Prolonged Infectivity of SARS-CoV-2 in Fomites*, 26 EMERGING INFECTIOUS DISEASES 9 (Sept. 2020), https://wwwnc.cdc.gov/eid/article/26/9/20-1788_article (last visited Mar. 3, 2022), Ex. 50.

- A Journal of Hospital Infection article citing studies revealing that human coronaviruses can persist on inanimate surfaces like metal, glass, or plastic for up to nine days.[60]

52.     Importantly, Coronavirus has been detected on environmental objects and surfaces from symptomatic, pre-symptomatic and asymptomatic individuals.[61]   Fomites are known to transform the surface of property into a potentially deadly Coronavirus transmission device.

53.     As noted above, Coronavirus can remain infectious for a considerable length of time.   For example, in the Journal of Virology, researchers demonstrated that Coronavirus can survive up to twenty-eight days at room temperature (68ºF) on a variety of surfaces including glass, steel, vinyl, plastic, and paper.[62]   A CDC report from March 27, 2020, stated that Coronavirus was identified on surfaces of the cabins on the Diamond Princess cruise ship seventeen days after the cabins were vacated but before they were disinfected.[63]

54.     Numerous other scientific studies and articles have identified the persistence of Coronavirus on doorknobs, toilets, faucets, and other high-touch points, as well as on commonly overlooked surfaces such as floors.[64]

55.     While the detection of viral RNA on surfaces or in the air does not necessarily mean that Coronavirus is currently present and infectious, it demonstrates that Coronavirus was in fact present.   Studies have demonstrated the transmission of laboratory-confirmed Coronavirus

---

[60] G. Kampf et al., *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, 104 J. HOSP. INFECTION 3, 246-51 (Mar. 1, 2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (last visited Mar. 3, 2022), Ex. 51.

[61] Minghui Yang et al., *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, 203 AM. J. RESPIRATORY & CRITICAL CARE MED. 3, 374-78 (Feb. 1, 2021), https://www.atsjournals.org/doi/10.1164/rccm.202006-2136LE (last visited Mar. 3, 2022), Ex. 7.

[62] *Id.*

[63] Leah F. Moriarty et al., *Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020*, 69 MMWR 12, 347-52 (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last visited Mar. 3, 2022), Ex. 52.

[64] Zhen-Dong Guo et al., *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020*, 26 EMERGING INFECTIOUS DISEASES 7, 1583-91 (July 2020), https://pubmed.ncbi.nlm.nih.gov/32275497/ (last visited Mar. 3, 2022), Ex. 53.

infection via surfaces.[65]

### 3. These Modes of Transmission Cause Physical Loss or Damage to Property

56. The presence of Coronavirus in and on property, including in the indoor air, on surfaces, and on objects, causes physical loss or damage to property by physically changing and physically altering property and otherwise making it incapable of being used for its intended purpose – just as if asbestos, ammonia, radon gas, cat urine, fumes, sulfuric gases emitted from Chinese drywall, carbon monoxide, mold, or salmonella were in the air or on surfaces of the premises.

57. Among other things, the presence of Coronavirus transforms everyday surfaces and objects into fomites, causing a tangible change of the property into a transmission vehicle for disease from one host to another. The WHO's description of fomite transmission of COVID-19 expressly recognizes this physical alteration of property, describing viral droplets as "*creating* fomites (contaminated surfaces)."[66] "Creating" involves making or bringing into existence something new[67] – such as something that is in an altered state from what it was before Coronavirus was present on, in and around the property.

58. Coronavirus adheres to surfaces and objects, physically changing and physically altering those objects by becoming a part of their surface and making physical contact with them unsafe for their ordinary and customary use. For example, the Mexico Plants each feature countless tables, chairs, extensive manufacturing equipment, control panels, touch PLC digital panels, equipment buttons, door handles, inspection trolleys, computers, work bench tables, water fountains, sliding doors, vending machines and many other surfaces on which Coronavirus can

---

[65] Nancy H.L. Leung, *Transmissibility and transmission of respiratory viruses*, 19 NATURE REVS. MICROBIOLOGY 8 52-35 (Aug. 2021), https://pubmed.ncbi.nlm.nih.gov/33753932/ (last visited Mar. 3, 2022), Ex. 25; G. Kampf et al., *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, 104 J. HOSP. INFECTIONS 3, 246-51 (Mar. 2020), https://pubmed.ncbi.nlm.nih.gov/32035997/ (last visited Mar. 3, 2022), Ex. 51.

[66] *See, e.g., Scientific Brief: Transmission of SARS-CoV-2: implications for infection prevention precautions*, WHO (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Mar. 3, 2022), Ex. 16 (emphasis added).

[67] *See, e.g., Create*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/create (last visited Mar. 3, 2022), Ex. 54.

deposit, transforming the surfaces into fomites ripe for COVID-19 transmission. Once Coronavirus is in, on, or near property, it is easily spread by the air, people, and objects, from one area to another, causing additional physical loss or damage to property.

59.     Additionally, the presence of the dangerous and potentially fatal Coronavirus in and on property, including in indoor air, on surfaces, and on objects, renders the property unsafe, uninhabitable, and unfit for its intended use or causes it to lose, in whole or in part, of the functional use of that property. Respiratory particles (including droplets and airborne aerosols) and fomites are physical substances that alter the physical properties of the interiors of buildings to make them unsafe, untenantable, uninhabitable, and unfit for normal use or cause the loss, in whole or in part, of their functional use.

60.     In addition to being found in air samples,[68] Coronavirus remains stable in body secretions (respiratory, urine, feces), on surfaces, and in sewage, particularly at lower temperatures.[69]

**D.      Coronavirus Cannot be Removed or Eliminated by Routine Cleaning**

61.     Coronavirus cannot be removed by routine surface cleaning.

62.     In fact, the CDC released guidance stating that there is little evidence to suggest that routine use of disinfectants can prevent the transmission of Coronavirus from fomites in community settings.[70] The CDC concluded that according to a more quantitative microbial risk assessment study, "surface disinfection once- or twice-per-day had little impact on reducing estimated risks" of Coronavirus transmission.[71]

---

[68] Zhen-Dong Guo et al., *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020*, 26 EMERGING INFECTIOUS DISEASES 7, 1583-91 (July 2020), https://pubmed.ncbi.nlm.nih.gov/32275497/ (last visited Mar. 3, 2022), Ex. 53.

[69] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. MED. VIROLOGY 11, 2498-510 (Nov. 2020), https://onlinelibrary.wiley.com/doi/10.1002/jmv.26170 (last visited Mar. 3, 2022), Ex. 55.

[70] *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, CDC (updated Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (last visited Jan. 25, 2022), Ex. 40.

[71] *Id.* (citing A. K. Pitol & T. R. Julian, *Community transmission of SARS-CoV-2 by fomites: Risks and risk reduction strategies*, ENV'T SCI. & TECH. LETTERS 8, 263-269 (2021), Ex. 56).

63.     A number of studies have similarly demonstrated that Coronavirus is "much more resilient to cleaning than other respiratory viruses so tested."[72]  The measures that must be taken to attempt to remove and disinfect Coronavirus from property are significant and depend on the concentration of Coronavirus, myriad surface characteristics (e.g., type of surface, temperature, porosity) and extend far beyond ordinary or routine cleaning.

64.     The efficacy of decontaminating agents for viruses is based on a number of factors, including the initial amount of virus present, surface porosity, contact time with the decontaminating agent, dilution, temperature, and pH, among many others.  No reported studies have investigated the efficacy of surface cleaning (with soap or detergent not containing a registered disinfectant) for reducing concentrations of Coronavirus on non-porous surfaces.[73] However, in one study, detergent surfactants were not recommended as single agents, but rather in conjunction with other complex disinfectant solutions.[74]

65.     Additionally, unlike cleaning a visible substance such as dust, Coronavirus is invisible to the naked eye, making it challenging to accurately determine the efficacy of decontaminating agents and how "clean is clean" or if surface disinfection was even effective. Moreover, the toxicity of an agent may inhibit the growth of cells used to determine the presence of virus, making it difficult to determine if lower levels of infectious virus are actually still present on treated surfaces.[75]

66.     To be effective, cleaning and decontamination procedures require strict adherence to protocols not necessarily tested under "real life" conditions in the midst of a widespread wave of pervasive Coronavirus spread, where treated surfaces or objects may not undergo even exposure

---

[72] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. MED. VIROLOGY 11, 2498-510 (Nov. 2020), https://onlinelibrary.wiley.com/doi/10.1002/jmv.26170 (last visited Mar. 3, 2022), Ex. 55.

[73] *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, CDC (updated Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (last visited Mar. 3, 2022), Ex. 31.

[74] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. MED. VIROLOGY 11, 2498-510 (Nov. 2020), (last visited Mar. 3, 2022), Ex. 55.

[75] *Id.*

or adequate contact time.[76]   Indeed, studies of coronaviruses have demonstrated viral RNA persistence on objects despite cleaning with 70% alcohol.[77]

67.     When considering disinfection and decontamination, the safety of products and procedures must be considered as well, due to the risks of harmful chemical accumulation, breakdown of treated materials, flammability, and potential for allergen exposure.[78]

68.     With respect to textiles (e.g., cloths and other fabrics) – exceedingly common items used at the Mexico Plants to clean machines and digital PLC panels – studies have demonstrated that virus can survive on fabrics and be transferred to skin and other surfaces, "suggesting it is biologically plausible that . . . infectious diseases can be transmitted directly through contact with contaminated textiles."[79]   Coronavirus, which was dispersed onto and into the very fabric of these items at the Mexico Plants, therefore caused physical loss or damage to those commonly used textiles, transforming them into hazardous material.

69.     Many of the surfaces and materials discussed in the studies and articles cited above are used throughout ACS's Mexico Plants as part of their operations, including plastics, glass, metals, and cloth and fabrics.  Similarly, these surfaces and materials are used in virtually all gyms, health clubs, office buildings, stores, shopping centers, restaurants, movie theaters, and other businesses and amenities throughout Mexico, the U.S. and the across the globe, including those within one mile of the Mexico Plants and ACS's **dependent business premises**.

70.     Studies have demonstrated that even extraordinary cleaning measures do not remove Coronavirus from surfaces.  For example, a 2021 study by the largest hospital network in New York State demonstrated that even *after* trained hospital personnel used disinfection

---

[76] *Id.*

[77] Joon Young Song et al., *Viral Shedding* and *Environmental Cleaning in Middle East Respiratory Syndrome Coronavirus Infection*, 47 INFECTION & CHEMOTHERAPY 4, 252-55 (Dec. 2015), https://www.icjournal.org/DOIx.php?id=10.3947/ic.2015.47.4.252 (last visited Mar. 3, 2022), Ex. 57.

[78] *Id.*

[79] Lucy Owen & Katie Laird*, The role of textiles as fomites in the healthcare environment: a review of the infection control risk*, 8 PEERJ L. LIFE & ENV'T e9790, 1-35 (Aug. 25, 2020), https://peerj.com/articles/9790/ (last visited Mar. 3, 2022), Ex. 58.

procedures in Coronavirus patient treatment areas, much of the virus *survived* in those areas – proving even intense, non-routine surface cleaning does not remove it from surfaces – let alone from the air.[80]

71.     Given the inadequacy of conventional cleaning procedures, and in response to the physical loss or damage to property at the Mexico Plants caused by the presence of Coronavirus and COVID-19 on surfaces, disinfection and decontamination measures have included, but are not limited to, the use of harsh chemicals to perform deep disinfection, the removal and disposal of porous materials like cloth and other fabrics, and the installation of improved ventilation systems.

72.     ACS also, as a result of or in connection with the physical loss or damage to its property, has removed or decommissioned property within its facilities and otherwise reconfigured and altered interior spaces to respond to and restore the physical loss or damage caused by Coronavirus.

73.     None of the above-referenced surface cleaning measures, however, remove Coronavirus from the room air.  And, in fact, many actually exacerbate the damage to the room air.  Aerosolized Coronavirus particles and virions specifically cannot be eliminated by routine surface cleaning and routine cleaning methods have been shown to make the aerosolization situation worse, in some cases cleaning contaminated surfaces (i.e., floors) could reasonably result in re-aerosolization of Coronavirus.

74.     Cleaning Coronavirus from surfaces in an indoor space does not remove aerosolized Coronavirus particles from the indoor air any more than cleaning friable asbestos particles that have landed on a surface will remove the friable asbestos particles suspended in the air.  In each case, people can inhale and become infected with Coronavirus or develop asbestos-related diseases.

75.     Moreover, given the ubiquity and pervasiveness of Coronavirus, no amount of

---

[80] Zarina Brune et al., *Effectiveness of SARS-CoV-2 Decontamination and Containment in a COVID-19 ICU*, 18 INT'L J. ENV'T RSCH. & PUB. HEALTH 5, 2479 (Mar. 3, 2021), https://www.mdpi.com/1660-4601/18/5/2479 (last visited Mar. 3, 2022), Ex. 59.

cleaning or ventilation intervention or even the dissipation of Coronavirus with the passage of time, will prevent a person who is infected with Coronavirus and contagious from entering an indoor space and exhaling millions of additional Coronavirus droplets and infectious aerosols into the air, thereby further: (a) filling the room air and physically altering it with aerosolized and hazardous Coronavirus that can be inhaled; and (b) depositing infectious Coronavirus droplets on the surfaces, physically altering and transforming those surfaces into disease-transmitting fomites.

76.     Stated differently, the continuous reintroduction of Coronavirus by infectious persons into a publicly open indoor space renders cleaning, ventilation interventions and even dissipation over time futile.  None of these things, while they may mitigate the situation temporarily, eliminate the presence of Coronavirus.  As such, none of these things make indoor property safe, habitable, or fit for its intended use, especially with respect to the time period before the emergence of widely available vaccinations for COVID-19 and widely effective and available treatments for COVID-19.

77.     The scientific facts and reality of Coronavirus in our world and in Mexico could not be clearer – the physical invasion by deadly Coronavirus particles that spread COVID-19 is not a single discharge event, such as a pipe bursting and spilling a toxic substance into a room that, once the valve is shut off, the substance can be cleaned and dissipated from the room.  To the contrary, due to its continuous reintroduction into businesses that remain open, the physical invasion by deadly Coronavirus particles that spread deadly COVID-19 into such a business is a continuous discharge event that does not stop.  As such, even if cleaning and dissipation of a one-time Coronavirus invasion into the business were effective in removing the virus, Coronavirus' continuous reintroduction into the business leaves the business owner no opportunity to permanently remove the virus from the business by cleaning or dissipation so that the building could be made safe for its intended use.  It is akin to a placing a pipe pumping fumes into a business premises with the valve stuck in the open position indefinitely – depriving the business owner of the opportunity to clean or dissipate the fumes.

78.     Thus, ACS is not able to remove or eliminate Coronavirus from the Mexico Plants

with routine cleaning.

79.     The only way to eliminate the presence of Coronavirus from property and prevent its continuous reintroduction is to close down property completely and bar all individuals from entering.

**E.     Coronavirus Was Present at the Mexico Plants, at Nearby Businesses Within One Mile of the Mexico Plants, and at ACS's Dependent Business Premises**

80.     Since the emergence of Coronavirus and COVID-19, no fewer than 555 of the ACS's employees in the Mexico Plants have confirmed to ACS that they had been infected with Coronavirus and contracted COVID-19, and all of ACS's employees in the Mexico Plants who confirmed they had contracted COVID-19 did so during time periods when the Mexico Plants where they worked were open for business and they were present.  This is proof of the actual, certain presence of Coronavirus at the ACS Mexico Plants.

81.     Given the high percentage of asymptomatic cases of COVID-19, it is certain that the actual number of ACS employees who had contracted COVID-19 was substantially greater than the over 555 employees known to have contracted COVID-19.  This too is proof of the actual, certain presence of Coronavirus at the Mexico Plants.

82.     Additionally, given that Coronavirus is highly contagious, the global pervasive status of COVID-19, and the heavily trafficked common areas at and within one-mile of the Mexico Plants, it is statistically certain, or near-certain, that many other individuals at or in the vicinity of the Mexico Plants contracted and carried Coronavirus.

83.     Nuevo Leon, Mexico, like much of the world, experienced dramatic COVID-19 outbreaks in mid-and late-March 2020.  The first case of COVID-19 in Mexico was confirmed by authorities on February 28, 2020, although in a later release, the official database included one case with a positive test result a month earlier, and the first death due to COVID-19 on March 18,

2020.[81]  By April 30, 2020, there were 19,224 confirmed COVID-19 cases and nearly 1,859 deaths from COVID-19 in Mexico.[82]  However,  it is certain that the early numbers reported by Mexico authorities drastically underestimated the actual number of individuals infected with COVID-19 at that time, as well as the number of deaths due to COVID-19.[83]

84.     The high prevalence of infectious COVID-19 cases makes it statistically certain or near-certain that Coronavirus droplets and aerosols were dispersed repeatedly into the air and on property in, on and around the Mexico Plants, rendering routine cleaning even less effective at removing Coronavirus from surfaces at those locations and completely ineffective at removing aerosolized Coronavirus particles and virions from the air inside those locations.  This was also the case at a myriad of business and tourist destinations throughout Nuevo Leon, Mexico, including those within one mile of the Mexico Plants.

85.     Due to the high prevalence of infectious cases, Coronavirus was statistically certain or near certain to be present at ACS's **dependent business premises**, including those **dependent business premises** listed above, and other businesses in the automotive "safety" business, major automotive manufactures and other OEMs, foodservice distributors, and foodservice businesses, located both internationally and throughout the United States including in the following states: Alabama, Arizona, Florida, Indiana, Ohio, South Carolina and Tennessee.

86.     The CDC keeps track of known infections by county, and each of the United States'

---

[81] *Mexico's Response to COVID-19: A Case Study*, UCSF INST. GLOBAL HEALTH SCI. (Apr. 12, 2021), https://globalhealthsciences.ucsf.edu/news/mexicos-response-covid-19-case-study (last visited Mar. 3, 2022), Ex. 60.

[82] V. Suárez et al., *Epidemiology of COVID-19 in Mexico: From the 27th of February to the 30th of April 2020*, 220 REV. CLIN. ESP. 463 (July 9, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7343663/ (last visited Mar. 3, 2022), Ex. 61.

[83] *Id.*; Azam Ahmed, *Hidden Toll: Mexico Ignores Wave of Coronavirus Deaths in Capital*, N.Y. TIMES (May 8, 2020), https://www.nytimes.com/2020/05/08/world/americas/mexico-coronavirus-count.html (last visited Mar. 3, 2022), Ex. 62.

over 3,142 county and county-equivalents has reported COVID-19 infections. Similarly, every state in Mexico has reported COVID-19 infections.[84]

87.     The presence of Coronavirus at and within one mile of the Mexico Plants, as well at many **dependent business premises**, was certain or virtually certain. This can be confirmed with certainty or near-certainty by statistical modeling based on the known incidences of infection, despite the lack of commercially available tests for air or surface presence of Coronavirus, and despite the shortage of either rapid or laboratory COVID-19 tests and testing sites that could have otherwise resulted in testing being administered to every individual who was on-site at the relevant times.[85]

88.     Early in the course of Coronavirus and COVID-19, testing was limited, and thus potentially thousands more people were infected than were reported.[86] This is especially true when looking at the numbers of infections reported in Mexico, initially relying less on testing and more on its own disease modeling, to guide its response to the pandemic.[87] Indeed, Mexico tested only 0.4 in 1,000 individuals for Coronavirus, by far the lowest of the dozens of nations in the Organization for Economic Cooperation and Development, which average 22.9 tests per every 1,000 people.[88] A large, nationally representative serological survey fielded between August and November of 2020 by the National Public Health Institute estimated that only 1 in every 30

---

[84] *COVID-19 México*, GOBIERNO DE MEXICO (updated Mar. 2, 2022), https://datos.covid-19.conacyt.mx/#DOView (last visited Mar. 3, 2022).

[85] *See, e.g.,* Aroon Chande et al., *Real-time, interactive website for US-county-level COVID-19 event risk assessment*, 4 NATURE HUM. BEHAV., 1313-19 (Nov. 9, 2020), https://www.nature.com/articles/s41562-020-01000-9 (last visited Mar. 3, 2022), Ex. 63.

[86] *See, e.g.,* Benedict Carey & James Glanz, *Hidden Outbreaks Spread Through U.S. Cities Far Earlier Than Americans Knew, Estimates Say*, N.Y. TIMES (updated July 6, 2020), https://nytimes.com/2020/04/23/us/coronavirus-early-outbreaks-cities.html (last visited Mar. 3, 2022), Ex. 64.

[87] Mary Beth Sheridan, *Coronavirus on the border: Why Mexico has so few cases compared with the U.S.*, WASH. POST (Mar. 30, 2020), https://www.washingtonpost.com/world/the_americas/coronavirus-mexico-us-border-covid-19/2020/03/30/18ad79b2-7061-11ea-a156-0048b62cdb51_story.html (Mar. 3, 2022), Ex. 65.

[88] Azam Ahmed, *Hidden Toll: Mexico Ignores Wave of Coronavirus Deaths in Capital*, N.Y. TIMES (updated Nov. 12, 2021), https://www.nytimes.com/2020/05/08/world/americas/mexico-coronavirus-count.html (last visited Mar. 3, 2022), Ex. 62; Douglas Broom, *These are the OECD countries testing most for COVID-19*, WORLD ECONOMIC FORUM (Apr. 30, 2020), https://www.weforum.org/agenda/2020/04/these-are-the-oecd-countries-testing-most-for-covid-19/ (last visited Mar. 3, 2022), Ex. 66.

COVID-19 infections were reported.[89]

89.     Moreover, the high number of COVID-19 deaths in Mexico demonstrate a significantly higher number of cases than those confirmed by COVID-19 tests.[90]  Additionally, in Mexico, the number of COVID-19 deaths was likely underreported, with many deaths absent from the data altogether.[91]

90.     Even so, national and local incidence and prevalence rates clearly demonstrated the very high magnitude of COVID-19 infections (and deaths) and the pervasiveness of Coronavirus throughout Nuevo Leon, Mexico and confirm the presence of Coronavirus at the Mexico Plants (in addition its certain presence as demonstrated by the extremely large number of ACS's employees who reported contracting COVID-19 while working at the Mexico Plants), as well as in the states and counties where ACS's **dependent business premises** operate.

91.     Epidemiologists have explained that "the percent positive is a critical measure because it gives us an indication of how widespread infection is in the area where the testing is occurring[.]"[92]  The percent positive is a crucial indicator to determine whether a business can safely remain open.  As a threshold for the percent positive being "too high," the WHO stated that the percent positive should remain below 5% for at least two weeks before re-opening.[93]

92.     Rhode Island presents a powerful example of how statistical modeling confirms the presence of Coronavirus at ACS's **dependent business premises**, located both internationally and

---

[89] *Mexico's Response to COVID-19: A Case Study*, UCSF INST. GLOBAL HEALTH SCI. (Apr. 12, 2021), https://globalhealthsciences.ucsf.edu/news/mexicos-response-covid-19-case-study (last visited Mar. 3, 2022), Ex. 60.

[90] Andrew T. Levin et al. *Assessing the age specificity of infection fatality rates for COVID-19: systematic review, meta-analysis, and public policy implications,* 35 EUR. J. EPIDEMIOLOGY 12, 1123-38 (Dec. 8, 2020), https://pubmed.ncbi.nlm.nih.gov/33289900/ (last visited Mar. 3, 2022), Ex. 67; V. Suárez et al., *Epidemiology of COVID-19 in Mexico: From the 27th of February to the 30th of April 2020,* 2020 REV. CLIN. ESP. 8, 463-71 (July 9, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7343663/ (last visited Mar. 3, 2022), Ex. 61.

[91] Azam Ahmed, *Hidden Toll: Mexico Ignores Wave of Coronavirus Deaths in Capital*, N.Y. TIMES (updated Nov. 12, 2021), https://www.nytimes.com/2020/05/08/world/americas/mexico-coronavirus-count.html (last visited Mar. 3, 2022), Ex. 62.

[92] David Dowdy & Gypsyamber D'Souza, *COVID-19 Testing: Understanding the "Percent Positive,"* JOHNS HOPKINS BLOOMBERG SCH. PUB. HEALTH (Aug. 10, 2020), https://www.jhsph.edu/covid-19/articles/covid-19-testing-understanding-the-percent-positive.html (last visited Mar. 3, 2022), Ex. 68.

[93] *Id.*

throughout the United States.

93.     As of March 17, 2020, Rhode Island's positivity rate was above 5% and climbed sharply after that.[94]  Indeed, as of March 30, 2020, the statewide 7-day rolling test positivity rate was 16.8%, over three times higher than the 5% guideline, indicating uncontrolled community spread of Coronavirus throughout Rhode Island in late March and early April 2020.[95]

94.     As shown below, by way of example, the states in which ACS's **dependent business properties** operate their businesses were experiencing exceptionally high positivity rates:

- **Tennessee:**  As of March 22, 2020, Tennessee had a 7-day positivity rate of 17.9%.[96]

- **Indiana**:  As of March 31, 2020, Indiana had a 7-day moving positivity average rate of 12.4%.[97]

- **Ohio:** As of April 1, 2020, Ohio had a daily positivity 7-day moving average of 11.4%, which continued to rise to 24.2% as of April 21, 2020.[98]

- **Arizona:** As of April 17, 2020, Arizona had a daily positivity 7-day moving average of 11.0%.  Arizona's daily positivity 7-day moving average subsequently rose to 19.2% as of July 6, 2020.[99]

- **Florida**:  As of March 29, 2020, the 7-day positivity rate for those

---

[94] *Daily State-By-State Testing Trends*, JOHNS HOPKINS UNIV. MED. (updated Mar. 3, 2022), https://coronavirus.jhu.edu/testing/individual-states/rhode-island (last visited Mar. 3, 2022).

[95] *Daily State-By-State Testing Trends*, JOHNS HOPKINS UNIV. MED. (updated Mar. 7, 2022), https://coronavirus.jhu.edu/testing/individual-states/rhode-island (last visited Mar. 7, 2022).

[96] *Daily State-By-State Testing Trends*, JOHNS HOPKINS UNIV. MED. (updated Mar. 7, 2022), https://coronavirus.jhu.edu/testing/individual-states/tennessee (last visited Mar. 7, 2022).

[97] *Daily State-By-State- Testing Trends*, JOHNS HOPKINS UNIV. MED. (updated Mar. 3, 2022), https://coronavirus.jhu.edu/testing/individual-states/indiana (last visited Mar. 3, 2022).

[98] *Daily State-By-State Testing Trends*, JOHNS HOPKINS UNIV. MED. (updated Mar. 3, 2022), https://coronavirus.jhu.edu/testing/individual-states/ohio (last visited Mar. 3, 2022).

[99] *Daily State-By-State Testing Trends*, JOHNS HOPKINS UNIV. MED. (updated Mar. 3, 2022), https://coronavirus.jhu.edu/testing/individual-states/arizona (last visited Mar. 3, 2022).

taking COVID-19 tests in Florida was 10% with the daily rate equal to 13%.[100]

**F.    The Presence of Coronavirus in the Indoor Air of the Mexico Plants As Well As on Surfaces Caused the Physical Loss or Damage to those Plants by Causing The Loss, In Whole or in Part, Of the Functional Use of those Plants**

95.    The presence of hundreds of COVID-19 positive ACS Mexico Plants employees at the Mexico Plants, each exhaling millions of infectious virions, proves the actual presence of Coronavirus in the air on and the surfaces at those plants.  In addition, due to the prevalence (ratio of infected persons in a population) and incidence (ratio of new cases) of COVID-19 infections in Mexico, the Mexico Plants were at consistently high risk for the presence of the airborne Coronavirus from infected patrons and employees, some of whom would have been asymptomatic and unknowing spreaders of Coronavirus.  Coronavirus can be released into the air when infected persons breathe, talk, cough, sneeze, or sing, and such releases can infiltrate ventilation systems, as well as myriad surfaces (i.e., fomites), such as dermal contact surfaces (e.g., elevator buttons, restroom taps, manufacturing equipment, doorknobs, railings, towels etc.).  Coronavirus has deposited, and continues to deposit, and therefore elevate contagion risks on, myriad dermal contact surfaces, which are transformed into disease-spreading fomites.  These fomites can pose transmission risks for persons contacting those surfaces.

96.    It is undisputed that air within a property laden with asbestos fibers is unsafe for people.  It is no different for a property that has Coronavirus physically invading and physically altering its air – the building has been damaged because the virus invades and physically transforms the air and makes it unsafe for breathing.

97.    The introduction of Coronavirus into the indoor air at the Mexico Plants directly and physically changes, alters, and transforms the composition of the air – such that it now contains

---

[100] *Florida Dept. of Health Updates New COVID-19 Cases, Announces Three New Deaths Related to COVID-19, Morning Updated*, FLORIDAHEALTH.GOV (Mar. 30, 2020), http://www.floridahealth.gov/newsroom/2020/03/033020-1100-covid19.pr.html (last visited Mar. 3, 2022).

a concentration of potentially deadly SARS-CoV-2 infectious particles and virions (whereas before it did not).  The presence of Coronavirus in the air of the Mexico Plants physically alters and transforms indoor air on the property into a transmission vector for COVID-19.  And the presence of Coronavirus impairs the functional use of the property in the same manner as the presence any other hazardous, toxic, or noxious substance would, causing the physical loss or damage to the property.

98.     As with asbestos in the air, the presence of an unsafe agent, such as Coronavirus, in the air of the premises alone results in risk.  In fact, the risk of death due to exposure to Coronavirus is orders of magnitude higher than the risk of death due to exposure to asbestos. Indeed, recent estimates indicate that approximately 2,600 Americans die from asbestos exposure (mesothelioma) per year,[101] compared with over 459,000 deaths of Americans due to Coronavirus exposure in 2021.[102]  It is undisputed that the air within a property filled with asbestos fibers is unsafe for people.  It is no different for a property that has Coronavirus – an external force – physically invading and physically altering its air space; in fact, Coronavirus is exponentially more deadly than exposure to asbestos fiber.

## G.     The Civil Authority Order and Other Government Orders and the Closure and Restriction of the Mexico Plants and ACS's Dependent Business Premises

99.     Recognizing the unprecedented and catastrophic situation of the mushrooming outbreaks of COVID-19 and Coronavirus' devastating impact through the direct physical loss or damage to property and lives, on March 19, 2020, Mexico's General Health Council in extraordinary session, held that the COVID in Mexico was a "serious disease of priority attention."[103]  On March 24, 2020, Mexico's Secretariat of Health launched the "Healthy Distance"

---

[101] Rengyi Xu et al., *Association between mesothelioma and non-occupational asbestos exposure: systematic review and meta-analysis*. 17 ENV'T HEALTH 1, 90 (Dec. 19, 2018),
https://ehjournal.biomedcentral.com/articles/10.1186/s12940-018-0431-9 (last visited Mar. 3, 2022), Ex. 69.

[102] *Trends in Number of COVID-19 Cases and Deaths in the US Reported to the CDC, by State/Territory* (updated Mar. 3, 2022), https://covid.cdc.gov/covid-data-tracker/#trends_dailydeaths (last visited Mar. 3, 2022).

[103] *Acuerdo por el que se establecen las medidas preventivas que se deberán implementar para la mitigación y control de los riesgos para la salud que implica la enfermedad por el virus SARS-CoV2 (COVID-19)*

program[104]

100.     On March 30, 2020, Mexico declared a Health Emergency due to force majeure from the spread of Coronavirus and COVID-19 throughout the country, including the businesses within one mile of the Mexico Plants.[105]  On March 31, 2020, the Mexican Ministry of Health ordered the immediate suspension of all non-essential activities, including the manufacturing operations at ACS's Monterey Plant and Guadalupe Plant (the "Civil Authority Order").

101.     The Civil Authority Order was a recognition that the physical presence of Coronavirus in the indoor air and on the surfaces of business premises causes direct physical loss or damage to property by making it unfit and dangerous for intended uses.  Particularly, the Civil Authority Order stated it was issued "in order to mitigate the spread and transmission of the virus SARS-CoV[-]2 in the community".[106]

102.     These government orders, including the Civil Authority Order, through their forced closure of the Mexico Plants and ACS's **dependent business premises**, prohibited access to these premises.  The government orders were issued in response to the spread of Coronavirus and COVID-19 throughout Mexico, including the properties within one mile of the Mexico Plants and ACS's **dependent business premises**, and the resulting direct physical loss or damage caused therefrom.

103.     As a result of these Mexican government orders, including the Civil Authority

---

*[AGREEMENT establishing the preventive measures to be implement for the mitigation and control of the health risks involved in the SARS-CoV2 virus disease (COVID-19))*, DIARIO OFICIAL DE LA FEDERACIÓN (Mar. 24, 2020), https://dof.gob.mx/nota_detalle.php?codigo=5590339&fecha=24/03/2020 (last visited Mar. 3, 2022).

[104] *Id.*; *Mexico's Response to COVID-19: A Case Study*, UCSF Inst. Global Health Sci. (Apr. 12, 2021), https://globalhealthsciences.ucsf.edu/news/mexicos-response-covid-19-case-study (last visited Mar. 3 2022), Ex. 60.

[105] *ACUERDO por el que se declara como emergencia sanitaria por causa de fuerza mayor, a la epidemia de enfermedad generada por el virus SARS-CoV2 (COVID-19) [AGREEMENT declaring as a health emergency due to force majeure, the epidemic of disease generated by the SARS-CoV2 virus (COVID-19)]*, DIARIO OFICIAL DE LA FEDERACIÓN (Mar. 30, 2020), https://dof.gob.mx/nota_detalle.php?codigo=5590745&fecha=30/03/2020 (last visited Mar. 3, 2022).

[106] *ACUERDO por el que se establecen acciones extraordinaries para attender la emergencia sanitaria generada por el virus SARS-C0V2. [AGREEMENT establishing extraordinary actions to address the health emergency generated by the SARS-CoV2 virus.]*, DIARIO OFICIAL DE LA FEDERACIÓN (Mar. 31, 2020), https://dof.gob.mx/nota_detalle.php?codigo=5590914&fecha=31/03/2020 (last visited Mar. 3, 2022).

Order, as of April 6, 2020, ACS's operations at both the Monterey Plant and Guadalupe Plant were fully closed, and ACS's operations at the Apodaca Plant were significantly limited to activities "directly necessary to respond to the sanitary emergency" and thus the manufacture of various of its cleaning products.[107]   The forced closure of Monterey Plant and Guadalupe Plant and severe restrictions in the operations of the Apodaca Plant triggered the Policy's Civil or Military Authority Coverage.

104.   State and local governments across the United States and government authorities throughout the world similarly recognized the unprecedented and catastrophic situation of the mushrooming outbreaks of COVID-19 and Coronavirus's catastrophic impact through the direct physical loss or damage to property and lives.

105.   For example, in the United States, the CDC and the national Coronavirus Task Force issued to the American public guidance titled "30 Days to Slow the Spread" of COVID-19, on March 16, 2020.   The guidance called for restrictive social distancing measures, such as working from home, avoiding gatherings of more than 10 people, and staying away from bars and restaurants. [108]   And in early March 2020, many states had issued "State of Emergency" Declarations.   Within a short time, many of the states in which ACS's **dependent business premises** operate issued orders suspending or severely limiting business operations deemed to be "non-essential businesses" where people could potentially contract COVID-19 from others or from the property itself.   This included certain manufacturers, foodservice distributors, foodservice businesses, among others, which were deemed non-essential businesses.

106.   Between March 16, 2020 and April 3, 2020, state, provincial or local authorities in many of the countries and states in which ACS's **dependent business premises** operate issued

---

[107] WilmerHale & Creel, García-Cuéllar, Aiza y Enriquez, *COVID-19: Federal Government of Mexico Declares State of Emergency and Suspends "Nonessential Activities"*, WILMERHALE (Apr. 8, 2020), https://www.wilmerhale.com/en/insights/client-alerts/20200408-covid-19-federal-government-of-mexico-declares-state-of-emergency-and-suspends-nonessential-activities (last visited Mar. 3, 2022).

[108] *The President's Coronavirus Guidelines for America, 30 Days to Slow the Spread*, WHITE HOUSE & CDC (Mar. 16, 2020), https://trumpwhitehouse.archives.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last visited Mar. 3, 2022).

orders that required ACS's **dependent business premises** to close or severely limit their operations in that state, including but not limited to: Mexico, Alabama, Arizona, Florida, Indiana, Ohio, South Carolina, and Tennessee.[109]  For example, upon information and belief, the Civil Authority Order forced the closure or severely limited the operations of ACS's **dependent business premises** also located in Mexico, including but not limited to the properties operated by ZF Reynosa, Tenneco, Daimler, and NASG.

107.   As early as March 18, 2020, ACS began to receive notices from various of its **dependent business premises** announcing the closure of operations at their premises and the fact they would no longer be accepting or picking up deliveries from their suppliers, in light of the ongoing outbreaks of COVID-19, the presence of Coronavirus at their premises, and the corresponding civil authority/government orders.

108.   These civil authority/government orders, through their forced closure or restriction of ACS's **dependent business premises**, prohibited access to these premises.  The government orders were issued in response to the spread of Coronavirus and COVID-19 throughout the area governed thereby, including the properties within one mile of ACS's **dependent business premises**, and the resulting direct physical loss or damage caused therefrom.

109.   Moreover, many government orders explicitly cited the need to protect and preserve

---

[109] *See, e.g.*, Ariz. Exec. Order No. 2020-12, *Prohibiting the Closure of Essential Services* (Mar. 23, 2020), https://azgovernor.gov/executive-orders (last visited Mar. 3, 2022); Ariz. Exec. Order No. 2020-18, *Stay Home, Stay Healthy, Stay Connected* (Mar. 30, 2020), https://azgovernor.gov/executive-orders (last visited Mar. 3, 2022); Ind. Exec. Order No. 20-08, *Directive for Hoosiers to Stay at Home* (Mar. 23, 2020), https://www.in.gov/gov/files/Executive_Order_20-08_Stay_at_Home.pdf (last visited Mar. 3, 2022); S.C. Exec. Order No. 2020-17 (Mar. 31, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-03-31%20eFILED%20Executive%20Order%20No.%202020-17%20-%20Closure%20of%20Non-Essential%20Businesses.pdf (last visited Mar. 3, 2022); S.C. Exec Order No. 2020-18 (Apr. 3, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-04-03%20eFILED%20Executive%20Order%20No.%202020-18%20-%20Closure%20of%20Additional%20Non-Essential%20Businesses.pdf (last visited Mar. 3, 2022); S.C. Exec. Order No. 2020-21 (Apr. 6, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-04-06%20eFILED%20Executive%20Order%20No.%202020-21%20-%20Stay%20at%20Home%20or%20Work%20Order.pdf (last visited Mar. 3, 2022); Tenn. Exec. Order No. 22, *An Order Directing Tennesseans to Stay Home unless Engaging in Essential Activities to Limit their Exposure to and Spread of COVID-19* (Mar. 30, 2020), https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee22.pdf (last visited Mar. 3, 2022).

property as a motivation for such order.  For example, almost every New York City order imposing COVID-19 related restrictions specifically cited the need to mitigate ongoing property damage. Consistent with this, a March 16, 2020 New York City Order stated that it was issued "because of the propensity of the virus to spread person to person and also *because the virus physically is causing property loss and damage.*"[110]

**H.    As the Civil Authority Order and Other Government Orders Lifted, The Mexico Plants Reopened but Operated Under Severe Restrictions and with Safety Measures that Forced ACS to Incur Extra Expenses to Continue Operating and Prevent Further Direct Physical Loss or Damage to the Mexico Plants**

110.    As discussed herein, the presence of Coronavirus in the indoor air and on the surfaces of property, directly and physically changes, alters, and transforms the composition of the air and surfaces it touches such that they are unsafe for people, its presence - much like the presence of any other hazardous, toxic, or noxious substance - is expected to impair the functional use of the property and cause physical loss or damage to the property.  The only way to eliminate the presence of Coronavirus from property and prevent its continuous reintroduction is to close down property completely and bar all individuals from entering.

111.    In an effort to continue and minimize the impairment of its operations on May 18, 2020, ACS reopened the Monterrey Plant and Guadalupe Plant.

112.    As civil authority/government orders affecting them lifted, ACS's **dependent business premises** also began reopening their businesses between May and July of 2020.

113.    However, the reopening of the Mexico Plants and ACS's **dependent business premises** did not abate ACS's losses arising from the direct physical loss or damage to the Mexico Plants, ACS's **dependent business premises**, and the business within one mile therefrom.

114.    Indeed, upon reopening these businesses were at constant risk that the Coronavirus

---

[110] N.Y.C. Emergency Exec. Order No. 100 (Mar. 16, 2020),
https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf (last visited Mar. 3, 2022) (emphasis added).

would be introduced into the indoor air and surfaces at their properties, causing physical loss or damage thereto.    This can be demonstrated by not only the high number of COVID-19 infections in areas surrounding these businesses, but also through the high number of employees that reported COVID-19 infections to their employers while working at those businesses.   Indeed, an ACS employee working at the Monterrey Plant reported they were COVID-19 positive on May 28, 2020, only ten days after reopening.   Thus, ACS and its properties, including the Mexico Plants, ACS's **dependent business premises**, and the business within one mile therefrom, were under the constant threat of imminent direct physical loss or damage to their properties caused by Coronavirus and COVID-19.

115.    In an attempt to stay open and continue operations at the Mexico Plants and to protect the Mexico Plants from the imminent direct physical loss or damage caused by Coronavirus and COVID-19, ACS has incurred significant reasonable and necessary extra expenses and costs, over and above the expenses it would have normally incurred, as well as loss prevention expenses, and has implemented numerous onerous and expensive new health safety, scheduling, and hygiene procedures for the Mexico Plants.   ACS also took actions to repair and replace property to reduce the losses it would have otherwise suffered due to the physical loss or damage caused by Coronavirus and COVID-19.

116.    Among other things, ACS created and developed a comprehensive Business Continuity Plan, a labor continuity plan risk matrix, an audit self-assessment checklist for COVID-19, as well as a Reaction Plan Protocol, 42 new safety protocols and procedures and 82 videos to describe these procedures.   Each of these new protocols were tested through simulations of situations that present the highest risk of Coronavirus infiltration.   Indeed, audit inspections of the Mexico Plants upon reopening by the inspectors of the Mexican labor, health and economic secretaries awarded ACS the highest score and recognized the actions ACS has taken to protect its employees, property, and business.

117.    Specifically, the necessary costs and expenses ACS incurred include, but are not limited to:

- purchasing and providing PPE to its employees such as facemasks, goggles, face shields, disposable shoe protectors and nitrite gloves;

- developing and implementing employee health assessment questionnaires and isolation protocols;

- purchasing and providing "non-contact" thermometers for employee evaluation;

- installing specialty hazardous waste containers for the disposal of used PPE equipment including masks ACS provided to employees;

- installing barriers (such as in manufacturing areas, in cafeterias or dining rooms and dressing rooms) to hamper transmission of Coronavirus and foster social distancing;

- removing turnstiles at entrances and exits at the Mexico Plants and replacing with newly installed barriers and new security and control protocols for entering and exiting the properties;

- installing separate areas for the isolation of individuals with suspected COVID-19 infections;

- installing sanitizing mats at entrances and sanitization stations throughout the Mexico Plants for employees to hamper transmission of Coronavirus and COVID-19;

- making hand sanitizer, disinfecting wipes, soap and water readily available to employees;

- purchasing and placing readily visible signage to encourage safe practices among employees;

- developing and implementing a digital record system, removing and replacing the previous manual, paper-based registration system, which was identified as having a high-risk of Coronavirus transmission;

- developing, updating and implementing various enhanced cleaning protocols including a deep cleaning and disinfection protocol to be used

when employees reported to ACS they were COVID-19 positive;

- regularly and frequently cleaning any high-touch and frequently touched surfaces according to heightened guidelines, including buttons, control panels, workstations, movable equipment, vending machines, as well as all incoming parts, material and packages;

- dramatically increasing cleaning frequency for the Mexico Plants;

- purchasing specialized cleaning supplies, including materials to test the concentration of various dangerous chemicals in cleaning solutions used at the Mexico Plants; and

- upgrading HVAC ventilation filters.

118.    Despite these concerted safety processes, ACS has not completely escaped the risks of exposure to and infection from Coronavirus as 555 employees at the Mexico Plants have reported to ACS that they contracted COVID-19 while working at the Mexico Plants since their reopening.

119.    The presence of Coronavirus in and on the Mexico Plants caused ACS to suffer direct physical loss or damage to its Mexico Plants as previously alleged herein.  The presence of Coronavirus in the air and on the surfaces at the plants has caused a significant impairment to and disruption of the Mexico Plants' business operations.  The reduced hours, reduced capacity, and significant restrictions on the Mexico Plants' manufacturing operations, have deprived ACS of the full functional use of its property, causing further direct physical loss or damage to the Mexico Plants.  Moreover, these closures, restrictions, and related measures discussed herein have alienated some of the current and prospective customers of the products manufactured at the Mexico Plants, causing ACS to sustain yet more losses.

I.    **The Devastating Toll to ACS from Coronavirus and COVID-19**

120.    ACS experienced direct physical loss or damage to the Mexico Plants in at least three ways:

(1) the presence of Coronavirus in the indoor air and on surfaces at each of the

Mexico Plants caused the loss, in whole or in part, of the functional use of those Mexico Plants;

(2) through the need to modify physical behaviors by social distancing, avoiding confined indoor spaces, and avoiding congregating in the same physical area as others, in order to reduce or minimize the potential for viral transmission; and

(3) through the need to mitigate the threat or actual physical presence of Coronavirus on frequently touched surfaces and objects, including the manufacturing equipment, work bench tables, door handles, bathrooms faucets, miscellaneous surfaces, in heating and air conditioning systems and in or on any other of the multitude of places that Coronavirus has been or could be found.

121.    Coronavirus and COVID-19's impacts on ACS's business in Mexico as well as the businesses of ACS's **dependent business premises** across the United States and throughout the world cannot be overstated.

122.    ACS's business derives a substantial amount of its revenue from the sale of its uniquely manufactured products at the Mexico Plants to ACS's **dependent business premises**.  If the Mexico Plants or ACS's **dependent business premises** are closed, ACS loses revenue.  And if the Mexico Plants or ACS's **dependent business premises** only operate at limited capacity, ACS's revenue decline from pre-COVID-19 levels.

123.    From April 6, 2020 until May 18, 2020, the Monterrey Plant and Guadalupe Plant were closed as a consequence of the Civil Authority Order prohibiting access to the plants. Although the Apodaca Plant remained open, it operated at a limited manufacturing capacity for an extended period of time as a consequence of government orders and the direct physical loss or damage caused by Coronavirus.  Upon reopening, the Monterey Plant and Guadalupe Plant also operated at a limited capacity for an extended period of time.

124.    Similarly, between Mid-March 2020 and June 2020, as a result of civil authority/government orders prohibiting access to their premises as well as the physical loss or damage to their property caused by Coronavirus, various of ACS's **dependent business premises**

were closed or otherwise refused to accept or pickup deliveries of product manufactured at the Mexico Plants.  Upon reopening, ACS's **dependent business premises** operated at a limited capacity for an extended period of time, refusing or otherwise limiting the quantity of deliveries accepted of product manufactured at the Mexico Plants.

125.    Thus, the Civil Authority Order, other government orders and the physical loss or damage to the Mexico Plants and ACS's **dependent business premises** has dramatically decreased ACS's revenues.

126.    ACS has suffered substantial losses to date.

127.    Of course, the devastation to ACS's property and business should come as no surprise given the toll COVID-19 has wreaked throughout the world, the United States and in Mexico specifically.  Coronavirus and COVID-19 could result in net losses starting at $3.2 trillion and reaching as much as $4.8 trillion in U.S. real gross domestic product over the course of two years.[111]  In Mexico, economic activity plummeted 18.9% in the second quarter of 2020 as compared to the same period the prior year.[112]  Similarly, the gross domestic product of industrial activities dropped 26% in the second quarter of 2020 as compared to the same period the prior year.[113]  In June of 2020, the National Institute of Statistics and Geography in Mexico announce that industrial activity fell 25% in April 2020 as compared to March, the worst monthly decline since it began tracking the monthly data in 1993.[114]  Economic analysts stated that the drop in economic output in the second quarter was the largest in Mexico's recorded history and have

---

[111] Emily Gersema, *Business closures and partial reopenings due to COVID-19 could cost the U.S. trillions*, USC NEWS (Nov. 30, 2020), https://news.usc.edu/178979/business-closures-covid-19-pandemic-united-states-gdp-losses/#:~:text=The%20COVID%2D19%20pandemic%20could,years%2C%20a%20USC%20study%20finds (last visited Mar. 3, 2022).

[112] Rubén Migueles, *Se hunde economía 19.5%; Covid profundiza recesión [Mexico's economy shrinks record 18.9%, faces deeper COVID-19 recession]*, EL UNIVERSAL (July 7, 2020), https://www.eluniversal.com.mx/english/mexicos-economy-shrinks-record-189-faces-deeper-covid-19-recession (last visited Mar. 3, 2022).

[113] *Id.*

[114] *Id.*

estimated that Mexico's economy could contrast between 8% and 11.2% for 2020.[115] As of April 2020, the working population in Mexico dropped by 12.5 million people.[116]  As of January 2021, at least 1.8 million people that their jobs during the onset of Coronavirus and COVID-19 had not returned to the work force.[117]

128.    As of January 1, 2020, ACS employed over 2,475 employees at the Mexico Plants. Following the emergence of Coronavirus and COVID-19 and the physical loss or damage they caused to the Mexico Plants, approximately 1,092 employees were furloughed, 50% of which were subsequently rehired or replaced.  Indeed, as of January 1, 2021, the Mexico Plants employed only 2,016 individuals.

129.    Coronavirus and COVID-19 have been disastrous for the manufacturing sector worldwide, with certain industries, seeing significant downturn in business in 2020.  Particularly, light vehicle production in the United States was down nearly 99% in April of 2020 and remained down nearly 38.6% during the first half of 2020 versus the same period last year.[118]  Additionally, as a result of the spread of Coronavirus and COVID-19 and the direct physical loss or damage they cause, the manufacturing sector has suffered disruption to production and supply chains.  These changes to production have had a major impact on manufacturing equipment performance,

---

[115] *Id.*; Linnea Sandin, *The Covid-19 Pandemic Threatens Mexico's Economy*, CTR. FOR STRATEGIC & INT'L STUD. (June 17, 2020), https://www.csis.org/analysis/covid-19-pandemic-threatens-mexicos-economy (last visited Mar. 3, 2022).

[116] Rubén Migueles, *Se hunde economía 19.5%; Covid profundiza recesión [Mexico's economy shrinks record 18.9%, faces deeper COVID-19 recession]*, EL UNIVERSAL (July 7, 2020), https://www.eluniversal.com.mx/english/mexicos-economy-shrinks-record-189-faces-deeper-covid-19-recession (last visited Mar. 3, 2022).

[117] Alonso Hidalgo, *México: Evaluación actualizada del impacto de la pandemia del coronavirus en el sector extractivo y la gobernanza de los recursos naturales [Mexico: Updated Assessment of the Impact of the Coronavirus Pandemic on the Extractive Sector and Resource Governance]*, NAT. RES. GOVERNANCE INST. (Jan. 7, 2021), https://resourcegovernance.org/analysis-tools/publications/mexico-updated-assessment-coronavirus-extractive (last visited Mar. 3, 2022).

[118] *The Impact of the COVID-19 Outbreak on the Manufacturing Market*, CIV. & ENV'T CONSULTANTS, INC. (Aug. 6, 2020), https://www.cecinc.com/blog/2020/08/06/the-impact-of-the-covid-19-outbreak-on-the-manufacturing-market/ (last visited Mar. 3, 2022).

maintenance schedules and practices, and the ability to meet demand in a timely manner.[119]

130.    The loss of life has also been devastating and reflective of the damage wrought by Coronavirus and COVID-19 and their pervasiveness in any business premises open to the public. As of March 3, 2022, COVID-19 has killed over 3,415 individuals in Rhode Island,[120] 952,223 Americans,[121] 318,531 individuals in Mexico,[122] and 5.9 million people worldwide.[123]   Recent reports estimate that the actual number of people killed by COVID-19 directly or indirectly in Mexico is closer to 680,000 people and worldwide that number is closer to 19.5 million people.[124] COVID-19 is now the third-leading cause of death in the United States, surpassed only by heart disease and cancer, and is the leading cause of death in Mexico.[125]   At its peak, over 4,000 Americans were perishing per day from COVID-19.[126]   A substantial number of individuals in the United States and Mexico are still dying daily, with surges of cases and waves of new and ever more contagious variants of Coronavirus occurring throughout the U.S. and Mexico – the Omicron variant in particular.[127]

---

[119] *How is the Coronavirus Impacting Manufacturing?*, ADVANCED TECH. SERVS., INC., https://www.advancedtech.com/blog/how-is-the-coronavirus-impacting-manufacturing/ (last visited Mar. 3, 2022).

[120] *Rhode Island Department of Health COVID-19 Data Tracker*, R.I. DEP'T HEALTH (updated Mar. 3, 2022), https://ri-department-of-health-covid-19-data-rihealth.hub.arcgis.com/ (last visited Mar. 3, 2022).

[121] *United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction,* CDC (updated Mar. 3, 2022), https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited Mar. 3, 2022).

[122] *Tracking Coronavirus in Mexico: Latest Map and Case County*, N.Y. TIMES (updated Mar. 2, 2022), https://www.nytimes.com/interactive/2021/world/mexico-covid-cases.html (last visited Mar. 3, 2022).

[123] *WHO Coronavirus (COVID-19) Dashboard*, WHO (updated Mar. 3, 2022), https://covid19.who.int/ (last visited Mar. 3, 2022).

[124] *The pandemic's true death toll,* ECONOMIST (updated Mar. 2, 2022), https://www.economist.com/graphic-detail/coronavirus-excess-deaths-estimates (last visited Mar. 3, 2022).

[125] Youyou Zhou & Gary Stix, *COVID-19 Is Now the Third Leading Cause of Death in the U.S.*, SCI. AM. (Oct. 8, 2020), https://www.scientificamerican.com/article/covid-19-is-now-the-third-leading-cause-of-death-in-the-u-s1/ (last visited Mar. 3, 2022), Ex. 70; *Mexico's Response to COVID-19: A Case Study*, UCSF INST. GLOBAL HEALTH SCI. (Apr. 12, 2021), https://globalhealthsciences.ucsf.edu/news/mexicos-response-covid-19-case-study (last visited Mar. 3, 2022), Ex. 60.

[126] Eugene Garcia, Lisa Marie Pane & Thalia Beaty, *U.S. tops 4,000 daily deaths from coronavirus for 1st time*, AP NEWS (Jan. 8, 2021), https://apnews.com/article/us-coronavirus-death-4000-daily-16c1f136921c7e98ec83289942322ee4 (last visited Mar. 3, 2022), Ex. 71.

[127] *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory*, CDC (updated Mar. 3, 2022), https://covid.cdc.gov/covid-data-tracker/#trends_dailydeaths (last visited Mar. 3, 2022);

131.    Thus, the damage to ACS and others will only continue.

**J.     The All-Risk Foreign Master Property Policy and its Applicable Coverages**

132.    In exchange for a very substantial premium ($136,610.00), Great Northern sold ACS the Policy, an all-risk commercial property policy with policy number 3584-30-71 BOS, for the policy period May 18, 2019 to May 18, 2020, that covered ACS's foreign operations in Mexico, China, and Romania (the "Policy").  The Policy provides coverage for property losses, for business interruption losses ("**business income** loss" per the Policy language), and other losses, on a Difference In Terms/Conditions basis and on an Excess basis, with separate limits of liability for property damage and business interruption losses that apply to each of ACS's international locations.

133.    ACS fully paid the premiums for the Policy.

134.    Great Northern (and/or its affiliate, Chubb Group of Insurance Companies ("Chubb")) drafted the Policy.  ACS played no role in drafting the Policy.

135.    The Policy insures "direct physical loss or damage to: **building**; or **personal property**, caused by or resulting from a peril not otherwise excluded" and provides coverage for property damage losses, Business Income losses, and other losses.

136.    The phrase "direct physical loss or damage to" property is not defined or limited in the Policy.  In plain English, "direct physical loss or damage to" denotes at least the following meanings: (1) physical damage to that property; (2) the physical alteration of that property; (3) the interaction of an external physical substance or force with that property, including its presence in the air or on the surfaces of that property, rendering the property unfit, unsafe or uninhabitable for normal or intended use, causing that property to lose, in whole or in part, its functional use or

---

*Tracking Coronavirus in Mexico: Latest Map and Case County*, N.Y. TIMES (updated Mar. 2, 2022), https://www.nytimes.com/interactive/2021/world/mexico-covid-cases.html (last visited Mar. 3, 2022); Jonathan Corum & Carl Zimmer, *Tracking Omicron and Other Coronavirus Variants*, N.Y. TIMES (updated Mar. 3, 2022), https://www.nytimes.com/interactive/2021/health/coronavirus-variant-tracker.html#B11 (last visited Mar. 3, 2022); Lauren Leatherby et al., *Omicron Drives U.S. Virus Cases Past Delta's Peak*, N.Y. TIMES (Dec. 23, 2021), https://www.nytimes.com/interactive/2021/12/23/us/omicron-case-count.html (last visited Mar. 3, 2022).

otherwise negatively affecting the property's usability; or (4) the loss of use or the loss of functional use, whether in whole or in part, of that property.

137.    The Policy's Limits of Insurance [128] include a $75,000,000 blanket limit of insurance for "BUSINESS INCOME/GROSS PROFITS WITH EXTRA EXPENSE" at the Monterrey Plant and Guadalupe Plant, a limit of $22,000,000 for "BUSINESS INCOME/GROSS PROFITS WITH EXTRA EXPENSE" at the Apodaca Plant, and for "BUILDING" coverage a $6,900,000 limit at the Monterrey Plant, a $7,500,000 limit at the Guadalupe Plant, and a $2,000,000 limit at Apodaca Plant.  The Policy's full terms and conditions are set forth therein, but as relevant here, the Policy provides as follows:

**a. *Business Income and Extra Expense Coverage***

138.    The Business Income and Extra Expense Coverage in the Policy provides in relevant part:

Business Income And Extra Expense

We will pay for the actual:

- **business income** loss you incur due to the actual impairment of your **operations**; and
- **extra expense** you incur due to the actual or potential impairment of your **operations**,

during the **period of restoration**, not to exceed the applicable Limit Of Insurance for Business Income/Gross Profits With Extra Expense shown in the Declarations.

This actual or potential impairment of operations must be caused by or result from direct physical loss or damage by a **covered peril** to **property**, unless otherwise stated.

139.    The Policy defines a **covered peril** as "a peril covered by the Form(s) shown in the Property Insurance Schedule of Forms, applicable to the lost or damaged **property**."

140.    The Policy defines **extra expense** as follows:

**Extra expense** means necessary expenses you incur:

A. in an attempt to continue **operations**, over and above the expense you would

---

[128] Capitalized and bolded terms herein are capitalized and bolded in the Policy, unless otherwise noted.

have normally incurred: and

B. to repair or replace any **property**, or to research or restore the lost information on damaged **valuable papers**, records and media, if such action will reduce any loss we would pay under this insurance.

Paragraph B. does not apply to Fungus Clean-up or Removal Premises Coverage.

141.    As set forth herein, Coronavirus and COVID-19 caused direct physical loss or damage to property, including the Mexico Plants.

142.    Coronavirus and COVID-19 also caused such property to lose (in whole or in part) its functional use and rendered such property uninhabitable, unfit and/or unsafe for its normal and/or intended usages, depriving ACS of its property.

143.    The Policy does not exclude virus or communicable disease as causes of loss.

144.    ACS derives a substantial amount of its revenue from the sale of products manufactured at the Mexico Plants.  Two of the Mexico Plants were closed during the Policy Period.  After those two plants re-opened and during the third plant's operations of only limited scope, the Mexico Plants, due to the physical presence of Coronavirus in their indoor air and on the surfaces, experienced an impairment of their operations.  As such, ACS has sustained and is sustaining a substantial loss of its Business Income as insured under the Policy.

145.    ACS undertook costly measures, over and above the expenses it would have normally incurred, covered as **extra expense** under the Policy, due to the actual or potential impairment of its business operations and to continue operations at the Mexico Plants in light of the continuing loss or damage to its property due to Coronavirus and COVID-19.  This included, among other things, altering its property to protect it from physical loss or damage, taking actions to repair and replace its property, and taking measures to protect the safety of its employees and customers, including erecting barriers, removing and replacing existing security features at entrances and exits, altering air circulation, reconfiguring indoor spaces, disinfecting surfaces and materials, and providing PPE to employees.

### b. *Additional Coverages and Other Coverages*

146.    The Policy also contains numerous Additional Coverage and other coverages that apply to ACS's losses.

147.    Similar to the Policy's Business Income And Extra Expense Coverage, Coronavirus and COVID-19 are both **covered perils** for the purposes of the Additional Coverages.

148.    Applicable Additional Coverages include, but are not limited to, the following:

149.    The Policy provides Dependent Business Premises coverage, which provides in relevant part:

Dependent Business Premises

> We will pay for the actual:
>
> - **business income** or **gross profits** loss you incur due to the actual impairment of your **operations**; and
> - **extra expense** you incur due to the actual or potential impairment of your **operations**,
>
> during the **period of restoration** or **indemnity period**, whichever applies, not to exceed the applicable Limit Of Insurance for Dependent Business Premises shown under Business Income/Gross Profits in the Declarations.
>
> This actual or potential impairment of **operations** must be caused by or result from direct physical loss or damage by a **covered peril** to **property** or **personal property of a dependent business premises** at a **dependent business premises**.

150.    The Policy defines **dependent business premises** as follows:

> **Dependent business premises** means premises operated by others on whom you depend to:
>
> - deliver materials or services to you or to others for your account (contributing premises);
> - accept your products or services (recipient premises);
> - manufacture products for delivery to your customers under contract of sale (manufacturing premises); or
> - attract customers to your business (leader premises).

151.    Among other things, as set forth herein, Coronavirus and COVID-19 caused direct physical loss or damage at premises that ACS depends on to deliver materials or services to ACS

and to others for ACS ("contributing premises") and at premises ACS depends on to accept its products or services ("recipient premises").

152.    Additionally, as set forth herein, Coronavirus and COVID-19 rendered such **dependent business premises** unfit and unsafe for their normal usages, resulting in the deprivation of use of such properties.

153.    The Policy also provides Civil or Military Authority Coverage which provides in relevant part:

> We will pay for the actual:
>
> - **business income** or **gross profits** loss; or
> - **extra expense,**
>
> you incur due to the actual impairment of your **operations**, directly caused by the prohibition of access to:
>
> - your premises; or
> - a **dependent business premises**,
>
> by a civil or military authority.
>
> This prohibition of access by a civil or military authority must be the direct result of direct physical loss or damage to property away from such premises or such **dependent business premises** by a **covered peril**, provided such property is within:
>
> - one mile
>
> from such premises or **dependent business premises**[.].

154.    Coronavirus, a physical substance that cannot be seen but can survive in the air or on the surface of property and that can make persons within a premises sick and the premises uninhabitable, caused direct physical loss or damage to property throughout the cities where the Mexico Plants are located, as well as the cities and states where ACS's **dependent business premises** are located, including property within one mile of these properties (including but not limited to each of the specific business premises located within one (1) mile of the Mexico Plants set forth above), giving rise to the actions of civil authority orders, including the Civil Authority

Order.  These orders prohibited access to the Mexico Plants and ACS's **dependent business premises** and these orders were the direct result of the direct physical loss or damage to the property described and/or referenced in this paragraph.

155.   This prohibition of access by the Civil Authority Order and the other civil authority orders to the Mexico Plants and ACS's **dependent business premises**, directly caused ACS to sustain an actual impairment of its **operations**.

156.   The Policy also includes an EXTENDED PERIOD AND INDEMNITY PERIOD, providing for 12 months of lost BUSINESS INCOME/GROSS PROFITS WITH EXTRA EXPENSE coverage.

157.   The Policy also provides Loss Prevention Expenses Coverage, which provides in relevant part:

> We will pay the reasonable and necessary costs you incur to protect:
>
> - **building . . .**
>
> at the premises shown in the Declarations from imminent direct physical loss or damage caused by or resulting from a peril not otherwise excluded[.]

158.   As set forth herein, the presence of Coronavirus and COVID-19 in and on property is expected to cause direct physical loss or damage to that property in the same manner as other hazardous, toxic, or noxious substances would.  Thus, the actions taken to protect property from such imminent direct physical loss or damage and the reasonable and necessary costs incurred thereby are covered losses under the Policy.

159.   ACS undertook such costly measures necessary to protect the Mexico Plants from imminent physical loss or damage.  This included, among other things, procuring and providing personal protective equipment ("PPE"), sanitizing products, upgrading HVAC filters, installing barriers and otherwise reconfiguring indoor spaces.  Additionally, during times of low or no manufacturing operations at the Mexico Plants, ACS incurred costs associated with security, fire monitoring, elevator maintenance, pest control, clean up control, utilities, and maintenance.

160. No exclusions apply to ACS's claims.

**c. *The Policy's Pollutants Exclusion Does Not Bar Coverage***

161. The Policy contains a Pollutants Exclusion which provides in relevant part:

This insurance does not apply to loss or damage caused by or resulting from the mixture of or contact between property and a **pollutant** when such mixture or contact causes the property to be impure and harmful to:

- itself or other property;
- persons, animals or plants;
- land, water or air; or

any other part of an environment,

either inside or outside of a building or other structure, regardless of any other cause or event that directly or indirectly:

- contributes concurrently to; or
- contributes in any sequence to,

the loss or damage, even if such other cause or event would otherwise be covered.

This Pollutants exclusion does not apply to:

A. the mixture of or contact between property and **pollutants** if the mixture or contact is directly caused by or directly results from a **specified peril**
B. any solid, liquid or gas used to suppress fire; or
C. **water.**

Paragraphs B. and C. do not apply to loss or damage involving:

- viruses or pathogens; or
- ammonia.

162. Great Northern (and/or its affiliate, Chubb) drafted the Pollutants Exclusion.

163. ACS had no role in drafting or negotiating the Pollutants Exclusion.

164. By its terms the Pollutants Exclusion does not apply to loss or damages caused by or resulting from "virus" (such as Coronavirus). Instead, the exclusion only applies to "loss or

damage caused by or resulting from the mixture of or contact between property and a **pollutant**"
and the Policy's definition of **pollutants** does not include "virus" or "disease."  Instead, the Policy
defines **pollutants** as "any solid, liquid, gaseous or thermal irritant or contaminant, including
smoke, vapor, soot, fibers, fumes, acids, alkalis, chemicals and waste. Waste includes materials to
be recycled, reconditioned or reclaimed."

165.    The only mention of "virus" is within the exceptions to the Pollutants Exclusion.
The Pollutants Exclusion does not mention communicable disease or pandemics.

166.    Even if the Pollutants Exclusion applies to loss or damage caused by or resulting
from "virus," it can only be read to exclude traditional environmental pollution, and does not apply
to naturally occurring communicable disease and its causative agents.

167.    Nor does the Policy's "Increase Of Loss Due To Death Or Injury" Loss Payment
Limitation (the "Death/Injury Limit") apply to ACS's claims for losses due to Coronavirus and
COVID-19.

168.    The Death/Injury Limit provides in relevant part: "We will not pay for any **business
income** loss, **gross profits** loss or **extra expense** caused by or resulting from any injury, sickness,
disease, death, emotional injury, emotional distress or humiliation of any person."  But the
Death/Injury Limit is inapplicable by its terms, applying solely to insurance claims for human
injury or death and not to insurance claims for property damage, business income loss, etc., caused
by the presence of Coronavirus and COVID-19.

169.    Upon information and belief, prior to the sale and issuance of the Policy, Great
Northern and Chubb were aware of exclusions being used in the insurance industry that purported
to expressly exclude loss from "pandemic", "pandemics" or "communicable disease"
("Communicable Disease Exclusions").

170.    Upon information and belief, Great Northern and Chubb were aware of the risk of
an infectious viral pandemic such as Middle East respiratory syndrome ("MERS"), severe acute
respiratory syndrome ("SARS") and Avian influenza prior to selling and issuing the Policy.

171.    Upon information and belief, prior to the sale and issuance of the Policy, Great

Northern and Chubb were aware of exclusions being used in the insurance industry that purported to expressly exclude loss from "viruses," such as the Virus Exclusion released in 2006 by the Insurance Services Office, Inc. ("ISO") in response to the SARS outbreak of 2003 (the "ISO Virus Exclusion").

172.    The ISO Virus Exclusion, written on ISO form CP 01 40 07 06, is titled "Exclusion for Loss Due To Virus Or Bacteria" and provides, in relevant part:

> We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

The ISO Virus Exclusion goes on to specifically state that it applies, among other things, to "business income," i.e., business interruption.

173.    Great Northern failed to include the ISO Virus Exclusion in the Policy.

### d. *The Underlying Insurance Program*

174.    The Policy provides coverage for ACS's international operations in Mexico, China, and Romania on a Difference in Terms/Conditions and Excess basis.

175.    The Difference In Terms/Conditions Provision in the Policy provides: "this insurance applies to loss or damage including **coinsurance deficiency** and **currency devaluation** to the extent that **underlying insurance**, by its terms and conditions, does not apply."

176.    The Policy applies on a Difference in Terms/Conditions where:

[the] **underlying insurance**, by its terms and conditions, does not apply to direct physical loss or damage other than:

1. collectability; or
2. the exhaustion of its limits of insurance;

and you [(ACS)] have maintained all **required specific insurance**[.]

177.    The Excess Provision in the Policy provides:

this insurance applies to that part of loss or damage which exceeds the applicable limit of insurance of:

- **controlled admitted** insurance, including any deductible, retention

or self-insurance applicable to such **controlled admitted** insurance, but only to the extent that the Limits Of Insurance of this insurance have not been used up by payments made under such **controlled admitted** insurance; or

- **underlying insurance** (other than **controlled admitted** insurance), including any deductible, retention or self-insurance applicable to such **underlying insurance**.

178.     The Policy applies on an Excess basis where the "**underlying insurance**, by its terms and conditions applies or would have applied but for the exhaustion of its limits of insurance by payments for direct physical loss or damage[.]"

179.     The Policy defines **underlying insurance** as "**controlled admitted** insurance; **compulsory admitted** insurance; **independently contracted admitted** insurance; or insurance that is **non-admitted**."   **Required specific insurance** is defined in the Policy as "**underlying insurance** that is described in any Required Specific Insurance endorsement."

180.     As an example, Chubb (through its subsidiary and/or affiliate Chubb Seguros México, SA ("Chubb Mexico") issued ACS (through its Mexican subsidiary ACS Internacional, S. De RL De C.V. ("ACS MX") a Named Perils policy for the Policy Period, bearing Policy No. 32879 (the "Mexico Policy", Exs. 72, 73).  The Mexico Policy excludes "Damage from Viruses, Molds and/or Toxic Spores", as well as "Epidemics, pandemics and/or contagious disease" (the "Virus and Pandemic Exclusion").

181.     ACS timely notified Chubb Mexico of the catastrophic losses ACS has suffered and continues to suffer from the closure of and subsequent impairment of ACS's operations at the Mexico Plants arising from the civil authority orders, including the Civil Authority Order, and from the presence of Coronavirus at the Mexico Plants.  As set forth below, Chubb Mexico has refused to provide coverage to ACS for its losses at the Mexico Plants.

182.     Chubb Mexico denied coverage for ACS's claims for losses in express reliance on Virus and Pandemic Exclusion contained in the Mexico Policy.

183.     Thus, the Policy's Difference in Terms/Conditions Provision provides coverage for ACS's losses at the Mexico Plants because the Mexico Policy does not provide coverage for such

"loss or damage" "to the extent that **underlying insurance**, by its terms and conditions, does not apply" – i.e., the operation of the Virus and Pandemic Exclusion present in the Mexico Policy but absent in the Policy.

**K.     The Denial of ACS's Insurance Claims**

     **1.   Chubb Mexico's Denial of ACS's Insurance Claims under the Mexico Policy**

    184.    On or about April 9, 2020, ACS gave notice to Chubb Mexico of ACS's claims, date of loss April 6, 2020, falling within the scope of the Mexico Policy.

    185.    On April 16, 2020, Chubb Mexico acknowledged ACS's notice of loss by email, and requested information from ACS.  Chubb Mexico did not send an adjuster to any of the Mexico Plants to investigate ACS's losses.

    186.    On April 27, 2020, ACS—in the midst of dealing with massive challenges to and the catastrophic impairment of its business—provided responses to Chubb Mexico's requests for information regarding the operations of ACS MX, including preliminary information regarding the prohibition of access to the Mexico Plants by civil authority orders in Mexico on April 6, 2020.

    187.    On May 25, 2020, Chubb Mexico sent ACS MX a letter, denying coverage for ACS's insurance claims under the Mexico Policy, stating in relevant part, "that the [Mexico Policy] is a Named Risk Insurance, not an All-Risk Insurance" and reasoning "the reported event does not comply with the characteristics of being a property damage caused by a covered peril" (the "Mexico Policy Denial Letter").  The Mexico Policy Denial Letter also cited the Virus and Pandemic Exclusion as a basis for denying coverage under the Mexico Policy. This disclaimer triggered coverage for this claim under the Policy.

    188.    On or about September 17, 2020, ACS through a Professional Loss Consultant provided Chubb Mexico with its partial proof of loss.

    **2.   Great Northern's Denial of ACS's Insurance Claims under the Policy**

    189.    On or about April 2, 2020, ACS gave notice to Great Northern of ACS's claims, date of loss April 2, 2020, falling within the scope of the Policy.

    190.    On April 9, 2020, ACS's notice of loss under the Policy was acknowledged by

Great Northern in an email from Lawrence Scrivener.

191.   On April 20, 2020, Great Northern issued coverage letters to ACS, reserving its rights to deny coverage under the Policy on various grounds and sent ACS an initial request for information (the "RoR Letter").

192.   On or about April 22, 2020, ACS through Jerry Pollock of USI Insurance Services, LLC ("USI")—ACS's broker, sent an initial response to the RoR Letter (the "Initial Response Letter"). In its initial response, ACS disputed Great Northern's assessment of coverage, stating in relevant part:

> Courts have long recognized that the presence of bacteria, smoke, asbestos fibers, ammonia, carbon monoxide, and other substances/chemicals can cause physical damage or loss to the insured premises when the presence of the substance renders the insured property uninhabitable and unusable for its intended purpose. Here the potential presence of COVID-19 may constitute physical damage and/or loss to the insured property.

193.   In the Initial Response Letter, ACS also provided initial responses to Great Northern's information requests in the RoR Letter. Particularly, ACS informed Great Northern that it "was forced to close its property because of the damage caused by COVID-19." ACS also informed Great Northern of its potential claim under the Policy's Civil or Military Authority coverage. ACS stated: "the appropriate governmental authority issued a civil order mandating and/or advising the closure of the insured property and prohibited/advised against public gatherings surrounding the insured property because of the dangerous and hazardous conditions posed by COVID-19."

194.   On or about May 27, 2020, ACS—in the midst of dealing with massive challenges to its business—provided further responses to Great Northern's information requests (the "Reply Letter"). Particularly, ACS informed Great Northern that as a result of COVID-19 and Coronavirus, its Monterrey Plant and Guadalupe Plant "were closed by shutdown orders from April 6, 2020", its business at the Apodaca Plant was "only able to continue partial operations," and that "[a]ll four of [ACS's top automotive] customers shutdown their operation in various

countries for various periods of time depending on government orders and/or in response to their customers (i.e. the automotive manufacturers) closing their plants to prevent the spread of COVID-19." ACS also informed Great Northern that Coronavirus and COVID-19 "is believed to be present in and around the insured premises and the immediately surrounding areas (as well as those of dependent business premises) rendering the insured property and the surrounding area and the dependent businesses uninhabitable and/or unusable for their intended purposes," that "the scientific community has concluded that the virus is able to attach to surfaces for a prolonged period time," and that "governmental authorities []issued shutdown and other civil orders mandating and/or advising the closure of the dangerous and hazardous condition posed by COVID-19" in those areas and necessitating the government orders.

195.    On or about August 4, 2020, ACS sent a letter to Great Northern, giving supplemental notice in ACS's insurance claims under the Policy of Chubb Mexico's denial of ACS's insurance claims under the Mexico Policy, and demanded coverage under the Policy as provided by the Difference In Terms/Conditions Provision (the "Supplemental Notice Letter"). Particularly, in the Supplemental Notice Letter, ACS noted Chubb Mexico's denial of ACS's insurance claims pursuant to the Virus and Pandemic Exclusion and the Policy's lack of a similar exclusion, and therefore argued the Policy provides broader coverage than the Mexico Policy.

196.    On or about September 17, 2020, ACS through a Professional Loss Consultant, provided Great Northern with its partial proof of loss.

197.    On September 20, 2020, Great Northern acknowledged receipt of ACS's partial proof of loss and the Supplemental Notice Letter, in an email from Mr. Scrivener.

198.    Despite the assurance in the RoR Letter that "Great Northern's investigation [was] ongoing", Great Northern never sent an adjustor to any of the Mexico Plants to investigate ACS's loss.

199.    On September 29, 2020, Great Northern sent ACS a "draft denial letter" for ACS's claims under the Policy (the "Draft Denial Letter"), attached to an email from Mr. Scrivener, which stated that "[t]he basis of the draft denial is that the facts of the loss do not meet the terms of the

insuring agreements . . . in that the insured has not provided any evidence of direct physical loss or damage to" to property and citing the Death/Injury Limit as applying to preclude coverage.

200.     On October 5, 2020, without conducting any meaningful investigation of the losses (as Great Northern is required to do under insurance law and regulations, as well as insurance industry custom and practice), Great Northern sent ACS a letter denying coverage for ACS's insurance claims under the Policy (the "Denial Letter").

201.     In the Denial Letter, Great Northern mischaracterized ACS's claim as being for losses sustained *solely* due to the executive orders and summarily concluded that ACS's insurance claim was not covered because "ACS has provided no evidence that would indicate that ACS has sustained direct physical loss or damage to **building** or **personal property,**" "no evidence to show that the COVID-19 virus damages property," and that "neither the presence of the COVID-19 virus on **building** or **personal property** and associated cleaning, if any, nor the loss of use or functionality of **building** or **personal property**, constitute direct physical loss or damage to **building** or **personal property** as required by the quoted insuring agreement."  In so doing, Great Northern ignored the mounting evidence to the contrary and mischaracterized its own Policy's language.  Great Northern denied ACS's insurance claims for coverage under the Business Income and Extra Expense coverage, Dependent Business Premises coverage, and Civil and Military Authority coverage, among others, for the same reasons.

202.     Great Northern also denied coverage for ACS's insurance claims based on the Death/Injury Limit, which as discussed above, does not apply to ACS's insurance claims.  By its terms, the Death/Injury Limit is clearly inapplicable to ACS's losses, applying to insurance claims for human injury or death and not to insurance claims for property damage, business income loss, etc., caused by the presence of Coronavirus and COVID-19.

203.     Great Northern also reserved its rights to deny coverage for ACS's insurance claim pursuant to the Acts Or Decisions Exclusion.  Application of this exclusion, however, would nullify and render the Policy's affirmative coverage for Civil or Military Authority coverage entirely illusory, a result forbidden by Rhode Island law.

204.     ACS has suffered significant damages as a direct and proximate result of Great Northern's wrongful denial of coverage and inadequate claim investigation.

## COUNT I

### (Declaratory Judgment)

205.     ACS repeats and realleges each and every allegation contained in paragraphs 1 through 204 of this Complaint as if fully set forth herein.

206.     This is a claim for declaratory judgment pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201.  An actual and justiciable controversy exists between ACS and Great Northern concerning their respective rights and obligations under the Policy.

207.     The issuance of declaratory relief will terminate the controversy between ACS and Great Northern that gave rise to this action.

208.     As such, this Court has the authority to issue a declaratory judgment concerning the respective rights and obligation of ACS and Great Northern under the Policy.

209.     ACS seeks a declaratory judgment declaring that the Policy covers the losses it has suffered.

210.     ACS seeks a declaratory judgment declaring that Great Northern is responsible for fully and timely paying ACS's Claim under the Policy.

211.     The burden of proof is upon Great Northern to demonstrate that coverage is limited in any way under the Policy.

## COUNT II

### (Breach of Contract)

212.     ACS repeats and realleges each and every allegation contained in paragraphs 1 through 204 of this Complaint as if fully set forth herein.

213.     The Policy is a valid and enforceable agreement.

214.     ACS paid substantial premiums for the Policy and the promises of coverage contained therein, and otherwise performed all of its obligations owed under the Policy or was excused from performance.

215.    Great Northern has denied ACS's claims under the Policy and has refused to pay or otherwise honor its promises.  In denying coverage for ACS's claim as alleged above, Great Northern breached the contract (that is, the Policy).  As a direct and proximate result of Great Northern's breaches, ACS has suffered and continues to suffer damages in an amount to be proven at trial but currently estimated to exceed $5 million.

216.    Consequential damages for breach of the Policy were reasonably contemplated by the parties when Great Northern issued the Policy.

## **PRAYER FOR RELIEF**

Wherefore, ACS respectfully requests that the Court enter judgment in its favor and against Defendant Great Northern, and grant the following relief:

A.      On the First Claim for Relief, a declaratory judgment that the losses ACS suffered are covered by the Policy and that Defendant is responsible for fully and timely paying ACS's losses;

B.      On the Second Claim for Relief, an award of damages in favor of ACS in an amount to be proven at trial, plus pre- and post-judgment interest at the maximum legal rate;

C.      An award of ACS's attorneys' fees and costs pursuant to contract, statute and by law including but not limited to R.I. Gen. Laws § 9-1-45; and

D.      Such other and further relief as the Court may deem just and proper.

A TRIAL BY JURY IS DEMANDED

Respectfully submitted,

Plaintiff ACS INDUSTRIES INC.,

By Its Attorneys,

Dated:  March 7, 2022

*/s/ David A. Wollin*
David A. Wollin (#4950)
Hinckley Allen & Snyder LLP
100 Westminster Street, Suite 1500
Providence, RI  02903-2319
T:  (401) 274-2000
F:  (401) 277-9600
dwollin@hinckleyallen.com
aramos@hinckleyallen.com

Joseph D. Jean (*Pro Hac Vice forthcoming*)
Scott D. Greenspan *(Pro Hac Vice forthcoming)*
PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019-6131
T:  (212) 858-1000
F:  (212) 858-1500
joseph.jean@pillsburylaw.com
scott.greenspan@pillsburylaw.com