**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| ACS INDUSTRIES INC., | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-00095 |
| GREAT NORTHERN INSURANCE COMPANY, | **ORAL ARGUMENT REQUESTED** |
| Defendant. | |

## DEFENDANT'S MOTION TO DISMISS COMPLAINT

Defendant Great Northern Insurance Company ("Great Northern") hereby moves to dismiss the complaint filed by plaintiff ACS Industries Inc. ("ACS" or "Plaintiff"). *See* Dkt. 1. For the reasons stated in the accompanying Memorandum of Law in Support of Defendant's Motion to Dismiss, the complaint should be dismissed entirely and with prejudice because Plaintiff fails to state a claim as a matter of law.

WHEREFORE, Great Northern respectfully requests dismissal of the complaint.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(e), Great Northern requests oral argument on this Motion. Great Northern estimates that 15 minutes per side would be sufficient for the parties to each explain their positions and answer any questions the Court may have regarding this Motion.

Dated: May 2, 2022

Respectfully submitted,

*/s/ Dana M. Horton*
Dana M. Horton (R.I. Bar No. 6251)
dhorton@rc.com
Daniel F. Sullivan (R.I. Bar No. 8169)
dsullivan@rc.com

1

Robinson & Cole LLP
One Financial Plaza, 14th Floor
Providence, RI  02903
Tel.: (401) 709-3352
Fax: (401) 709-3399

Richard B. Goetz (*pro hac vice*)
rgoetz@omm.com
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071
Tel.: (213) 430-6400
Fax: (213) 430-6407

*Attorneys for Defendant Great Northern*
*Insurance Company*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| ACS INDUSTRIES INC., | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-00095 |
| GREAT NORTHERN INSURANCE COMPANY, | **ORAL ARGUMENT REQUESTED** |
| Defendant. | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................... 1

II.    BACKGROUND ...................................................................................... 4

    A.    THE GREAT NORTHERN POLICY ................................................. 4

        i.    Building and Personal Property Coverage ................................... 4

        ii.    Business Income, Extra Expense, and Dependent Business Premises Coverage ........................................................... 5

        iii.    Civil or Military Authority Coverage ......................................... 5

        iv.    Loss Prevention Expenses Coverage .......................................... 6

    B.    ACS'S CLAIMED LOSSES ............................................................ 6

III.    LEGAL STANDARD .............................................................................. 9

IV.    ARGUMENT .......................................................................................... 9

    A.    RHODE ISLAND POLICY INTERPRETATION PRINCIPLES ......................... 9

    B.    ACS'S BUILDING AND PERSONAL PROPERTY, BUSINESS INCOME, EXTRA EXPENSE, DEPENDENT BUSINESS PREMISES, AND LOSS PREVENTION EXPENSES CLAIMS FAIL BECAUSE ACS DOES NOT ALLEGE "DIRECT PHYSICAL LOSS OR DAMAGE" TO ITS PROPERTIES ................................................. 11

        i.    "Direct Physical Loss or Damage" Requires a Physical Alteration or Permanent Dispossession of Property .................................... 12

        ii.    The Insured Properties Do Not Include the "Air" Within the Structures ....................................................... 14

        iii.    The Alleged "Presence" of the Virus on the Premises Does Not Amount to "Direct Physical Loss or Damage" to Property ..................... 15

        iv.    The Absence of A Virus or Communicable-Disease Exclusion Does Not Change the Analysis ................................................. 23

    C.    ACS'S BUSINESS INCOME, EXTRA EXPENSE, AND DEPENDENT BUSINESS PREMISES CLAIMS FAIL BECAUSE ACS DOES NOT ALLEGE THAT THE IMPAIRMENT OF OPERATIONS WAS *CAUSED BY* ANY "DIRECT PHYSICAL LOSS OR DAMAGE" TO ITS PROPERTIES ................................................. 25

i

**TABLE OF CONTENTS**

(continued)

                                                                                          **Page**

D.    ACS'S CIVIL AUTHORITY CLAIM FAILS BECAUSE ACS DOES
      NOT ALLEGE THAT ANY CIVIL OR MILITARY AUTHORITY
      PROHIBITED ACCESS DUE TO PHYSICAL DAMAGE TO
      PROPERTY ................................................................................................ 27

      i.    ACS Does Not Allege That Access Was Prohibited Because of
            Offsite Property Damage Within One Mile of Its Premises ................... 27

      ii.   ACS Does Not—and Cannot—Allege That the Civil-Authority
            Orders Prohibited Access to Its Apodaca Plant Property ........................ 30

E.    THE POLICY'S DIFFERENCE IN TERMS/CONDITIONS AND
      EXCESS PROVISIONS DO NOT SAVE ACS'S CLAIMS .............................. 31

F.    LEAVE TO AMEND SHOULD BE DENIED ................................................... 32

V.    CONCLUSION ........................................................................................................ 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*100 Orchard St., LLC v. Travelers Indem. Ins. Co. of Am.*,
542 F. Supp. 3d 227 (S.D.N.Y. 2021) ...................................................... 32

*10012 Holdings, Inc. v. Sentinel Ins. Co.*,
21 F.4th 216 (2d Cir. 2021) ................................................................ 2, 28

*Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone,*
*LLP v. Valley Forge Ins. Co.*,
2021 WL 5759703 (E.D.N.Y. Dec. 3, 2021) .............................................. 16

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008) ...................................................................... 9

*AJC Int'l, Inc. v. Triple-S Propiedad*,
790 F.3d 1 (1st Cir. 2015) ...................................................................... 11

*Am. Food Sys., Inc. v. Fireman's Fund Ins. Co.*,
530 F. Supp. 3d 74 (D. Mass. 2021) ........................................................ 16

*Am. Food Sys., Inc. v. Fireman's Fund Ins. Co.*,
No. 21-1307 (1st Cir. Dec. 16, 2021) ...................................................... 20

*Am. States Ins. Co. v. LaFlam*,
808 F. Supp. 2d 400 (D.R.I. 2011) .......................................................... 10

*America's Kids, LLC v. Zurich Am. Ins. Co.*,
2021 WL 4477872 (N.D. Ill. Sept. 30, 2021) ............................................ 21

*Archer-Daniels-Midland Co. v. Phoenix Assur. Co. of N.Y.*,
975 F. Supp. 1129 (S.D. Ill. 1997) .......................................................... 32

*Armbrust Int'l, Ltd. v. Travelers Cas. & Sur. Co. of Am.*,
2006 WL 1207659 (D.R.I. May 1, 2006) .................................................. 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................... 9

*Atwells Realty Corp. v. Scottsdale Ins. Co.*,
2021 WL 2396584 (R.I.Super. June 4, 2021) ............................................ 20

*Bel Air Auto Auction, Inc. v. Great N. Ins. Co.*,
2021 WL 1400891 (D. Md. Apr. 14, 2021) ............................................... 24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................... 9

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*BN Farm LLC v. Cincinnati Cas. Co.*,
    2021 WL 4488215 (D. Mass. Sept. 16, 2021) ........................................................ 14

*Brown Jug, Inc. v. Cincinnati Ins. Co.*,
    27 F.4th 398 (6th Cir. 2022) .......................................................................... 28, 30

*Byberry Servs. & Sols., LLC v. Mt. Hawley Ins. Co.*,
    2021 WL 3033612 (N.D. Ill. July 19, 2021).......................................................... 22

*Café La Trova LLC v. Aspen Specialty Ins. Co.*,
    519 F. Supp. 3d 1167 (S.D. Fla. 2021) ............................................................... 24

*Chhun v. Mortgage Electronic Registration Sys., Inc.*,
    84 A.3d 419 (R.I. 2014).................................................................................. 18

*Chief of Staff LLC v. Hiscox Ins. Co. Inc.*,
    2021 WL 1208969 (N.D. Ill. Mar. 31, 2021)........................................................ 14

*Children's Place, Inc. v. Zurich Am. Ins. Co.*,
    2021 WL 4237284 (D.N.J. Sept. 17, 2021) .......................................................... 26

*Circus Circus LV, LP v. AIG Specialty Ins. Co.*,
    2022 WL 1125663 (9th Cir. Apr. 15, 2022) ......................................................... 26

*Consolidated Rest. Ops., Inc. v. Westport Ins. Co.*,
    2022 WL 1040367 (N.Y. App. Apr. 7, 2022).................................................... 3, 19

*Cosmetic Laser, Inc. v. Twin City Fire Ins. Co.*,
    554 F. Supp. 3d 389 (D. Conn. 2011).................................................................. 17

*Crellin Techs., Inc. v. Equipmentlease Corp.*,
    18 F.3d 1 (1st Cir. 1994).................................................................................. 10

*Crestview Country Club, Inc. v. St. Paul Guardian Ins. Co.*,
    321 F. Supp. 2d 260 (D. Mass. 2004) ................................................................ 12

*Dakota Girls, LLC v. Phila. Indemnity Ins. Co.*,
    17 F.4th 645 (6th Cir. 2021) ......................................................................... 19, 24

*Derderian v. Essex Ins. Co.*,
    44 A.3d 122 (R.I. 2012).................................................................................. 10

*El Novillo Rest. v. Certain Underwriters at Lloyd's, London*,
    505 F. Supp. 3d 1343 (S.D. Fla. 2020) ............................................................... 24

*Emerald Coast Restaurants, Inc. v. Aspen Specialty Ins. Co.*,
    2020 WL 7889061 (N.D. Fla. Dec. 18, 2020) ...................................................... 11

iv

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Emhart Indus., Inc. v. Century Indem. Co.*,
    559 F.3d 57 (1st Cir. 2009) ...................................................... 32

*First & Stewart Hotel Owner, LLC v. Fireman's Fund Ins. Co.*,
    2021 WL 3109724 (W.D. Wash. July 22, 2021) ................................. 27

*Gavrilides Mgt. Co. vs. Michigan Ins. Co.*,
    2022 WL 301555 (Mich. Ct. App. Feb. 1, 2022) ............................ 3, 19

*Gen. Acc. Ins. Co. of Am. v. Am. Nat. Fireproofing, Inc.*,
    716 A.2d 751 (R.I. 1998) ......................................................... 11

*Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co.*,
    2021 WL 3870697 (11th Cir. Aug. 31, 2021) ........................... 2, 19, 28

*Goodwill Indus. of Cent. Okla., Inc. v. Philadelphia Indem. Ins. Co.*,
    21 F.4th 704 (10th Cir. 2021) .......................................... 2, 19

*Great Meadow Cafe v. Cincinnati Ins. Co.*,
    2022 WL 813796 (D. Conn. Mar. 17, 2022) ................................. 25

*Hampshire House Corp. v. Fireman's Fund Ins. Co.*,
    557 F. Supp. 3d 284, 304 (D. Mass. 2021) ................................ 32

*Indiana Repertory Theatre v. Cincinnati Cas. Co.*,
    180 N.E.3d 403 (Ind. Ct. App. 2022) ................................ 2, 19

*In-N-Out Burgers v. Zurich Am. Ins. Co.*,
    2022 WL 472800 (C.D. Cal. Feb. 10, 2022) ............................. 27

*Inns by the Sea v. California Mutual*,
    71 Cal. App. 5th 688 (2021) ........................................... 26

*Island Hotel Properties, Inc. v. Fireman's Fund Ins. Co.*,
    512 F. Supp. 3d 1323 (S.D. Fla. 2021) ................................. 29

*John Gore Org., Inc. v. Fed. Ins. Co.*,
    2022 WL 873422 (S.D.N.Y. Mar. 23, 2022) .............................. 22

*Josephson, LLC v. Affiliated FM Ins. Co.*,
    2022 WL 999134 (R.I. Super. Ct. Mar. 29, 2022) ................... passim

*Kamakura, LLC v. Greater New York Mut. Ins. Co.*,
    525 F. Supp. 3d 273 (D. Mass. 2021) .......................... 16, 26, 28

*Kamakura, LLC v. Greater New York Mut. Ins. Co.*,
    No. 21-1259 (1st Cir. April 11, 2022) .................................. 19

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Kim-Chee LLC v. Philadelphia Indem. Ins. Co.*,
  2022 WL 258569 (2d Cir. Jan. 28, 2022) ........................................ 18, 24

*L&J Mattson's Co. v. Cincinnati Ins. Co.*,
  2021 WL 1688153 (N.D. Ill. Apr. 29, 2021) ........................................ 21

*Legal Sea Foods, LLC v. Strathmore Ins. Co.*,
  No. 21-01202 (1st Cir. Dec. 16, 2021) ........................................ 19, 30

*Los Angeles Lakers, Inc. v. Fed. Ins. Co.*,
  2022 WL 831549 (C.D. Cal. Mar. 17, 2022 ........................................ 26, 28

*Lynch v. Spirit Rent-a-Car*,
  965 A.2d 417 (R.I. 2009) ........................................ 9

*M&N Food Service, LLC v. Twin City Fire Ins. Co.*,
  2022 WL 1137311 (D.R.I. Apr. 18, 2022) ........................................ 3, 18, 30

*Madison Int'l v. Valley Forge Ins. Co.*,
  2022 WL 224853 (C.D. Cal. Jan. 18, 2022) ........................................ 27

*Mallane v. Holyoke Mut. Ins. Co. in Salem*,
  658 A.2d 18 (R.I. 1995) ........................................ 10

*Malo v. Aetna Cas. & Sur. Co.*,
  459 A.2d 954 (R.I. 1983) ........................................ 10, 23

*Mastellone v. Lightening Rod Mut. Ins. Co.*,
  884 N.E. 2d 1130 (Ohio Ct. App. 2008) ........................................ 12

*Michael Cetta, Inc. v. Admiral Indem. Co.*,
  506 F. Supp. 3d 168 (S.D.N.Y. 2020) ........................................ 14

*Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*,
  15 F.4th 885 (9th Cir. 2021) ........................................ 2, 12, 19

*Nelson v. Allstate Ins. Co.*,
  228 A.3d 983 (R.I. 2020) ........................................ 13

*Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins. Co.*,
  17 F. Supp. 3d 323 (S.D.N.Y. 2014) ........................................ 12

*Oral Surgeons, P.C. v. Cincinnati Ins. Co.*,
  2 F.4th 1141 (8th Cir. 2021) ........................................ 2, 14, 19

*Oregon Clinic, PC v. Fireman's Fund Ins. Co.*,
  2021 WL 5921370 (D. Or. Dec. 15, 2021) ........................................ 16

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Pakachoag Acres Day Care Ctr., Inc. v. Philadelphia Indem. Ins. Co.*,
  2021 WL 4392088 (D. Mass. Sept. 24, 2021) .......................................................... 30

*Pappy's Barber Shops, Inc. v. Farmers Grp., Inc.*,
  487 F. Supp. 3d 937 (S.D. Cal. 2020) .................................................................... 31

*Peerless Ins. Co. v. Luppe*,
  118 A.3d 500 (R.I. 2015) .............................................................................. 10, 13

*Philadelphia Indem. Ins. Co. v. Atlantic Specialty Ins. Co.*,
  2022 WL 390834 (W.D. Mo. Feb. 8, 2022) .............................................................. 32

*Procaccianti Cos. Inc. et al. v. Zurich Am. Ins. Co.*,
  No. 1:20-cv-00512-WES-PAS (D.R.I. Sept. 2, 2021) .................................................... 20

*Promotional Headwear*,
  504 F. Supp. 3d 1191 (D. Kan. 2020) ........................................................... 16, 21, 29

*Q Clothier New Orleans LLC v. Twin City Fire Ins. Co.*,
  29 F.4th 252 (5th Cir. 2022) ............................................................................. 28

*Reilly v. Cox Enterps., Inc.*,
  2014 WL 4473772 (D.R.I. Apr. 16, 2014) ................................................................ 18

*SA Hosp. Grp., LLC v. Hartford Fire Ins. Co.*,
  542 F. Supp. 3d 148 (D. Conn. 2021) *aff'd*, 2022 WL 815683 (2d Cir. Mar. 18,
  2022) ...................................................................................................... 33

*Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*,
  20 F.4th 327 (7th Cir. 2021) ...................................................................... 2, 19, 21

*Santo's Italian Café LLC v. Acuity Ins. Co.*,
  15 F.4th 398 (6th Cir. 2021) .............................................................................. 2

*Santo's Italian Café LLC v. Acuity Ins. Co.*,
  2020 WL 7490095 (N.D. Ohio Dec. 21, 2020) ........................................................... 30

*Sanzo Enters. LLC v. Erie Ins. Exch.*,
  2021-Ohio-4268 (Ohio Ct. App.) ...................................................................... 3, 19

*SAS Int'l Ltd. v. Gen. Star Indem. Co.*,
  520 F. Supp. 3d 140 (D. Mass. 2021) .............................................................. 21, 24

*SAS Int'l, Ltd. v. Gen. Star Indem. Co.*,
  No. 21-01219 (1st Cir. Dec. 16, 2021) ................................................................... 19

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*Schatz v. Republican State Leadership Comm.*,
   669 F.3d 50 (1st Cir. 2012) ................................................................................... 9

*Scherder v. Aspen Am. Ins. Co.*,
   553 F. Supp. 3d 1098 (M.D. Fla. 2021) ............................................................... 22

*Selane Prods., Inc. v. Continental Cas. Co.*,
   2021 WL 4496471 (9th Cir. Oct. 1, 2021) ........................................................... 28

*Select Hospitality, LLC v. Strathmore Ins. Co.*,
   533 F. Supp. 3d 31 (D. Mass. 2021) .................................................................... 29

*Sweet Berry Café, Inc. v. Society Ins., Inc.*,
   2022 IL App (2d) 210088 ................................................................................. 2, 19

*Terry Black's Barbecue Dallas, L.L.C. v. State Auto. Mut. Ins. Co.*,
   22 F.4th 450 (5th Cir. 2022) ................................................................ 2, 12, 19, 32

*Textron, Inc. v. Aetna Cas. & Sur. Co.*,
   638 A.2d 537 (R.I. 1994) ...................................................................................... 32

*Town Kitchen v. Certain Underwriters at Lloyd's, London*,
   522 F. Supp. 3d 1216 (S.D. Fla. 2021) .................................................................. 3

*TranSched Sys. Ltd. v. Fed. Ins. Co.*,
   958 F. Supp. 2d 331 (D.R.I. 2013) ....................................................................... 10

*Twin River Worldwide Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh,*
*PA*,
   324 F. Supp. 3d 266 (D.R.I. 2018) ....................................................................... 10

*Uncork & Create LLC v. Cincinnati Ins. Co.*,
   2020 WL 6436948 (S.D. W. Va. Nov. 2, 2020) *aff'd*, 27 F.4th 926 (4th Cir.
   2022) ..................................................................................................................... 21

*Uncork & Create LLC v. Cincinnati Ins. Co.*,
   27 F.4th 926 (4th Cir. 2022) ............................................................................. 2, 18

*United Talent Agency v. Vigilant Ins. Co., et al.*,
   2022 WL 1198011 (Cal. Ct. App. Apr. 22, 2022) .................................. 2, 19, 22, 29

*United Talent Agency, LLC v. Vigilant Ins. Co.*,
   2021 WL 4197670 (Cal. Super. Ct. June 23, 2021) *aff'd*, 2022 WL 1198011 .................. 16, 24

*Universal Image Prods., Inc. v. Federal Ins. Co.*,
   475 Fed. Appx. 569 (6th Cir. 2012 ....................................................................... 12

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Unmasked Mgmt., Inc. v. Century-Nat'l Ins. Co.*,
   514 F. Supp. 3d 1217 (S.D. Cal. 2021)......................................................................... 17

*Van Hoesen v. Lloyd's of London*,
   134 A.3d 178 (R.I. 2016)............................................................................................. 23

*Verveine Corp. v. Strathmore Ins. Co.*,
   2022 WL 1180061 (Mass. Apr. 21, 2022)......................................................... passim

*W. Coast Hotel Mgmt., LLC v. Berkshire Hathaway Guard Ins. Cos.*,
   498 F. Supp. 3d at 1240 (C.D. Cal. 2020) ................................................................. 29

*Wakonda Club v. Selective*,
   2022 WL 1194012 (Iowa Apr. 22, 2022) ............................................................. 2, 19

*Whiskey River on Vintage, Inc. v. Illinois Cas. Co.*,
   2020 WL 7258575 (S.D. Iowa Nov. 30, 2020)......................................................... 29

*Zarrella v. Minnesota Mut. Life Ins. Co.*,
   824 A.2d 1249 (R.I. 2003)......................................................................................... 10

*Zebra Techs. Corp. v. Factory Mut. Ins. Co.*,
   2021 WL 4459532 (N.D. Ill. Sept. 29, 2021) ........................................................... 16

**Treatises**

10A COUCH ON INS. § 148:46 (3d Ed. West June 2020)............................................... 13

## I.    __PRELIMINARY STATEMENT__[1]

Defendant Great Northern Insurance Company ("Great Northern") issued a commercial property insurance policy to Plaintiff ACS Industries Inc. ("ACS") that provides coverage where ACS's operations are impaired as a result of "direct physical loss or damage to" its properties. ACS contends that the policy covers economic losses it allegedly suffered because of the COVID-19 pandemic, despite the virus causing no physical harm to its properties or property anywhere else.  ACS's attempts to evade the policy's plain language fail as a matter of law.

As hundreds of rulings around the country have made clear, there is no "direct physical loss or damage to" property unless the property itself has been physically altered.  The mere temporary presence of an unwanted substance on the property is not enough.  ACS speculates that the coronavirus may have been present at its insured properties, but it does not and cannot allege that the virus harmed the properties themselves in any physical way.

Instead, ACS floods its complaint with allegations about the purported scientific properties of the virus in an attempt to disguise its conclusory assertions as factual ones. Virtually all of these allegations relate to the person-to-person transmission of the virus and how the virus affects the "air."  But the Policy confirms that the insured properties only include "buildings," which are expressly defined to exclude the "air" within the structure, and it makes clear that Great Northern will not pay for loss resulting from any "injury, sickness, disease, [or] death" of any person.  ACS's other allegations relating to fomite transmission via surfaces similarly focus on the virus's impact on the safety of people, rather than any actual change to the property itself.  Courts have repeatedly held—and ACS's own allegations establish—that the

---

[1] Unless otherwise specified, all quotation marks, citations, ellipses, brackets, and other alterations are omitted, and all emphases are added.

virus deactivates on its own and can be removed from surfaces through ordinary cleaning methods.

Since the pandemic began, every appellate court to have addressed the arguments espoused by ACS has rejected them. Those courts, like trial courts in jurisdictions around the nation, including Rhode Island, have concluded that coverage was not available for COVID-19-related business suspensions under policies that required "direct physical loss or damage" to property because "neither the closure order nor the Covid-19 virus caused present or impending material destruction or material harm that physically altered the covered property requiring repairs or replacement." *Uncork & Create LLC v. Cincinnati Ins. Co.*, 27 F.4th 926, 933 (4th Cir. 2022); *see also, e.g.*, *10012 Holdings, Inc. v. Sentinel Ins. Co.*, 21 F.4th 216, 221–222 (2d Cir. 2021); *Terry Black's Barbecue Dallas, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 456–458 (5th Cir. 2022); *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 401–406 (6th Cir. 2021); *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, 20 F.4th 327, 331–334 (7th Cir. 2021); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1143–1144 (8th Cir. 2021); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 890–893 (9th Cir. 2021); *Goodwill Indus. of Cent. Okla., Inc. v. Philadelphia Indem. Ins. Co.*, 21 F.4th 704, 710–712 (10th Cir. 2021); *Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co.*, 2021 WL 3870697, at *2 (11th Cir. Aug. 31, 2021); *United Talent Agency v. Vigilant Ins. Co., et al.*, 2022 WL 1198011, at *11 (Cal. Ct. App. Apr. 22, 2022); *Sweet Berry Café, Inc. v. Society Ins., Inc.*, 2022 IL App (2d) 210088, ¶ 39; *Indiana Repertory Theatre v. Cincinnati Cas. Co.*, 180 N.E.3d 403, 408–409 (Ind. Ct. App. 2022); *Wakonda Club v. Selective*, 2022 WL 1194012, at *5–6 (Iowa Apr. 22, 2022); *Verveine Corp. v. Strathmore Ins. Co.*, 2022 WL 1180061, at *6 (Mass. Apr. 21, 2022); *Gavrilides Mgt. Co. vs. Michigan Ins. Co.*, 2022 WL 301555, at *5 (Mich. Ct. App. Feb. 1,

2

2022); *Consolidated Rest. Ops., Inc. v. Westport Ins. Co.*, 2022 WL 1040367, at *2 (N.Y. App.

Apr. 7, 2022); *Sanzo Enters. LLC v. Erie Ins. Exch.*, 2021-Ohio-4268, ¶¶ 40–43 (Ohio Ct. App.).

Recently, District of Rhode Island Chief Judge John J. McConnell, Jr. reached the same

conclusion under Rhode Island law, finding that "COVID-19 does not cause damage to

property." *M&N Food Serv., LLC v. Twin City Fire Ins. Co.*, 2022 WL 1137311, at *2, n.2

(D.R.I. Apr. 18, 2022).  Similarly, in *Josephson, LLC v. Affiliated FM Ins. Co.*, Judge Brian

Stern held that "COVID-19 is not capable of causing 'physical loss or damage' to property, full

stop."  2022 WL 999134, at *12 (R.I. Super. Ct. Mar. 29, 2022).  As in these failed cases, ACS's

Complaint claims that the coronavirus rendered its properties unsafe, limited access to the

properties, and impaired their intended use.  But even if such conclusory allegations were

proven, they do not establish any direct physical loss or damage to the properties.  ACS's

allegations are not sufficient to satisfy the plausibility standard under federal law, and ACS

cannot overcome this fundamental legal defect.  Put simply, "coronavirus particles damage

lungs, they do not damage buildings."  *Town Kitchen v. Certain Underwriters at Lloyd's,

London*, 522 F. Supp. 3d 1216, 1222 (S.D. Fla. 2021).

In addition to failing to allege any "direct physical loss or damage" to property, ACS also

fails to allege that its impairment of operations was "caused by or resulted from" direct physical

loss or damage.  Instead, ACS admits that it suspended certain operations because of broad

government closure orders issued to curb the spread of the virus.  ACS's failure to plead facts

meeting the policy's causation requirement provides an independent basis for dismissal.

The COVID-19 pandemic is extraordinary, but the contract interpretation required here is

not.  Under the plain language of ACS's insurance policy, Great Northern is entitled to dismissal

of the Complaint.  The Court should dismiss the entire Complaint with prejudice, and enter judgment for Great Northern.

## II.      BACKGROUND

### A.      THE GREAT NORTHERN POLICY

Great Northern issued a commercial property insurance policy (the "Policy") to ACS—which manufactures various products, including wire mesh, commercial cleaning, and insulation products, in manufacturing plants in the U.S., China, India, Romania, and Mexico—for the policy period from May 18, 2019, to May 19, 2020.   The Policy specifies what it covers and what it does not.  Coverage is available only if ACS shows that a "covered peril" caused loss or damage to its property.  Policy (ECF No. 1-3) at 109.  The Policy defines "covered peril" as "a peril covered by the Form(s) shown in the Property Insurance Schedule Of Forms … applicable to the lost or damaged property."  *Id*. at 56.

The Policy provides six types of coverage relevant here: Building and Personal Property, Business Income, Extra Expense, Dependent Business Premises, Civil or Military Authority, and Loss Prevention Expenses.  Each type of coverage is triggered only where there is (i) direct physical harm to property (ii) caused by or resulting from a "covered peril."  *Id*. at 81, 109, 112–13, 124–26.

### i.      Building and Personal Property Coverage

The Policy's Building and Personal Property provision states that Great Northern will pay ACS for "**direct physical loss or damage** to building; or personal property" caused by or resulting from a covered peril.  *Id*. at 81.

ii.     **Business Income, Extra Expense, and Dependent Business Premises Coverage**

The Policy's Business Income and Extra Expense provisions call for Great Northern to pay ACS for certain loss of income if ACS had to suspend operations due to "**direct physical loss or damage** by a covered peril to property." *Id*. at 109, 124.  The provision specifically emphasizes that the "actual or potential impairment of operations must be caused by or result from **direct physical loss or damage** by a covered peril to property," or there is no coverage. *Id*.

The Dependent Business Premises provision similarly requires "direct physical loss or damage to property." *Id*. at 113.  It states that Great Northern will pay for certain of ACS's losses only if the "actual or potential impairment of operations [is] caused by or result[s] from **direct physical loss or damage** by a covered peril to property or personal property of a dependent business premises at a dependent business premises." *Id*.

The Business Income, Extra Expense, and Dependent Business Premises provisions only provide coverage during the "period of restoration." *Id*. at 109, 113.  And for all those types of coverage, the definition of "period of restoration" is tied to and requires "direct physical loss or damage" to property. *Id*.  The Policy specifies that the term "period of restoration" means "the period of time that . . . begins" either (i) "[i]mmediately after the time of **direct physical loss or damage** by a covered peril to property," or (ii) "on the date operations would have begun if the **direct physical loss or damage** had not occurred." *Id*. at 66.  And the period of restoration ends when the property is "repair[ed] or replace[d]." *Id.*

iii.     **Civil or Military Authority Coverage**

The Civil or Military Authority provision affords coverage when governmental orders prohibit access to ACS's premises, but only if a covered peril causes "direct physical loss or

5

damage to property" within one mile of Plaintiff's property.  *Id.* at 112.  Specifically, the provision states that Great Northern will pay for certain losses "directly caused by the prohibition of access" by a civil or military authority to ACS's premises or a dependent business premises, but only if the "prohibition of access . . . [is] the direct result of **direct physical loss or damage to property** away from such premises [but] . . . within . . . one mile."  *Id.* at 112, 125.

### iv.    Loss Prevention Expenses Coverage

The Loss Prevention Expenses provision applies to costs incurred by ACS to protect building, personal, and research and development property at its premises and similarly requires "direct physical loss or damage."  *Id.* at 83.  The provision states that Great Northern will pay "reasonable and necessary costs" incurred by ACS "to protect building; personal property; or research and development property, at the premises . . . from **imminent direct physical loss or damage** caused by or resulting from a peril not otherwise excluded."  *Id.*  ACS must notify Great Northern within 48 hours after taking any loss prevention action.  *Id.*

### B.    ACS'S CLAIMED LOSSES

ACS filed suit on March 7, 2022, asserting claims for declaratory judgment and breach of contract and alleging that Plaintiff is entitled to Building and Personal Property, Business Income, Extra Expense, Dependent Business Premises, Civil or Military Authority, and Loss Prevention Expenses coverage for certain losses it purportedly suffered during the coronavirus pandemic.  Compl. (ECF No. 1) ¶¶ 132–160, 205–216.  The Complaint describes three main insured premises located in Mexico (the "Mexico Plants").  *Id.* ¶ 19.  The Complaint alleges that, in March 2020, the Mexican government issued civil-authority and government orders requiring "the immediate suspension of all non-essential activities, including the manufacturing operations" at two of ACS's manufacturing plants and resulting in the "forced closure of the Mexico Plants and ACS's dependent business premises."  *Id.* ¶¶ 100, 102.  ACS claims that two

of the Mexico Plants were "fully closed" and operations at a third plant "were significantly limited." *Id.* ¶ 103.

The Complaint also repeats the legal conclusions that "[t]he presence of Coronavirus in and on the Mexico Plants caused ACS to suffer direct physical loss or damage to its Mexico Plants" and that "ACS and its properties, including the Mexico Plants, ACS's dependent business premises, and the business within one mile therefrom, were under the constant threat of imminent direct physical loss or damage to their properties caused by Coronavirus and COVID-19." *Id.* ¶¶ 1, 114–15, 119–20, 123–24, 141, 151, 154, 158.  But the Complaint makes only conclusory allegations about "the presence of Coronavirus in the indoor air and on surfaces at each of the Mexico Plants" based on (1) a number of ACS employees reporting positive COVID-19 tests during unspecified time periods when the Mexico Plants were open and (2) the "high prevalence of infectious COVID-19 cases" in the general geographic area where the Mexico Plants are located. *See, e.g.*, *id.* ¶¶ 3, 80, 84–85, 120, 144, 194.  ACS does not allege any facts about when or how the virus was actually present on the properties, or that the virus itself caused any physical harm to the properties.

To be sure, the Complaint alleges that the presence of the virus "in the indoor air of the Mexico Plants as well as on surfaces caused the physical loss or damage to those Plants" because the virus "directly and physically changes, alters, or transforms the composition of the air" into a "transmission vector for COVID-19" and "adheres to surfaces and objects, physically changing and physically altering those objects by becoming a part of their surface and making physical contact with them unsafe for their ordinary and customary use." *See, e.g.*, *id.* ¶¶ 58, 97.  But these allegations focus on the safety of the air and surfaces for normal use by *people*, and the Complaint does not allege how the virus actually changed or damaged the insured property itself.

*Id.*; *see also*, *e.g.*, *id.* ¶¶ 59 (particles and fomites "alter the physical properties of the interiors of buildings to make them unsafe, untenantable, uninhabitable, and unfit for normal use"); 97 ("the presence of Coronavirus impairs the functional use of the property"); 110 (presence of the virus "physically changes, alters, and transforms the composition of the air and surfaces it touches such that they are unsafe for people"). Although ACS claims that "[t]he only way to eliminate the presence of Coronavirus from property and prevent its continuous reintroduction is to close down property completely and bar all individuals from entering," the Complaint acknowledges that any temporary contamination may be cleaned and that the property can be made safe for operation through measures such as disinfection and infectious-disease prevention protocols. *See, e.g.*, *id.* ¶¶ 71, 79, 110, 115–17. Indeed, at least one article cited in the Complaint—a CDC Science Brief—makes clear that the virus can be eliminated with commonly available disinfectants. *Id.* at n.70 (citing Ex. 40) ("Routine cleaning performed effectively with soap or detergent, at least once per day, can substantially reduce virus levels on surfaces").

The Complaint additionally alleges the legal conclusion that the civil-authority orders were issued "in response to the spread of Coronavirus and COVID-19 throughout Mexico, including the properties within one mile of the Mexico Plants and ACS's dependent business premises, and the resulting direct physical loss or damage caused therefrom." *Id.* ¶ 102, 108. The Complaint does not assert, however, whether or how any other property supposedly suffered from any tangible, physical changes due to the virus. *See id.* Plaintiff cites a civil-authority order from New York City that purports to recognize that COVID-19 "physically is causing property loss or damage" as support for its conclusory assertion. *Id.* ¶ 109 (emphasis omitted). But this order is not evidence that the virus caused tangible, physical changes to ACS's properties or to any other specific property within one mile thereof.

Finally, ACS alleges the legal conclusion that "[t]he Policy provides coverage for ACS's international operations in Mexico, China, and Romania on a Difference in Terms/Conditions and Excess basis." *Id.* ¶ 174.  ACS relies on these provisions—which grant coverage in certain situations where a policyholder's underlying insurance does not apply—because the underlying policy for the Mexico Plants contains a virus and pandemic exclusion that precludes coverage under that policy.  *Id.* ¶¶ 180, 183.  ACS's Complaint ignores that these provisions apply "[s]ubject to the terms and conditions" of the Policy, which include the requirement of direct physical loss or damage.

## III.   LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008).  A complaint cannot avoid dismissal if a pleading merely "tenders naked assertions devoid of further factual enhancement."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  In resolving a motion to dismiss, a court should "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements."  *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).

## IV.   ARGUMENT

### A.   RHODE ISLAND POLICY INTERPRETATION PRINCIPLES

Under Rhode Island law,[2] the interpretation of an insurance contract is a question of law for a court to decide.  *Lynch v. Spirit Rent-a-Car*, 965 A.2d 417, 427 (R.I. 2009).  A policy's

---

[2] Rhode Island law applies to the substantive issues in this case.  "A federal court sitting in

9

terms must be given their "plain and ordinary" meaning; if the policy language is "clear and unambiguous, the task of judicial construction is at an end" and "[t]he contract terms must then be applied as written and the parties are bound by them." *Zarrella v. Minnesota Mut. Life Ins. Co.*, 824 A.2d 1249, 1259 (R.I. 2003); *Malo v. Aetna Cas. & Sur. Co.*, 459 A.2d 954, 956 (R.I. 1983). A court will "'refrain from engaging in mental gymnastics or from stretching the imagination to read ambiguity into a policy where none is present.'" *Derderian v. Essex Ins. Co.*, 44 A.3d 122, 128 (R.I. 2012) (quoting *Mallane v. Holyoke Mut. Ins. Co. in Salem*, 658 A.2d 18, 20 (R.I. 1995)). Additionally, "a contract is not rendered ambiguous merely because the parties disagree over its proper interpretation." *Peerless Ins. Co. v. Luppe*, 118 A.3d 500, 506 (R.I. 2015).

ACS suggests that because the Policy is denominated an "all risks" policy, it must cover all losses unless they are specifically excluded. Compl. (ECF No. 1) ¶ 1, 4, 23, 132. But an "all risk" policy is not an "all loss" policy. *See, e.g.*, *Verveine*, 2022 WL 1180061, at *4 (policy "somewhat inaccurately referred to as an 'all-risk' property insurance policy" because "the burden remains on the insured to demonstrate that such loss or damage, within the meaning of the policy, actually occurred"); *Emerald Coast Restaurants, Inc. v. Aspen Specialty Ins. Co.*,

---

diversity applies the substantive law of the forum state, including the choice of law rules." *Armbrust Int'l, Ltd. v. Travelers Cas. & Sur. Co. of Am.*, 2006 WL 1207659, at *5 (D.R.I. May 1, 2006). Under Rhode Island law, courts apply the law of the state where the insured is incorporated and where the contract is performed. *See, e.g.*, *Am. States Ins. Co. v. LaFlam*, 808 F. Supp. 2d 400, 403 (D.R.I. 2011) (applying Rhode Island law in interpreting policy because "the contract was made in Rhode Island"); *TranSched Sys. Ltd. v. Fed. Ins. Co.*, 958 F. Supp. 2d 331, 334 (D.R.I. 2013) (same, where insured was a Rhode Island corporation); *Twin River Worldwide Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 324 F. Supp. 3d 266, 270 n.7 (D.R.I. 2018) (same) *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 5 (1st Cir. 1994) ("[T]he Rhode Island Supreme Court has held that the place of contracting is the place in which the last act that forms the contract is performed.").

2020 WL 7889061, at *1 (N.D. Fla. Dec. 18, 2020); *see also AJC Int'l, Inc. v. Triple-S Propiedad*, 790 F.3d 1, 7 (1st Cir. 2015) ("an 'all risks policy'—covers all *physical loss* to the [specified] property unless 'caused by or resulting from' an *excluded* peril") (internal quotation omitted).  Thus, a court must ask which losses the policy's plain language actually covers.  And the Policy here provides Building and Personal Property, Business Income, Extra Expense, Dependent Business Premises, and Loss Prevention Expenses coverage only when there is "direct physical loss or damage" to the insured properties.  Policy (ECF No. 1-3) at 81, 83, 109, 113, 124.

As the insured, ACS bears the burden of pleading and proving that it is entitled to coverage.  *See Gen. Acc. Ins. Co. of Am. v. Am. Nat. Fireproofing, Inc.*, 716 A.2d 751, 757 (R.I. 1998).

## B. ACS'S BUILDING AND PERSONAL PROPERTY, BUSINESS INCOME, EXTRA EXPENSE, DEPENDENT BUSINESS PREMISES, AND LOSS PREVENTION EXPENSES CLAIMS FAIL BECAUSE ACS DOES NOT ALLEGE "DIRECT PHYSICAL LOSS OR DAMAGE" TO ITS PROPERTIES

To allege "direct physical loss or damage" to property, policyholders are required to show a physical alteration or permanent dispossession of the property.  ACS's Complaint includes numerous allegations about the airborne transmission of the virus and the virus's effect on humans, but the Policy is clear that the "air" within a building is not part of the covered property, and that there is no coverage for losses caused by "injury, sickness, disease, [or] death."  ACS's few allegations about the virus's presence on the surface of its property do not establish that the property was physically harmed in any way, and hundreds of courts have already concluded that these types of allegations do not constitute "direct physical loss or damage" to property.  And, contrary to ACS's suggestion, the absence of an explicit virus or communicable-disease exclusion in its Policy cannot create coverage as a matter of law.

11

> i.   **"Direct Physical Loss or Damage" Requires a Physical Alteration or Permanent Dispossession of Property**

Numerous cases in Rhode Island and elsewhere have interpreted the same policy language and allegations at issue in this case and determined that "direct physical loss or damage" to property requires an actual physical alteration or permanent dispossession of the insured property itself; a mere loss of use of the property is insufficient. *See, e.g.*, *Josephson*, 2022 WL 999134, at *13 (agreeing with the rationale of the "overwhelming majority of jurisdictions" that "COVID-19 cannot cause 'physical loss or damage' to property where no physical *alteration* or *damage* has occurred to the property") (emphasis in original); *Verveine*, 2022 WL 1180061, at *5 ("We conclude that 'direct physical loss of or damage to' property requires some 'distinct, demonstrable, physical alteration of the property.'  Every appellate court that has been asked to review COVID-19 insurance claims has agreed with this definition for this language or its equivalent."); *Mudpie*, 15 F.4th at 892 ("direct physical loss of or damage to" property requires a "distinct, demonstrable, physical alteration" or a "permanent dispossession" of the property); *Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co.*, 22 F.4th at 458 ("direct physical loss of or damage to" property requires a "tangible alteration or deprivation of property").**[3]**

---

[3] Courts have applied the same interpretation of "direct physical loss or damage" outside the COVID-19 context.  *See, e.g.*, *Universal Image Prods., Inc. v. Federal Ins. Co.*, 475 Fed. Appx. 569, 574 (6th Cir. 2012) (requirement of "direct physical loss or damage" not met where presence of bacteria in air conditioning system did not cause tangible damage to the insured property); *Mastellone v. Lightening Rod Mut. Ins. Co.*, 884 N.E.2d 1130, 1144 (Ohio Ct. App. 2008) (holding that mold does not constitute "physical damage" because "the presence of mold did not alter or otherwise affect the structural integrity of the [property]"); *Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins. Co.*, 17 F. Supp. 3d 323, 329–30 (S.D.N.Y. 2014) (loss of electrical power at the insured's offices did not constitute physical damage because it did not compromise the physical integrity of the property); *Crestview Country Club, Inc. v. St. Paul Guardian Ins. Co.*, 321 F. Supp. 2d 260, 264 (D. Mass. 2004) (no direct physical loss to golf course where loss of tree modified how a hole on the course was played because

"The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." 10A COUCH ON INS. § 148:46 (3d Ed. West June 2020).[4]

In addition to its use of the term "direct physical loss or damage," other aspects of ACS's Policy confirm that the insured properties must tangibly change from the fortuitous event for there to be coverage.  For instance, the Policy provides Business Income, Extra Expense, and Dependent Business Premises coverage for ACS's operations only during the "period of restoration," which begins "immediately after the time of direct physical loss or damage" or "on the date operations would have begun if the direct physical loss or damage had not occurred," and continues during the time required to "repair or replace the property," including where the repairs or replacement "require[] the tearing down of parts of any property not damaged."  Policy (ECF No. 1-3) at 66.  The Policy's reference to "direct physical loss or damage" and "repair or replace" is no accident; that language connotes physical harm because coverage is triggered only if a fortuitous event causes an actual, physical change in the insured property itself.  *See, e.g.*, *Verveine*, 2022 WL 1180061, at *4 (finding that period of restoration definition "clearly implies that the property has not experienced physical loss or damage in the first place unless there needs to be active repair or remediation measures to correct the claimed damage or the business must

---

there was no direct physical loss to the course; "'physical' must be given its plain meaning–e.g., 'material'").

[4] The Rhode Island Supreme Court has repeatedly looked to *Couch* as an authoritative source with respect to insurance coverage issues.  *See, e.g.*, *Nelson v. Allstate Ins. Co.*, 228 A.3d 983, 987 (R.I. 2020) (relying on COUCH); *Peerless Ins. Co.*, 118 A.3d at 507 (similar).

13

move to a new location" and holding in COVID-19 business interruption case that "[t]he allegations in the complaint do not support recovery under this definition"); *Oral Surgeons*, 2 F.4th at 1144 (affirming dismissal of complaint seeking coverage for COVID-19-related business interruption losses and stating that "[t]he unambiguous requirement that the loss or damage be physical in nature accords with the policy's coverage of lost business income and incurred extra expense during the 'period of restoration'"); *BN Farm LLC v. Cincinnati Cas. Co.*, 2021 WL 4488215, at *10 (D. Mass. Sept. 16, 2021) (granting insurer's motion for summary judgment in COVID-19 business interruption case because "[t]he language of the Policy, taken as a whole and including the Period of Restoration provision, confirms that 'physical loss' or 'physical damage' denotes tangible damage to the actual integrity or structure of the property"); *Michael Cetta, Inc. v. Admiral Indem. Co.*, 506 F. Supp. 3d 168, 177 (S.D.N.Y. 2020) ("[t]he words 'repair' and 'replace' contemplate physical damage to the insured premises as opposed to loss of use of it"); *Chief of Staff LLC v. Hiscox Ins. Co. Inc.*, 2021 WL 1208969, at *3 (N.D. Ill. Mar. 31, 2021) ("The uneasy fit between the 'period of restoration' language and [Plaintiff's] reading of the Business Income provision confirms that the better reading of the provision is the one that requires some physical change to the condition or location of property at the insured's premises.").

    As discussed in the following sections, ACS's claims fail because it nowhere pleads any actual change from the COVID-19 pandemic to the insured properties themselves that required the property to be "repaired" or "replaced."

        ii.    **The Insured Properties Do Not Include the "Air" Within the Structures**

    Hoping to mask the fact that the virus did not cause any permanent dispossession of or tangible alteration to its properties, ACS floods its Complaint with allegations about the

14

purported scientific properties of COVID-19.  But almost all of those allegations relate to the person-to-person transmission of the virus and the virus's effect on air.  For example, ACS alleges that "[t]he presence of Coronavirus in the *air* physically alters and transforms the content of the room *air*" (Compl. ¶ 34); "[t]he *airborne transmission* of Coronavirus within buildings is depicted in the following illustrations: . . ." (*id.* ¶ 37); "[t]he introduction of Coronavirus into the indoor *air* at the Mexico Plants directly and physically changes, alters, and transforms the composition of the *air*" (*id.* ¶ 97); and "[a]s with asbestos in the *air,* the presence of an unsafe agent, such as Coronavirus, in the *air* of the premises alone results in risk" (*id.* ¶ 98).

These allegations are irrelevant to ACS's claims because the "air" within a building is not part of the insured property.  The Policy provides coverage only when there is "direct physical loss or damage . . . to **property**."  Policy (ECF No. 1-3) at 109.  "Property" is defined to include a "building," and "building" means "a structure."  *Id.* at 53, 71.  The Policy expressly states that "building" "does not mean: land, water or *air*, either inside or outside of a structure."  *Id.* at 53.  And the Policy adds that Great Northern will not pay for losses caused by "injury, sickness, disease, [or] death" of any person.  *Id.* at 118.  Accordingly, ACS's allegations about the "air" and airborne transmission of the virus are irrelevant because they do not establish any direct physical loss or damage to *property*.

### iii.     The Alleged "Presence" of the Virus on the Premises Does Not Amount to "Direct Physical Loss or Damage" to Property

ACS's few remaining allegations about the virus's effect on surfaces do not save its claims.  To start, ACS does not even definitively plead that the virus was present on its premises, beyond mere speculation.  ACS alleges only that a number of employees who worked in the Mexico Plants "during time periods when the Mexico Plants . . . were open for business" tested positive for COVID-19, and that the city where the Mexico Plants are located experienced

"dramatic COVID-19 outbreaks in mid- and late-March 2020," and so the virus must have been present on the insured properties at some point. *Id.* ¶¶ 80–90, 95, 114. These allegations amount only to speculation about the prevalence of the virus and how the employees were infected, and do not establish that the virus itself was ever present on the properties. *See, e.g., Kamakura, LLC v. Greater New York Mut. Ins. Co.*, 525 F. Supp. 3d 273, 284–85 (D. Mass. 2021) ("even considering the highly contagious nature of the virus and its spread in Boston, it is unduly speculative to infer that the virus was present within the confines of plaintiffs' restaurants").[5]

But even if ACS had alleged facts showing the virus was present on its premises, this still would not amount to allegations of "direct physical loss or damage" to its premises. ACS alleges only that some of its employees tested positive for COVID-19 and that the virus may have been present on "surfaces," which created "fomites" that were unsafe for people. *See, e.g.*, Compl. ¶¶ 48–60, 80–81. ACS claims that the presence of the virus made the property into "a transmission

---

[5] *See also, e.g., Am. Food Sys., Inc. v. Fireman's Fund Ins. Co.*, 530 F. Supp. 3d 74, 78 (D. Mass. 2021) (dismissing complaint alleging virus was "ubiquitous" in area where insured properties were located); *Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP v. Valley Forge Ins. Co.*, 2021 WL 5759703, at *6 (E.D.N.Y. Dec. 3, 2021) (granting insurer's motion to dismiss where plaintiff alleged that employees tested positive because "Plaintiff does not actually allege the presence of COVID-19 in any of its offices"); *Promotional Headwear*, 504 F. Supp. 3d 1191, 1203 (D. Kan. 2020) (finding that "Plaintiff's allegation that the virus likely contaminated its property" based on infection of customers, employees, and other visitors "fails to raise a 'right of relief above the speculative level.'"); *Oregon Clinic, PC v. Fireman's Fund Ins. Co.*, 2021 WL 5921370, at *7 (D. Or. Dec. 15, 2021) (dismissing complaint alleging "statistically certain or near-certain" presence of virus based on statistical modeling and known incidences of infection); *United Talent Agency, LLC v. Vigilant Ins. Co.*, 2021 WL 4197670, at *2 (Cal. Super. Ct. June 23, 2021) ("Coverage should not arise based upon speculation" virus was present after insured's employees tested positive because "perhaps the employees became infected elsewhere, or their spouses or dependents were the ones who infected the employees" and dismissing complaint where plaintiff did not allege that the virus "was actually detected by a surface or air test at the time the claim was tendered"), *aff'd*, 2022 WL 1198011; *Zebra Techs. Corp. v. Factory Mut. Ins. Co.*, 2021 WL 4459532, at *3 (N.D. Ill. Sept. 29, 2021) (holding that there was no physical loss or damage to property where employees at certain insured facilities tested positive for COVID-19).

vehicle for disease from one host to the other" by "adher[ing] to surfaces and objects" and "becoming a part of their surface." *Id.* ¶¶ 34, 57–58. But all of these allegations relate to the safety of *people*; they do not establish that any *property* was damaged in a way that required "repair" or "replacement." If allegations that the virus was present on property were sufficient to establish "direct physical loss or damage" to the property, this would "render[] every sneeze, cough, or even exhale a 'structural change.'" *Cosmetic Laser, Inc. v. Twin City Fire Ins. Co.*, 554 F. Supp. 3d 389, 407 (D. Conn. 2011). It would "strain credulity to say that [a] countertop was damaged or physically altered" if a "sick person walked into one of Plaintiff's restaurants and left behind COVID-19 particulates on a countertop." *Unmasked Mgmt., Inc. v. Century-Nat'l Ins. Co.*, 514 F. Supp. 3d 1217, 1226 (S.D. Cal. 2021). For that reason, hundreds of courts around the country have found that similar allegations did not amount to "direct physical loss or damage" to property.

In *Josephson*, for example, the policyholder alleged that its insured properties were damaged by COVID-19 because the virus rendered the properties "'partially or fully unusable for their intended purposes.'" 2022 WL 999134, at *3. Similar to ACS, the policyholder claimed that employees, tenants, and guests who were present on the properties tested positive for COVID-19. *Id.* Rhode Island Superior Court Judge Brian Stern held that even if COVID-19 was present on the plaintiff's properties, "not only does COVID-19 not constitute 'physical loss or damage' under the terms of the Policy," but "COVID-19 is not capable of causing 'physical loss or damage' to property, full stop." *Id.* at *12. That is because "COVID-19 does not permanently exist on surfaces for an indefinite period of time, unlike mold, and does not require any physical repair, replacement, or rebuild to remedy its presence on property." *Id.* at *14. "At most, the physical response required when faced with the presence of COVID-19 at an insured

location is to undertake routine cleaning and disinfecting." *Id*. The court added that "merely asserting that employees at various facilities who [sic] have or are suspected of having COVID-19 does not cause the type of 'physical loss or damage' that is required by the Policy." *Id*. at *15. The court agreed with "the overwhelming majority of jurisdictions" that "COVID-19 cannot cause 'physical loss or damage' to property where no physical *alteration* or *damage* has occurred to the property." *Id*. at *13 (emphasis in original).[6] District of Rhode Island Chief Judge John J. McConnell, Jr. has reached the same conclusion, finding that "COVID-19 does not cause damage to property." *M&N Food Service*, 2022 WL 1137311, at *2, n.2.

Every appellate court to have addressed this issue has reached the same conclusion, holding, without dissent, that COVID-19 did not cause "direct physical loss or damage" to property, regardless of whether the policyholder alleged the virus was present on its premises. *See, e.g.*, *Kim-Chee LLC v. Philadelphia Indem. Ins. Co.*, 2022 WL 258569, at *2 (2d Cir. Jan. 28, 2022) ("Even assuming the virus's presence at [the insured]'s tae-kwon-do studio, the complaint does not allege that any part of its building or anything within it was damaged—let alone to the point of repair, replacement, or total loss."); *Uncork & Create*, 27 F.4th at 933 n.11 ("To the extent that [the insured] argues that the Covid-19 virus itself impaired the covered property by its presence, [the insured] has not alleged that any such presence would require the repair, rebuilding, replacement, or permanent relocation necessary to trigger coverage under the

---

[6] Although *Josephson* was decided on summary judgment, the Court can decide this case at the motion to dismiss stage based on the heightened federal pleading standards articulated in *Twombly/Iqbal*. The Rhode Island Supreme Court has elected not to adopt that heightened pleading standard, *see Chhun v. Mortgage Elec. Registration Sys., Inc.*, 84 A.3d 419 (R.I. 2014), and therefore "a motion to dismiss under Fed. R. Civ. P. 12(b)(6) may be fatal to state law claims that would have survived an analogous challenge in the Rhode Island state court." *See Reilly v. Cox Enterps., Inc.*, 2014 WL 4473772, at *3 (D.R.I. Apr. 16, 2014).

business income loss provision"); *Dakota Girls, LLC v. Phila. Indemnity Ins. Co.*, 17 F.4th 645, 649 (6th Cir. 2021) (rejecting argument that COVID-19 "merely through its supposed presence, was somehow 'damaging surfaces' within its properties"); *Sandy Point Dental*, 20 F.4th at 331–334 ("Even if the virus was present and physically attached itself to [the insured's] premises, [the insured] does not allege that the virus altered the physical structures to which it attached, and there is no reason to think that it could have done so."); *Gilreath*, 2021 WL 3870697, at *2 ("[W]e do not see how the presence of those particles would cause physical damage or loss to the property."); *Verveine*, 2022 WL 1180061, at *6 ("Even accepting the plaintiffs' premise that the suspension of their business was caused by the 'presence' of the virus on surfaces and in the air at the restaurants (as opposed to the danger that the virus would be introduced to the restaurants or spread directly from person to person if indoor dining were allowed), mere 'presence' does not amount to loss or damage to the property."); *United Talent Agency*, 2022 WL 1198011, at *10 ("[W]e agree with the majority of the cases finding that the presence or potential presence of the virus does not constitute direct physical damage or loss."); *see also Terry Black's*, 22 F.4th at 456–58; *Oral Surgeons*, 2 F.4th at 1143–1144; *Mudpie*, 15 F.4th at 890–893; *Goodwill Indus.*, 21 F.4th at 710–712; *Sweet Berry*, 2022 IL App (2d) 210088 at ¶ 39; *Indiana Repertory Theatre*, 180 N.E.3d at 408–409; *Wakonda Club*, 2022 WL 1194012, at *5–6; *Gavrilides*, 2022 WL 301555, at *5; *Consolidated Rest. Ops.*, 2022 WL 1040367, at *2; *Sanzo Enters.*, 2021-Ohio-4268, at ¶¶ 40–43.[7]  The overwhelming majority of trial courts around the country have reached

---

[7] Although the First Circuit has not yet issued a ruling in any cases seeking coverage for COVID-19-related losses, it stayed several such cases pending the outcome of *Verveine v. Strathmore Insurance Company* in the Massachusetts Supreme Court.  *See Legal Sea Foods, LLC v. Strathmore Ins. Co.*, No. 21-01202 (1st Cir. Dec. 16, 2021); *SAS Int'l, Ltd. v. Gen. Star Indem. Co.*, No. 21-01219 (1st Cir. Dec. 16, 2021); *Kamakura, LLC v. Greater New York Mut. Ins. Co.*, No. 21-1259 (1st Cir. April 11, 2022); *Select Hosp., LLC v. Strathmore Ins. Co.*, No. 21-1380 (1st Cir. April 11, 2022); *Am. Food Sys., Inc. v. Fireman's Fund Ins. Co.*, No. 21-1307

the same result.  *See* Penn Law COVID Coverage Litigation Tracker, *available at* https://cclt.law.upenn.edu/judicial-rulings/ (last visited May 2, 2022).**8**

Just as in *Josephson* and hundreds of other cases around the country, ACS's allegations about the virus's presence on the surfaces of its properties do not amount to allegations of "direct physical loss or damage" to property.  And ACS cannot save its claims by alleging that "Coronavirus cannot be removed by routine surface cleaning" and "[t]he only way to eliminate the presence of Coronavirus from property and prevent its continuous reintroduction is to close down property completely and bar all individuals from entering."  *See* Compl. ¶¶ 61–79.  First, those allegations are contradicted by ACS's other allegations (i) demonstrating that property contaminated by the virus can be made safe enough for operation through "concerted safety

---

(1st Cir. Dec. 16, 2021).  Now that the Massachusetts Supreme Court has ruled in favor of the insurer in *Verveine*, finding that allegations of the virus's presence did not amount to "direct physical loss of or damage to" property, the First Circuit will presumably lift those stays and join the other appellate courts that have ruled in the insurers' favor.

[8] Great Northern is aware of only two state court cases applying Rhode Island law where the court ruled, at least in part, for the policyholder.  In *Atwells Realty Corp. v. Scottsdale Ins. Co.*, 2021 WL 2396584, at *11 (R.I. Super. Ct. June 4, 2021), the court correctly granted the motion to dismiss as to business income coverage, finding that there was no "direct physical loss of or damage to" property.  However, the court denied the motion as to civil authority coverage, distinguishing the majority of rulings against the insured on this issue because "those cases were determined under a plausibility pleading standard."  *Id.*  To the extent *Atwells* suggests that a policyholder is entitled to discovery on the issue of whether COVID-19 causes "direct physical loss or damage to" property, that holding is not binding on this Court, which must apply federal pleading standards.  And in any case, it is contrary to hundreds of decisions across the country and to Rhode Island's well-established standards of policy interpretation.  In the second case, *Procaccianti Cos. Inc. et al. v. Zurich Am. Ins. Co.*, No. 1:20-cv-00512-WES-PAS (D.R.I. Sept. 2, 2021), Judge Smith denied the insurer's motion to dismiss with no substantive reasoning, declining to dismiss the complaint at the "early stage," while noting that the court would revisit the issues on summary judgment.  Notably, when the ruling in *Procaccianti* was issued, only the Eighth and Eleventh Circuits had affirmed that a Rule 12(b)(6) motion was the proper procedural vehicle for dismissal, and no Rhode Island courts had yet affirmed that the insured's allegations failed under Rhode Island substantive law.  For the reasons explained in this brief, ACS's Complaint cannot survive under federal pleading standards.

processes" and (ii) acknowledging that the virus, whether in the air or on surfaces, eventually deactivates even if left untreated.  Compl. ¶¶ 51, 53, 111, 118.  Second, any allegation that COVID-19 cannot be cleaned from surfaces does not meet the plausibility standard of *Twombly/Iqbal*, as numerous courts have found.  *See, e.g.*, *America's Kids, LLC v. Zurich Am. Ins. Co.*, 2021 WL 4477872, at *3, 5 (N.D. Ill. Sept. 30, 2021) (taking judicial notice that "COVID-19 can be cleaned from surfaces, disinfected, or both, using standard household cleaning and disinfectant products" because "[a]fter nearly two years of living amidst the virus, the fact that COVID-19 can be cleaned from surfaces is well-known in this community and is confirmed by the reliable sources (CDC, EPA, and OSHA)"); *Sandy Point Dental*, 20 F.4th at 335 ("While the impact of the virus on the world over the last year and a half can hardly be overstated, its impact on physical property is inconsequential: deadly or not, it may be wiped off surfaces using ordinary cleaning materials, and it disintegrates on its own in a matter of days."); *SAS Int'l Ltd. v. Gen. Star Indem. Co.*, 520 F. Supp. 3d 140, 144 (D. Mass. 2021) ("COVID-19 . . . does not endure beyond a brief passage of time or a proper cleaning, let alone render the property permanently uninhabitable."); *L&J Mattson's Co. v. Cincinnati Ins. Co.*, 2021 WL 1688153, at *5 (N.D. Ill. Apr. 29, 2021) ("One does not replace, rebuild or repair a countertop (or a doorknob or a floor) because SARS-CoV-2 . . . is present on the surface.  One simply cleans the surface."); *Promotional Headwear*, 504 F. Supp. 3d at 1203–04 ("even assuming that the virus physically attached to covered property, it did not constitute the direct, physical loss or damage required to trigger coverage because . . . routine cleaning and disinfecting can eliminate the virus on surfaces"); *Uncork & Create LLC v. Cincinnati Ins. Co.*, 2020 WL 6436948, at *5 (S.D. W. Va. Nov. 2, 2020) ("even when present, COVID-19 does not threaten the inanimate

structures covered by property insurance policies, and its presence on surfaces can be eliminated with disinfectant"), *aff'd*, 27 F.4th 926 (4th Cir. 2022).

Finally, ACS does not plausibly allege that the actions it took to purportedly "repair and replace property"—including installing physical barriers, developing health safety protocols and record systems, removing and replacing security features, altering air circulation, reconfiguring indoor spaces, providing PPE, and disinfecting surfaces (Compl. ¶¶ 117, 145)—were made to actually "repair" any property, as opposed to ensure the future safety of people. *See, e.g.*, *John Gore Org., Inc. v. Fed. Ins. Co.*, 2022 WL 873422, at *12 (S.D.N.Y. Mar. 23, 2022) (installation of hand sanitizing stations, plexiglass shields, COVID-related signage, and enhanced HVAC systems were "not there to replace or repair damage to the property; they [we]re there to protect humans"); *Scherder v. Aspen Am. Ins. Co.*, 553 F. Supp. 3d 1098, 1104–05 (M.D. Fla. 2021) ("People may take measures that modify property to protect themselves from any direct physical loss or damage caused by a virus, like putting up plexiglass barriers at a grocery store checkout area.  But these physical measures are not there to protect <u>property</u> in the same way that, for example, hurricane shutters and sandbags protect property from direct physical loss or damage. Rather, these measures were meant to protect <u>people</u> from contracting the virus.") (emphasis in original); *United Talent Agency*, 2022 WL 1198011, at *11 (discussing several cases holding that "cleaning or employing minor remediation or preventive measures to help limit the spread of the virus does not constitute direct property damage or loss").  And ACS's allegations amount only to measures taken to *prevent* the reintroduction of the virus, not anything done to repair any present damage.  *See, e.g.*, *Byberry Servs. & Sols., LLC v. Mt. Hawley Ins. Co.*, 2021 WL 3033612, at *4 (N.D. Ill. July 19, 2021) ("while the plaintiffs did physically alter their property in response to the orders—installing plexiglass among other changes—such measures do not

22

qualify as a physical loss").  Indeed, ACS has reopened its facilities with the much of the same equipment, workstations, machinery, and other physical property that it had before the pandemic.  *See id.* ¶¶ 110–119.  Because ACS has not alleged any tangible alteration or permanent dispossession of its property that required "repair" or "replacement," it has not alleged any "direct physical loss or damage" to its properties.

> ### iv.   The Absence of A Virus or Communicable-Disease Exclusion Does Not Change the Analysis

Faced with overwhelming authority rejecting coverage in materially identical circumstances, ACS resorts to an illogical argument that the absence of a virus exclusion or communicable-disease exclusion in its Policy somehow proves that it is entitled to coverage.  Compl. ¶¶ 143, 169, 171–73.  That theory is contrary to basic principles of insurance, and numerous courts have rejected it.

ACS's argument is flawed from the start because it relies on evidence outside the Policy's four corners.  The Policy is unambiguous and, under Rhode Island law, an unambiguous insurance policy must be interpreted solely based on its plain terms.  *See, e.g.*, *Malo*, 459 A.2d at 956 (unambiguous contract terms must be "applied as written and the parties are bound by them"); *Van Hoesen v. Lloyd's of London*, 134 A.3d 178, 181 (R.I. 2016) (similar).

ACS's argument also reflects a basic misunderstanding of contract interpretation principles.  According to ACS, some commercial property insurance policies contain virus and communicable-disease exclusions, but its Policy did not, so there must be coverage under the Policy for any and all virus-related losses.  Compl. ¶¶ 169, 171–73.  But that argument conflates two separate questions—first, whether there is coverage, and second, if so, whether coverage is excluded by some other provision.

For this very reason, a long line of courts have rejected similar arguments in the COVID-19 context. *See, e.g.*, *Josephson*, 2022 WL 999134, at *11 ("several courts, including the Seventh, Ninth, and Tenth Circuits have held that despite the existence of an applicable exclusion, COVID-19-related claims fail to trigger coverage in the first instance"); *Verveine*, 2022 WL 1180061, at *7 (holding that no "negative implication can or should be drawn" from the absence of an exclusion for virus or disease); *Kim-Chee*, 2022 WL 258569, at *2 ("[insured]'s policy does not contain a virus exclusion.  Thus, [the insured] argues, the policy must cover losses 'caused by or resulting from' the coronavirus.  We disagree."); *Dakota Girls*, 17 F.4th at 653 ("The district court declined to consider the significance of the virus exclusion, reasoning that no coverage existed in the first place for the clause to exclude.  We agree."); *SAS Int'l*, 520 F. Supp. 3d at 145 ("the 'absence of an express [virus] exclusion does not operate to create coverage' for pandemic-related losses"); *El Novillo Rest. v. Certain Underwriters at Lloyd's, London*, 505 F. Supp. 3d 1343, 1348 (S.D. Fla. 2020) ("the existence or nonexistence of an exclusionary provision in an insurance contract is not at all relevant until it has been concluded that the policy provides coverage for the insured's claimed loss"); *United Talent Agency*, 2021 WL 4197670, at *12 (rejecting insured's argument that its COVID-19-related losses must be covered because insurer failed to include a virus, communicable-disease, or pandemic exclusion, and emphasizing that "policy exclusions cannot expand the scope of coverage"), *aff'd*, 2022 WL 1198011; *Café La Trova LLC v. Aspen Specialty Ins. Co.*, 519 F. Supp. 3d 1167, 1178 n.7 (S.D. Fla. 2021) ("exclusionary provisions plainly cannot be used to establish coverage in the first instance"); *Bel Air Auto Auction, Inc. v. Great N. Ins. Co.*, 2021 WL 1400891, at *10 (D. Md. Apr. 14, 2021) (insured's argument based on absence of exclusion in policy issued by Great Northern affiliate "without merit" because "an exclusion cannot grant

coverage" and "[o]mission of an exclusion does not alter the plain language of the provisions");

*Great Meadow Cafe v. Cincinnati Ins. Co.*, 2022 WL 813796, at n.3 (D. Conn. Mar. 17, 2022)

("Because the Court finds that there is no coverage for Plaintiff's claimed losses under the

Policy, it need not address the exclusions (or lack of exclusions) therein.").

The parties' decision to not add to the Policy exclusions for viruses and communicable

diseases does not render the phrase "direct physical loss or damage to" property susceptible to an

alternative meaning covering economic losses that are neither "direct" nor "physical."

### C.      ACS'S BUSINESS INCOME, EXTRA EXPENSE, AND DEPENDENT BUSINESS PREMISES CLAIMS FAIL BECAUSE ACS DOES NOT ALLEGE THAT THE IMPAIRMENT OF OPERATIONS WAS *CAUSED BY* ANY "DIRECT PHYSICAL LOSS OR DAMAGE" TO ITS PROPERTIES

ACS's Business Income, Extra Expense, and Dependent Business Premises claims also

fail for the independent reason that ACS has not alleged any causal nexus between its suspension

of operations and the virus's presence on its premises.  The Policy provides that the "impairment

of operations must be *caused by or result from* direct physical loss or damage by a covered peril

to property."  Policy (ECF No. 1-3) at 109, 113, 124.  As discussed, ACS's allegations about the

virus's presence on its properties are insufficient to establish "direct physical loss or damage."

But even apart from that issue, ACS's claims fail because it is required to show that its

impairment of operations was *caused by or resulted from* the alleged "direct physical loss or

damage"—i.e., the virus's presence on the insured premises.

ACS makes no such allegation.  To the contrary, ACS alleges that it suspended

operations to comply with broad government closure orders issued in response to the pandemic.

And ACS admits that those orders were issued "in order to mitigate the spread and transmission

of the virus SARS-CoV-2 in the community," not because the virus damaged ACS's properties

specifically.  Compl. ¶¶ 99–101.  Thus, ACS's impairment of operations resulted from its

25

compliance with the preventative government orders, not any "direct physical loss or damage" to its properties.

Numerous courts have dismissed COVID-19 business interruption claims on this basis as well. In *Inns by the Sea v. California Mutual*, for example, the California Court of Appeal held that government closure orders issued in response to the COVID-19 pandemic were not issued because of the virus's presence at the specific insured premises, and therefore the insured's business interruption losses were not caused by any "direct physical loss or damage" to its property. 71 Cal. App. 5th 688, 703 (2021). The court noted that the government orders in that case "were issued because the COVID-19 virus was present *throughout* San Mateo and Monterey Counties, not because of any particular presence of the virus on [the insured's] premises." *Id.* (emphasis in original). The court explained:

> [T]he lack of causal connection between the alleged physical presence of the virus on [the insured's] premises and the suspension of [the insured's] operations can be best understood by considering what would have taken place if [the insured] had thoroughly sterilized its premises to remove any trace of the virus after the Orders were issued. In that case, [the insured] would *still* have continued to incur a suspension of operations because the Orders would *still* have been in effect and the normal functioning of society *still* would have been curtailed.

*Id.* at 704 (emphasis in original).[9]

---

[9] *See also, e.g.*, *Circus Circus LV, LP v. AIG Specialty Ins. Co.*, 2022 WL 1125663, at *1 (9th Cir. Apr. 15, 2022) ("Despite [the insured]'s allegation that the COVID-19 virus was present on its premises, it has not identified any direct physical damage to its property caused by the virus which led to the [the insured]'s closure. Rather, the allegations surrounding [the insured]'s closure are based on the local Stay at Home Orders"); *Kamakura, LLC v. Greater New York Mut. Ins. Co.*, 525 F. Supp. 3d 273, 283 (D. Mass. 2021) ("Here, conclusory allegations aside, plaintiffs' loss of use was caused by the government orders; it was not caused by the presence of the coronavirus itself."); *Los Angeles Lakers, Inc. v. Fed. Ins. Co.*, 2022 WL 831549, at *4 (C.D. Cal. Mar. 17, 2022) ("[W]hether the plaintiff could resume its business operations did not depend on whether it had repaired its property by eliminating the presence of the Virus from its property, but on whether the government rescinded its health orders"); *Children's Place, Inc. v. Zurich Am. Ins. Co.*, 2021 WL 4237284, at *4 (D.N.J. Sept. 17, 2021) ("Here, there is no allegation that [the insured] shut its doors due to high concentrations of the Virus on its premises; rather, [the

Just as in *Inns by the Sea* and many other cases, ACS's Complaint establishes that its impairment of operations was caused by the broad, preventative government closure orders, not any "direct physical loss or damage" to its property.

### D.    ACS'S CIVIL AUTHORITY CLAIM FAILS BECAUSE ACS DOES NOT ALLEGE THAT ANY CIVIL OR MILITARY AUTHORITY PROHIBITED ACCESS DUE TO PHYSICAL DAMAGE TO PROPERTY

Like the other coverages, Civil or Military Authority coverage applies only if there is physical harm to some property away from the insured premises, which ACS does not plead. Nor has ACS alleged that any civil-authority order actually prohibited access to its Apodaca Plant property.  Accordingly, ACS's assertion of Civil or Military Authority coverage fails, too.

### i.    ACS Does Not Allege That Access Was Prohibited Because of Offsite Property Damage Within One Mile of Its Premises

Under the Policy's Civil or Military Authority provision, coverage arises only where the action of a civil authority "prohibit[s] . . . access" to the insured properties due to damage to property within one mile thereof.  Policy (ECF No. 1-3) at 112, 125.  That is, the "prohibition of access by a civil authority must be the direct result of direct physical loss or damage to property" within one mile of the insured properties.  *Id.*  But just as ACS fails to allege direct physical loss

---

insured] merely complied with government orders to prevent the Virus from spreading further throughout the general population."); *First & Stewart Hotel Owner, LLC v. Fireman's Fund Ins. Co.*, 2021 WL 3109724, at *4 (W.D. Wash. July 22, 2021) ("[T]he presence of COVID-19 on Plaintiff's property did not cause damage to the property necessitating rehabilitation or restoration efforts . . . .  Instead, all that is required for Plaintiff to return to full working order is for the Governor to lift the decrees and restrictions."); *Madison Int'l v. Valley Forge Ins. Co.*, 2022 WL 224853, at *3 (C.D. Cal. Jan. 18, 2022) ("[T]he cause of the widespread economic loss was the 'restriction on human activities' by government orders, not the 'consequence of a direct physical loss or damage to the insured premises.'"); *In-N-Out Burgers v. Zurich Am. Ins. Co.*, 2022 WL 472800, at *3 (C.D. Cal. Feb. 10, 2022) (similar).

or damage to its own properties, ACS does not allege any physical loss or damage to property within one mile of its properties.  Moreover, as ACS itself alleges, the orders cited by ACS were issued "'in order to mitigate the spread and transmission of [COVID-19] in the community'"— not because of any direct physical loss or damage to *property*.  Compl. ¶ 101.  Accordingly, no coverage exists under the Policy's Civil or Military Authority provision as a matter of law.  *See, e.g.*, *10012 Holdings*, 21 F.4th at 223 (no civil authority coverage because government orders "were the result of the COVID-19 pandemic and the harm it posed to human beings," not because of "direct physical loss" to neighboring property); *Q Clothier New Orleans LLC v. Twin City Fire Ins. Co.*, 29 F.4th 252, 260 (5th Cir. 2022) (no civil authority coverage because government orders were a "direct result" of "the global pandemic and the need to take measures to contain and prevent the spread of COVID-19," not any physical loss or damage to property); *Brown Jug, Inc. v. Cincinnati Ins. Co.*, 27 F.4th 398, 404 (6th Cir. 2022) ("Plaintiffs have also failed to allege that COVID-19 caused loss or damage to properties 'other than the covered property' as required to plead a breach of the Civil Authority provision."); *Selane Prods., Inc. v. Continental Cas. Co.*, 2021 WL 4496471, at *1 (9th Cir. Oct. 1, 2021) (no civil authority coverage because COVID-19 did not cause "direct physical loss of or damage to" neighboring property); *Gilreath*, 2021 WL 3870697, at *2 (no civil authority coverage because COVID-19 did not cause "physical loss or damage" to nearby property); *Los Angeles Lakers*, 2022 WL 831549, at *6 (rejecting claim under identical provision because orders "were aimed at limiting viral spread in the community, not at mitigating property damage at any specific facility"); *Kamakura*, 525 F. Supp. 3d at 287 ("If Civil Authority coverage were available absent a specific and identifiable damaged property, that coverage would extend without geographic limitation— in this case, for insured premises across the entire state—something that the language of the

28

provision plainly does not contemplate."); *Whiskey River on Vintage, Inc. v. Illinois Cas. Co.*, 2020 WL 7258575, at *12 (S.D. Iowa Nov. 30, 2020) ("[the governor's] proclamation was not issued in response to a dangerous physical condition that resulted from a Covered Cause of Loss. Rather, the proclamation was issued to limit the spread of COVID-19.").

The New York order containing the bare statement that the virus "physically is causing property loss or damage" changes nothing.  Compl. ¶ 109 (emphasis omitted).  The order did not govern the Mexico Plants, and in any event, does not state that the coronavirus caused any actual, tangible change in any property.  As several courts adjudicating COVID-19-related insurance-coverage claims have already recognized, such statements in civil-authority orders do not constitute evidence of damage to any property, let alone damage to the insured's property. Like ACS's own naked allegations, the New York order merely provides an unsubstantiated legal conclusion to which this Court need not and should not defer—instead, well-settled principles of Rhode Island law governing interpretation of the policy provisions control here. *See, e.g.*, *United Talent Agency*, 2022 WL at 1198011, at *11 (no civil authority coverage because there was no "direct physical loss or damage" to property within one mile, despite New York order's statement that COVID-19 "physically is causing property loss and damage"); *W. Coast Hotel Mgmt., LLC v. Berkshire Hathaway Guard Ins. Cos.*, 498 F. Supp. 3d 1233, 1240 (C.D. Cal. 2020) (rejecting reliance on California order's assertion of property damage for this reason); *Select Hospitality, LLC v. Strathmore Ins. Co.*, 533 F. Supp. 3d 31, 38 (D. Mass. 2021) (rejecting conclusory allegations that orders were issued because of damage to other property); *Island Hotel Properties, Inc. v. Fireman's Fund Ins. Co.*, 512 F. Supp. 3d 1323, 1327 (S.D. Fla. 2021) ("the Court need not defer to a conclusory legal conclusion" stated by Florida order); *Promotional Headwear*, 504 F. Supp. 3d at n.66 (D. Kan. 2020) (same, Kansas order).

ii. **ACS Does Not—and Cannot—Allege That the Civil-Authority Orders Prohibited Access to Its Apodaca Plant Property**

ACS's Civil or Military Authority claim relating to its Apodaca Plant property also fails for the independent reason that ACS does not plead that any civil-authority orders prohibited access to that property.  Civil or Military Authority coverage is triggered only if an action of a civil authority imposes a "prohibition of access" to the insured premises.  Policy (ECF No. 1-3) at 112, 125.  But the Complaint establishes that no civil-authority order ever prohibited access to ACS's Apodaca Plant—instead, ACS alleges that that its operations at that plaint were merely "limited to activities 'directly necessary to respond to the sanitary emergency.'"  Compl. ¶ 103. While the other Mexico Plaints were allegedly forced to close completely, the Apodaca Plant was permitted to continue manufacturing "various of its cleaning products."  *Id.*  Because access to the Apodaca Plant was not prohibited, ACS's claims for Civil or Military Authority coverage at that property fail as a matter of law.  *See, e.g.*, *M&N Food Service*, 2022 WL 1137311, at *3 ("While it is true that the governor issued executive orders that substantially affected [the insured]'s business, [the insured] was not prohibited from accessing their property as a result of specifically covered loss."); *Brown Jug*, 27 F.4th at 405 (no civil authority coverage where plaintiff was able to continue operating business for certain purposes because access was not "prohibited"); *Legal Sea Foods*, 523 F. Supp. 3d at 153 (courts "address[ing] equivalent civil authority provisions" draw "clear line between actions that 'prohibit' access to insured properties and those that merely 'limit' such access"); *Pakachoag Acres Day Care Ctr., Inc. v. Philadelphia Indem. Ins. Co.*, 2021 WL 4392088, at *4 (D. Mass. Sept. 24, 2021) ("Civil Authority coverage does not extend coverage to government orders limiting access to property."); *Santo's Italian Café LLC v. Acuity Ins. Co.*, 2020 WL 7490095, at *13 (N.D. Ohio Dec. 21, 2020) ("while the State's Closure Orders prevented [the insured] from conducting dine-in operations—[its] primary

30

source of income—the Closure Orders did not prevent [the insured] from accessing its premises altogether," and, therefore, the insured "fail[ed] to meet the threshold for Civil Authority coverage"); *Pappy's Barber Shops, Inc. v. Farmers Grp., Inc.*, 487 F. Supp. 3d 937, 945 (S.D. Cal. 2020) (allegations that insureds were "prohibited from operating their businesses at their premises" insufficient because they did not show all access was prohibited).

### E.     THE POLICY'S DIFFERENCE IN TERMS/CONDITIONS AND EXCESS PROVISIONS DO NOT SAVE ACS'S CLAIMS

ACS's legal conclusion that the Policy's Difference in Terms/Conditions and Excess provisions grant coverage for its losses (Compl. ¶¶ 174, 183) runs contrary to the plain language of the Policy.  These provisions simply explain when the Policy operates as a primary policy and when it operates as an excess policy.  But whether it is operating on a primary or excess basis, coverage is always subject to the Policy's other terms and conditions.  Specifically, the Excess Provision states that "*[s]ubject to all the terms and conditions of this insurance*, this insurance applies to that part of loss or damage which exceeds the applicable limit of insurance of . . . underlying insurance."  Policy (ECF No. 1-3) at 46.  And the Difference in Terms/Conditions provision states that "*[s]ubject to all the terms and conditions of this insurance*, this insurance applies to loss or damage . . . to the extent that underlying insurance . . . does not apply."  *Id.*

ACS argues that these provisions grant coverage here because its underlying policy, the "Mexico Policy," does not provide coverage due to a virus and pandemic exclusion.  Compl. ¶¶ 174–183.  ACS ignores, however, that each of the provisions on which it relies is expressly "[s]ubject to all the terms and conditions of this insurance."  Policy (ECF No. 1-3) at 46. Accordingly, these provisions are subject to the requirements in the Policy, including the requirement that the impairment of operations must be caused by "direct physical loss or damage" to property.  *See Philadelphia Indem. Ins. Co. v. Atlantic Specialty Ins. Co.*, 2022 WL

390834, at *4 (W.D. Mo. Feb. 8, 2022) (no coverage under policy with "Difference in Conditions" form because the policy, "by its terms, does not apply to the losses at issue here"); *Archer-Daniels-Midland Co. v. Phoenix Assur. Co. of N.Y.*, 975 F. Supp. 1129, 1137 (S.D. Ill. 1997) (noting that excess policy with "Difference in Conditions" form shall "provide coverage within the primary policy dollar coverage range, but only for the losses expressly insured by the excess policy itself").  Indeed, if accepted, ACS's argument would mean that Great Northern is obligated to provide coverage for every loss not covered by the underlying Mexico Policy, regardless of whether the terms of this Policy grant coverage—a result contrary to the plain language of the Policy and common sense.  *See Emhart Indus., Inc. v. Century Indem. Co.*, 559 F.3d 57, 71 (1st Cir. 2009) ("[B]oth the 'rules of contract' and the 'rules of common sense' apply in construing an insurance policy.") (citing *Textron, Inc. v. Aetna Cas. & Sur. Co.*, 638 A.2d 537, 541 (R.I. 1994)).

## F.    LEAVE TO AMEND SHOULD BE DENIED

Because ACS cannot amend the Complaint to allege all of the above requirements to state a claim for Building and Personal Property, Business Income, Extra Expense, Dependent Business Premises, Loss Prevention Expenses, or Civil or Military Authority coverage, the Complaint should be dismissed with prejudice and leave to amend should be denied.  Numerous courts have dismissed COVID-19-related insurance-coverage complaints with prejudice for precisely this reason.  *See, e.g.*, *Terry Black's*, 22 F.4th at 460 (affirming denial of leave to amend because any additional allegations would be futile); *Hampshire House Corp. v. Fireman's Fund Ins. Co.*, 557 F. Supp. 3d 284, 304 (D. Mass. 2021) (denying leave to amend after granting motion to dismiss); *100 Orchard St., LLC v. Travelers Indem. Ins. Co. of Am.*, 542 F. Supp. 3d 227, 231 (S.D.N.Y. 2021) (same); *SA Hosp. Grp., LLC v. Hartford Fire Ins. Co.*, 542 F. Supp. 3d

32

148, 161 (D. Conn. 2021) (granting motion to dismiss and finding that "leave to amend would be futile"), *aff'd*, 2022 WL 815683 (2d Cir. Mar. 18, 2022).

## V.   <u>CONCLUSION</u>

For all the foregoing reasons, Great Northern's motion to dismiss should be granted with prejudice and without leave to amend.


Dated: May 2, 2022                          Respectfully submitted,


                                            */s/ Dana M. Horton*
                                            Dana M. Horton (R.I. Bar No. 6251)
                                            dhorton@rc.com
                                            Daniel F. Sullivan (R.I. Bar No. 8169)
                                            dsullivan@rc.com
                                            Robinson & Cole LLP
                                            One Financial Plaza, 14th Floor
                                            Providence, RI  02903
                                            Tel.: (401) 709-3352
                                            Fax: (401) 709-3399

                                            Richard B. Goetz (*pro hac vice*)
                                            rgoetz@omm.com
                                            O'Melveny & Myers LLP
                                            400 South Hope Street
                                            Los Angeles, CA 90071
                                            Tel.: (213) 430-6400
                                            Fax: (213) 430-6407


                                            *Attorneys for Defendant Great Northern
                                            Insurance Company*

**<u>CERTIFICATE OF SERVICE</u>**

I, Dana M. Horton, hereby certify that this document filed through the ECF system will

be sent electronically to the registered participants as identified on the Notice of Electronic Filing

(NEF) and paper copies will be sent to those indicated as non-registered participants on May 2,

2022.


<u>*/s/ Dana M. Horton*</u>
Dana M. Horton